# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Appellant*,

v.

ZENTIAN LTD.,

*Appellee*.

Appeal from the U.S. Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2023-00036, IPR2023-01195

## APPLE INC.'S OPENING BRIEF

BITA RAHEBI
REBECCA E. WEIRES
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

ROMAN A. SWOOPES
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

BRIAN R. MATSUI
SETH W. LLOYD
NOAH PRILUCK
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

*Counsel for Appellant Apple Inc.*

JANUARY 23, 2025

# '789 Patent Claim 1

**1.** An acoustic coprocessor for processing data associated with an audio signal, comprising:

> a first interface for receiving at least one feature vector, wherein the feature vector is determined from the audio signal;
>
> an acoustic model memory for storing an acoustic model defining a plurality of acoustic states;
>
> a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and respective acoustic states of the acoustic model read from the acoustic model memory; and
>
> a second interface for sending at least one distance calculated by the calculating apparatus;
>
> wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit.

# CERTIFICATE OF INTEREST

Counsel for Apple Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.      **Represented Entities**.  Provide the full names of all entities represented by the undersigned counsel in this case.

Apple Inc.

2.      **Real Parties in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list real parties if they are the same as the entities.

None.

3.      **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4.      **Legal Representatives.**  List all law firms, partners, or associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

ERISE IP, P.A.: Jennifer C. Bailey, Adam P. Seitz, Kevin Rongish, Christina Canino

5.      **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes, see separately filed notice.

6.      **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  January 23, 2025                          /s/ Brian R. Matsui
                                                                Brian R. Matsui

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......................................................................i

TABLE OF AUTHORITIES .........................................................................v

STATEMENT OF RELATED CASES ............................................. viii

JURISDICTIONAL STATEMENT ................................................. viii

INTRODUCTION ......................................................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE....................................................................3

    A.    Prior-Art Speech Recognition Systems Taught Integrating Processors With Memory On The Same Circuit..................................3

    B.    The '789 Patent Claims Center On Known Speech Recognition Technology ..................................................................................7

    C.    The Board Upheld The Subset Of Claims Reciting A "Single Integrated Circuit," And Claim 29, For Which Apple's Showing Of Unpatentability Was Uncontested.....................................................9

        1.    The Board rejected that Smyth alone discloses or suggests the claimed on-chip memory by imposing unclaimed requirements and narrowing the prior art to specific exemplary embodiments ........................................................10

        2.    The Board rejected that Smyth and Mozer together disclose or suggest using a processor with on-chip memory for similar reasons and because a skilled artisan could not personally fabricate an integrated circuit..................11

        3.    The Board sua sponte upheld claim 29, which recites a different "single integrated circuit" limitation..........................13

SUMMARY OF ARGUMENT ........................................................14

STANDARD OF REVIEW ..........................................................15

ARGUMENT ...........................................................................................................16

I. THE BOARD ERRED ON SMYTH ALONE BY IMPOSING A PHYSICAL-COMBINABILITY REQUIREMENT AND SIMILAR LEGALLY FLAWED STANDARDS .........................................................16

    A. Smyth Alone At Least Suggests Putting A Calculating Apparatus And Memory "On A Single Integrated Circuit" ..................................17

    B. The Board Concluded Otherwise Based On Legally Erroneous Standards And Unsupported Findings ................................................21

        1. The Board erred in imposing a memory-capacity requirement and other requirements found nowhere in the claims ......................................................................................21

        2. The Board wrongly failed to consider Smyth for all it teaches and instead focused on bodily incorporation of certain exemplary embodiments ................................................24

II. THE BOARD ERRED ON SMYTH COMBINED WITH MOZER BY AGAIN REQUIRING PHYSICAL COMBINABILITY AMONG OTHER LEGALLY FLAWED REQUIREMENTS.....................................30

    A. Undisputed Facts And Unrebutted Evidence Show That Smyth And Mozer Combined Disclose Putting A Calculating Apparatus And Memory On A Single Integrated Circuit....................................30

    B. The Board Concluded Otherwise Based On Legally Erroneous Standards And Unsupported Findings ................................................33

        1. The Board erred in requiring evidence a skilled artisan could personally fabricate an integrated circuit, a requirement untethered from the claims and the '789 patent disclosure.................................................................34

        2. The Board again erred in restricting prior art to specific embodiments and departing from the claims' breadth .............38

III.  THE BOARD *SUA SPONTE* UPHELD CLAIM 29 BASED ON THE SAME LEGALLY FLAWED REQUIREMENTS AND UNSUPPORTED FINDINGS ................................................................42

CONCLUSION ................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple v. Corephotonics*,
   81 F.4th 1353 (Fed. Cir. 2023) ..................................................................43, 44

*Axonics, Inc. v. Medtronic, Inc.*,
   73 F.4th 950 (Fed. Cir. 2023) ....................................................................22, 35

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ......................................... 16, 22, 24, 25, 26, 28

*CRFD Rsch., Inc. v. Matal*,
   876 F.3d 1330 (Fed. Cir. 2017) .............................................................17, 21, 24

*Enzo Life Scis., Inc. v. Roche Molecular Sys.*,
   928 F.3d 1340 (Fed. Cir. 2019) ..........................................................................37

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) ............................................................................17

*EWP Corp. v. Reliance Universal Inc.*,
   755 F.2d 898 (Fed. Cir. 1985) ............................................................................25

*Fleming v. Cirrus Design Corp.*,
   28 F.4th 1214 (Fed. Cir. 2022) ...........................................................................17

*Genentech, Inc. v. Novo Nordisk A/S*,
   108 F.3d 1361 (Fed. Cir. 1997) ..........................................................................37

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986) ..........................................................................37

*Intel Corp. v. PACT XPP Schweiz AG*,
   61 F.4th 1373 (Fed. Cir. 2023) .....................................................................31, 39

*Intel Corp. v. PACT XPP Schweiz AG*,
   No. 2022-1038, 2023 WL 2198649 (Fed. Cir. Feb. 24, 2023)...........................17

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) ..........................................................40, 41

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
   821 F.3d 1359 (Fed. Cir. 2016) .......................................................16, 22, 35

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ........................................................................17

*In re Magnum Oil Tools Int'l, Ltd.*,
   829 F.3d 1364 (Fed. Cir. 2016) .....................................................43

*In re NuVasive, Inc.*,
   841 F.3d 966 (Fed. Cir. 2016) .......................................................16

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
   993 F.3d 1374 (Fed. Cir. 2021) .....................................................35

*Sony Interactive Ent. LLC v. Intell. Pixels*,
   No. 2022-2118, 2023 WL 6773879 (Fed. Cir. Oct. 13, 2023) ....................25, 27

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
   511 F.3d 1186 (Fed. Cir. 2008) .....................................................37

*Uber Techs., Inc. v. X One, Inc.*,
   957 F.3d 1334 (Fed. Cir. 2020) .....................................................37, 38

**Statutes**

5 U.S.C. § 554(b)(3)........................................................................43

5 U.S.C. § 554(c)(1)........................................................................43

28 U.S.C. § 1295(a)(4)(A) ............................................................ viii

35 U.S.C. § 6(b)(4)........................................................................ viii

35 U.S.C. § 103 ............................................................................36

35 U.S.C. § 141(c) ........................................................................ viii

35 U.S.C. § 311 ............................................................................ viii

**Other Authorities**

37 C.F.R. § 90.3(a)(1) ........................................................................ viii

## STATEMENT OF RELATED CASES

No appeal from the same Patent Trial and Appeal Board proceedings between Apple Inc. and Zentian Ltd. on U.S. Patent No. 10,839,789 has previously been before this or any other appellate court.

The '789 patent is at issue in *Zentian Ltd v. Apple Inc.*, No. 3:23-cv-02921 (N.D. Cal.), which thus may be directly affected by this Court's decision in this appeal.

The '789 patent was previously at issue in *Zentian Ltd v. Apple Inc.*, No. 6:22-cv-00122 (W.D. Tex.), which was transferred to the Northern District of California as case No. 3:23-cv-02921.

The '789 patent was previously at issue in *Zentian Ltd v. Amazon.com, Inc.*, No. 6:22-cv-00123 (W.D. Tex.), which terminated November 20, 2024.

## JURISDICTIONAL STATEMENT

The Board issued a final written decision on June 11, 2024, in case Nos. IPR2023-00036 and IPR2023-01195. Appx1-66. Apple timely appealed on August 12, 2024. Appx571-573; 37 C.F.R. § 90.3(a)(1).

The Board had jurisdiction over both proceedings under 35 U.S.C. §§ 6(b)(4) and 311. This Court has jurisdiction over Apple's appeals under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

The Board legally and factually erred in upholding the challenged claims. It required Apple to address unclaimed requirements. It applied a legally erroneous standard focused on select prior-art embodiments without considering what the art teaches as a whole. And without adequate explanation, the Board extended its flawed analysis to a meaningfully different claim that Zentian never contested.

The '789 patent claims an allegedly inventive speech recognition "coprocessor for processing data" used in speech recognition. But as the Board found and Zentian never contested, almost nothing about that coprocessor was new—not its basic components like a processor and memory for storing speech model data, nor its recited functionality. Zentian's only dispute at the Board was over a small subset of claims based on a single limitation: a requirement that a claimed processor and memory be integrated on a "single integrated circuit."

Nothing about that "integrated circuit" requirement supports patentability here. It is undisputed that integrated circuits with both a processor and on-board memory were well-known, as were the benefits of that configuration. Yet the Board thought more was required to prove obviousness. Although the claims recite no specific hardware or memory capacity, the Board rejected Apple's challenge because of an alleged lack of proof that a specific commercial processor had a large enough memory capacity to store one specific large-vocabulary speech model.

Applying that analysis, the Board thought there would have been something nonobvious about having an on-chip integrated memory with a capacity of 4.7 kilobytes compared with the 4-kilobyte capacity mentioned in one prior art reference. And the Board reasoned that the claims would have been nonobvious because skilled workers in the field of speech recognition could not personally fabricate an integrated circuit with both a processor and memory.

None of that analysis comports with settled obviousness standards or is reasonably supported by this record. The claims lack the requirements the Board demanded Apple prove are disclosed in the prior art. And the Board failed to consider that art for all it teaches, which goes well beyond the specific exemplary embodiments on which the Board focused.

Under the correct legal standards, the essential elements of obviousness are undisputed. The Board's determinations of no unpatentability should be reversed, or at a minimum vacated and remanded to consider any unresolved issues on obviousness under the correct legal standards.

## STATEMENT OF THE ISSUES

1. Whether, in upholding claims 1-2, 4, 6-9, 11, and 24 despite unrebutted evidence that Smyth alone discloses and at least suggests integrating a processor and memory on a single circuit, the Board failed to consider Smyth for all it teaches and added new requirements to the claims.

2. Whether, in upholding the same claims over similarly unrebutted evidence from Smyth and Mozer, the Board repeated similar errors and also wrongly required evidence a skilled artisan could personally fabricate an integrated circuit.

3. Whether the Board erred in upholding claim 29 by importing its flawed analysis from the other claims even though that analysis was based on a different claim limitation and Zentian did not even contest claim 29's unpatentability.

## STATEMENT OF THE CASE

### A. Prior-Art Speech Recognition Systems Taught Integrating Processors With Memory On The Same Circuit

Speech recognition refers to technology that allows computers to recognize the words in human speech. Appx920-921(¶28). Speech recognition systems were known and widely used before the priority date of the '789 patent—by the 1990s, speech recognition was supported on desktop workstations and to automate operator services on telephone networks. Appx920-921(¶28); Appx1637; Appx1162-1163.

In general, speech recognizers at the time of the invention operated in a known manner. *See* Appx920-974(¶¶27-104). First, a speech recognizer receives a user's speech as an audio signal. The audio signal is digitized and split apart or "partitioned" into a set of short-duration "frames." Appx1198; Appx101(col.12:52-57); Appx1115(col.5:1-5). Each frame is then encoded as a set of numbers that represent aspects of the user's speech. Appx921-923(¶30), Appx929-930(¶36). This set of numbers is often called a "feature vector." Appx929-930(¶36). Next,

the feature vector is compared to a set of "templates" (also called "models" or "states") stored in memory.  Appx921-923(¶30); Appx98(col.6:29-31).  Each template is a set of numbers representing a sound or a word in the recognizer's vocabulary. Appx921-923(¶30).  The speech recognizer calculates how different the feature vector is from each template.  Appx921-923(¶30), Appx947(¶60).  The calculated difference is referred to as a "distance" between the feature vector and the template.  Appx947(¶60).  Using these distance scores, the speech recognizer determines which word or sound in the recognizer's vocabulary best matches what the user said.  Appx921-923(¶30).

Three prior-art references related to speech recognition are most relevant to Apple's appeal:  U.S. Patent No. 5,819,222 to Smyth (Appx1106-1119); U.S. Patent No. 6,832,194 to Mozer (Appx3076-3090); and U.S. Patent No. 6,959,376 to Boike (Appx1120-1126).

**Smyth**:  Smyth discloses dividing speech recognition across a variety of programmable devices, using the general structure depicted in Fig.2:



Fig. 2

Appx1107, Appx1115(col.5:1-18); Appx969(¶92). Smyth's system includes a "classifier 34" that computes distances using a "classifying processor" and "state memory." Appx1012-1017(¶¶155, 158); Appx1115(col.5:55-col.6:4). The classifying processor compares features from the input audio to templates stored in the state memory. Appx1015-1017(¶158) (citing Appx1115(col.5:63-col.6:4)).

Smyth teaches a range of hardware options for the classifying processor and state memory. The "classifying processor 341 may be" a "digital signal processing (DSP) device (such as the Motorola DSP 56000, or the Texas Instruments TMC C 320) or similar device." Appx1115(col.5:49-53, col.6:5-8); Appx1022-1023(¶165). The "state memory" may store templates for a few sounds or the sounds of an entire language. *See* Appx1115(col.5:58-62); Appx3380(Tr.76:7-23); Appx937(¶¶44-45). Smyth starts with an exemplary system "allowing for the recognition of a three-digit string, the recognisable digits being 1, 2, 3, 4." Appx1117(col.9:23-25). Smyth also

5

acknowledges more complex models for larger vocabularies, noting that an "operative speech recogniser is likely to have a larger recognition capability." Appx1117(col.9:25-28); *see* Appx3380(Tr.76:7-23) (Zentian's expert noting the correspondence between vocabulary and number of states stored in memory).

*Mozer:* Mozer discloses offloading computationally intensive speech recognition to a dedicated "audio recognition peripheral integrated circuit." Appx3076(Abstract), Appx3079(Fig.4), Appx3084(col.7:53-58); Appx1023-1024(¶166). Mozer's integrated circuit includes a "vector processor" that, like Smyth's classifying processor, calculates distances between a feature vector and template. Appx3084-3085(col.7:38-39, col.9:22-26, col.10:7-12); Appx1023-1024(¶166). And like Smyth's state memory, Mozer includes a memory that holds templates; Mozer expressly describes this memory as part of the same integrated circuit or chip as the processor. Appx3084-3085(col.7:38-39, col.10:17-21); Appx1023-1024(¶166).

*Boike:* Boike also teaches integrating components on the same chip and describes advantages of that approach. Appx972(¶100); Appx1120-1123(Abstract, col.1:6-8). For example, Boike teaches putting multiple "digital signal processors (DSPs)" onto one "system-on-a-chip (SoC) integrated circuit." Appx1121-1123(Fig.1, col.2:52-54); Appx958-960(¶75). "Each DSP includes its own memory unit." Appx1123(col.2:8); Appx1026-1027(¶168), Appx1067-1069(¶230). Boike

explains that such a design choice can reduce the "amount of space on a circuit board taken up" and reduce the electrical energy wasted "by the random access memory," "particularly by the input/output ports." Appx1123(col.1:19-42, col.2:21-35); Appx958-960(¶75).

## B. The '789 Patent Claims Center On Known Speech Recognition Technology

The '789 patent purports to describe a new "acoustic coprocessor" for speech recognition. Appx67(Abstract). The Abstract highlights that the allegedly inventive co-processor includes "an interface for receiving" data, a "calculating apparatus for calculating distances" used in speech processing, an "acoustic model read from an acoustic model memory," and an additional interface "for sending" data. Appx67(Abstract). The specification focuses on these same features, describing a "calculating apparatus" or "distance calculation engine" and an "acoustic model memory" for storing data used in those calculations. Appx98(col.6:58-66), Appx107(col.24:26-31), Appx108(col.26:42-46).

At the Board, Zentian abandoned any suggestion that a co-processor with these features was patentable. *See* Appx471-491; Appx436-453. Zentian thus did not dispute Apple's showing that claim 10, which recites a co-processor with each of these features, was unpatentable for obviousness based on the combination of Smyth and Mozer. Appx39-41. Instead, and as shown by comparing claims 1 and

10 in the chart below, the only dispute at the Board was over a requirement of some claims that a calculating apparatus and memory be "on a single integrated circuit":

| Claim 1 | Claim 10 |
|---|---|
| 1. An acoustic coprocessor for processing data associated with an audio signal, comprising:<br><br>a first interface for receiving at least one feature vector, wherein the feature vector is determined from the audio signal;<br><br>an acoustic model memory for storing an acoustic model defining a plurality of acoustic states;<br><br>a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and respective acoustic states of the acoustic model read from the acoustic model memory; and<br><br>a second interface for sending at least one distance calculated by the calculating apparatus;<br><br>*wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit.* | 10. An acoustic coprocessor, comprising:<br><br>a first interface for receiving at least one feature vector;<br><br>a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and at least one acoustic state of an acoustic model read from an acoustic model memory; and<br><br>a second interface for sending at least one distance calculated by the calculating apparatus. |

Appx114-115(col.38:55-col.39:2, col.39:39-46); Appx472.

The '789 patent provides little discussion of that "single integrated circuit" limitation. According to the patent, an "acoustic model memory" is just regular data-

storage memory used to store the data for an acoustic model.  Appx115(col.39:6-7) ("acoustic model memory" can be standard "FLASH memory"), Appx115(col.40:26-29) ("acoustic model memory" can be standard "static random access memory (SRAM)").  The patent explains that any memory can be used:  an "acoustic model memory" may be "a dedicated" or "shared off-chip memory" or it may be an "on-chip memory," i.e., on the same integrated circuit as the processor that performs distance calculations.  Appx98(col.5:13-20), Appx108(col.26:42-51), Appx112-113(col.34:56-col.35:6).    The specification leaves the details of implementing any of these scenarios to the skilled artisan, explaining without more that "[t]he system may be implemented in any combination of hardware or software."  Appx107(col.24:43-44).  The specification asserts generally that using "an on-chip memory" may "maximize bandwidth and minimize power consumption," with no details of how to achieve those benefits nor any suggestion achieving them depends on any implementation details.  Appx108(col.26:47-49).

### C. The Board Upheld The Subset Of Claims Reciting A "Single Integrated Circuit," And Claim 29, For Which Apple's Showing Of Unpatentability Was Uncontested

After Apple successfully petitioned for *inter partes* review of claims 1-2, 4, 6-14, 16-18, 20-29, 35, 37-39, and 42-45, Zentian defended only claims 1-2, 4, 6-9, 11, and 24; Apple's showing of unpatentability on all other claims was uncontested.  Appx471-491.  For the small subset of contested claims, Zentian's sole argument

was that the prior art did not teach or suggest combining a calculating apparatus and memory "on a single integrated circuit." Appx471-491. The Board ultimately agreed with Zentian on that limitation, and it also *sua sponte* upheld claim 29, the unpatentability of which Zentian never contested because the claim lacks the same "single integrated circuit" limitation as the only claims Zentian contested. Appx1-66.

### 1. The Board rejected that Smyth alone discloses or suggests the claimed on-chip memory by imposing unclaimed requirements and narrowing the prior art to specific exemplary embodiments

Apple's petition showed that Smyth alone discloses or at least suggests a processor with on-chip memory as claimed—i.e., a calculating apparatus and acoustic memory model "fabricated on a single integrated circuit." Smyth teaches implementing its calculating apparatus, which Smyth calls a "classifying processor," using a variety of hardware. Appx167-169; Appx1115(col.5:49-53, col.6:5-8). Smyth gives as one example a digital signal processor (DSP) integrated circuit with on-chip memory. Appx167-169. And Smyth at least suggests storing data—like the acoustic model its calculating apparatus needs to access—using that on-chip memory. Appx167-169. Apple explained that it thus would have been obvious for an integrated circuit that already housed the calculating apparatus to also hold the acoustic model memory. Appx169.

The Board rejected Apple's position. The Board thought the only question for obviousness was whether one exemplary circuit in Smyth—the DSP56000—could bodily incorporate one exemplary acoustic model requiring 4,800 bytes of memory. Appx25. Applying that standard, it disagreed with Apple's challenge because "the available memory on the DSP56000 of 1.5 kilobytes would have been too small to store" a model "requir[ing] 4,800 bytes of memory." Appx25. For that reason, the Board determined that Apple "has not shown that processor 341 of Smyth and state memory 342 of Smyth, which Petitioner maps to the claimed 'acoustic model memory,' could have both been on the DSP of Smyth." Appx25.

### 2. The Board rejected that Smyth and Mozer together disclose or suggest using a processor with on-chip memory for similar reasons and because a skilled artisan could not personally fabricate an integrated circuit

The Board also rejected Apple's alternative showing that a calculating apparatus and acoustic model memory on a "single integrated circuit" would have been obvious over the combined teachings of Smyth and Mozer. Apple's obviousness challenge relied on Mozer's disclosure of storing data (like speech templates) in on-chip "memory 460" for distance calculations. Appx169-170. Apple pointed to Zentian's expert's testimony recognizing the efficiency gains from using memory on the same integrated circuit as a processor. Appx377-379; Appx170-173. Given that evidence and more, combining Smyth's and Mozer's teachings would have been nothing more than applying a known technique—using

a memory and processor fabricated on a single integrated circuit—to address a known problem. Appx170-173.

The Board rejected Apple's challenge based on the specific storage capacities of memories disclosed in the prior art and whether those memories could store a *particular* acoustic model. According to the Board, Apple's challenge failed because Apple did not show "how Smyth's state memory," of "at least 4.7 kilobytes, would have been stored in Mozer's 4 kilobytes of memory." Appx30. Although it was undisputed that Smyth teaches the claimed "acoustic model memory," the Board also thought it mattered whether Mozer "teaches the claimed acoustic model memory." Appx30-31. And the Board refused to hold the claims unpatentable because Apple had not shown that an ordinarily skilled artisan in the field of speech recognition would have been personally capable of "fabricating an integrated circuit." Appx29.

The Board also addressed Apple's evidence of motivation to combine. But rather than make findings about whether a skilled artisan would have appreciated the advantages of on-chip memory, the Board just repeated its unclaimed memory-size requirements. Appx35-38. The Board explained that any known "advantages from a" single integrated circuit "do not show that any of the prior art integrated circuits relied on in the Petition would have been able to store Smyth's state memory." Appx35-36, 38. And without disagreeing with Zentian's admissions about known

benefits of integrating elements onto a single circuit, the Board dismissed these admissions because Zentian and its expert consistently maintained that the specific combination here was "unknown in the prior art."  Appx35-36, Appx38.

### 3. *The Board* sua sponte *upheld claim 29, which recites a different "single integrated circuit" limitation*

Claim 29 requires a different set of elements on a single integrated circuit.  It recites: "The speech recognition system of claim 28, wherein the acoustic coprocessor *and the at least one processor* are fabricated on a single integrated circuit."  Appx115(col.40:55-57) (emphasis added).  Zentian did not contest Apple's showing of obviousness for claim 29.  Appx474 (addressing only "the 'single integrated circuit' requirement of claims 1-9, 11, and 24"); Appx453.

Yet the Board upheld claim 29 based on arguments Zentian never raised.  Appx56-57.  The Board first relied on its upholding of claim 1 even though claim 29 depends from claim 28 and other claims that the Board found unpatentable.  Appx56-57.  Overlooking that claim 29 recites different limitations from claim 1's integrated-memory limitation, the Board reiterated that "the Petition has not shown that any of the integrated circuits cited in the Petition would have had enough memory to include both classifier processor 341 and state memory 342."  Appx56.  The Board also again pointed to the alleged level of skill in the art as purportedly not including the ability to "fabricat[e] an integrated circuit."  Appx56.  Going further, the Board stated that the petition should have explained how the prior-art

memories "would have been large enough to store" other components recited in the claims from which claim 29 depends, all of which the Board had already concluded would have been obvious. Appx56-57.

## SUMMARY OF ARGUMENT

I. Apple addressed every recited element of the "single integrated circuit" limitation at issue, and Zentian's own expert admitted the advantages of combining the elements on a single integrated circuit. But the Board demanded more than the claims require. The claims recite no model size or specific hardware, yet the Board rejected Apple's argument for lack of proof that a specific large-vocabulary model in the prior art could fit onto the available memory of the Motorola DSP56000 chip. The Board's blinkered focus on bodily incorporating one exemplary prior art embodiment into another contravenes settled law that prior art is to be considered for all it teaches. The Board also erred in demanding Apple prove the obviousness of requirements—like specific memory capacities—recited nowhere in the challenged claims.

II. The Board's decision repeated many of the same errors and more in upholding the claims over Smyth and Mozer. The Board again limited its inquiry to exemplary models and hardware in the prior art, requiring an accounting of how Smyth's large-vocabulary model would physically fit in an exemplary prior-art memory. The Board further rejected Apple's combination on the basis that a skilled

artisan could not personally fabricate an integrated circuit. But the apparatus claims here do not limit how or by whom the single integrated circuit is fabricated, so Apple bore no burden to prove what the Board required. And the patent here says nothing about how to fabricate an integrated circuit or even how to integrate memory onto the same chip as the processor—it simply presents the location of the memory on-chip as the alternative to the only other option, off-chip. The Board erred by demanding more of the prior art than the '789 patent itself discloses.

III. The Board erred in upholding claim 29 despite Zentian's entire abandonment of that claim. The Board was wrong in its rote extension to claim 29 of its analysis from the other claims because that analysis was based on a claim limitation that claim 29 lacks. Regardless, that analysis is just as wrong for claim 29 as it is for the other claims. At the least, the Board failed to give Apple the notice and opportunity to respond required by the Administrative Procedure Act when it *sua sponte* raised and decided issues related to requirements unrecited in claim 29, requiring at least vacatur and a remand.

## STANDARD OF REVIEW

"Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, the motivations to modify or combine prior art, and any objective

15

indicia of non-obviousness." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

This Court "review[s] the Board's compliance with the governing legal standards de novo and its underlying factual determinations for substantial evidence." *Id.* For example, this Court reviews de novo "whether the Board failed to consider the appropriate scope of the patent's claimed invention in evaluating the reasonable expectation of success." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366-67 (Fed. Cir. 2016) (cleaned up).

This Court reviews de novo the Board's compliance with the legal requirements of the Administrative Procedure Act, including notice and an opportunity to respond. *In re NuVasive, Inc.*, 841 F.3d 966, 970-71 (Fed. Cir. 2016).

## ARGUMENT

## I. THE BOARD ERRED ON SMYTH ALONE BY IMPOSING A PHYSICAL-COMBINABILITY REQUIREMENT AND SIMILAR LEGALLY FLAWED STANDARDS

Apple's petition showed that Smyth alone at least suggests integrating a calculating apparatus and acoustic model memory on a single circuit, as claimed. The Board erred in at least two ways in concluding otherwise. First, it imposed unclaimed requirements, like demanding proof of an existing integrated circuit with 4.7 kilobytes of available memory to store a large acoustic model, none of which is required by the claims. Second, and independently, the Board departed from this

Court's precedent by failing to consider Smyth for all it teaches, instead constraining its analysis to one exemplary integrated circuit and to a model larger than the ones on which Smyth focuses. Either error warrants reversal, whether viewed as legal errors reviewed de novo or factual errors unsupported by the record.

**A. Smyth Alone At Least Suggests Putting A Calculating Apparatus And Memory "On A Single Integrated Circuit"**

Obviousness is judged from the perspective of a person of ordinary skill, who "is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). So "it is appropriate to consider the knowledge, creativity, and common sense of a skilled artisan in an obviousness determination." *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1223 (Fed. Cir. 2022). And it is necessary to consider not merely what the art literally discloses but also what it "*suggests*." *CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1347 (Fed. Cir. 2017) (Court's emphasis). An obviousness analysis thus must go beyond merely considering whether one element expressly disclosed in a reference could be jammed to fit with another expressly disclosed element: "the test for obviousness is 'not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole.'" *Intel Corp. v. PACT XPP Schweiz AG*, No. 2022-1038, 2023 WL 2198649, at *3 (Fed. Cir. Feb. 24, 2023) (quoting *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc)).

Here, Zentian did not dispute that Smyth alone teaches both the claimed calculating apparatus and acoustic model memory. Appx472, Appx477-491 (patent owner's response). Specifically, Smyth teaches a "classifier" that receives speech data and calculates probabilities using a model to recognize what a user has spoken. Appx1115(col.5:1-15, col.5:54-67). The classifier includes two components: a "classifier processor" and a "state memory." Appx1115(col.5:1-15, col.5:55-57); Appx40. Both are illustrated, with the combined classifier unit shown as item 34 on the left and the processor 341 and memory 342 within that classifier shown on the right:



Appx1107(Fig.2), Appx1108(Fig.3). It is undisputed that Smyth's "classifier processor" falls within the scope of the claimed calculating apparatus and Smyth's "state memory" falls within the scope of the claimed "acoustic model memory"; the Board never found otherwise. *See* Appx40 (finding similar limitations of claim 10

18

met by Smyth). Thus, the only question was whether Smyth discloses or suggests combining its processor and memory "on a single integrated circuit." Appx17 (Board recognizing this is sole dispute).

Smyth's plain teachings and unrebutted evidence answer that question and show Smyth does disclose or at least suggest that limitation. In addition to Smyth's express depiction in Figure 2 and description of its processor and memory as being joined to form a single "classifier," Smyth expressly states that the processor in its system can be "a suitably programmed digital signal processing (DSP) device." Appx1115(col.5:55-col.6:8). Smyth teaches that a suitable DSP could be "the Motorola DSP56000" "or similar device." Appx1115(col.5:49-53, col.6:5-8). As was undisputed, the Motorola DSP56000 combines "a core processor, RAM, ROM, peripheral interfaces, and a memory expansion interface on a single, 88-pin chip." Appx1133. RAM (random access memory) and ROM (read-only memory) are both types of memory. Thus as Apple's expert Mr. Schmandt confirmed, DSP56000 "provides both memory and a processor fabricated on a single integrated circuit." Appx1022-1023(¶165); Appx1133, Appx1138; *see* Appx479-481(acknowledging memory of digital signal processor disclosed in Smyth). Other "similar device[s]" (Appx1115(col.5:49-53)) with processors and memory integrated on the same circuit were well known. Appx953-961(¶¶70-76); Appx1123(col.2:52-63).

The teachings of Smyth thus are straightforward. Smyth teaches a single unit (classifier) integrating a calculating apparatus (classifier processor) and acoustic model memory (state memory); it identifies one commercially available device with a processor and integrated on-chip memory; and it makes clear that "similar device[s]" could be used. Appx1115(col.5:1-15, col.5:49-col.6:8). Those teachings are more than enough to disclose—or at least suggest—to those in the field using a single integrated circuit containing both Smyth's classifier processor and its state memory. That is especially true because Smyth never says to locate its state memory on a *separate* integrated circuit from its classifier processor or discloses such an embodiment. Appx1115(col.5:1-15, col.5:49-col.6:8). The Board did not find otherwise or identify any teaching away when it noted that Smyth discloses putting processor 341 on one of the exemplary integrated circuits but does not specify that state memory 342 is also there. Appx17-18.

Plus, as Zentian's own expert admitted when discussing processors from Motorola at the time of Smyth, the reason for including on-chip memory with a processor was well known: "Motorola had one of the top DSPs on the market in terms of performance. And they put memory on the chip so that you could do some operations more quickly." Appx3383(Tr.79:11-14). That is one of the same benefits the '789 patent purported to identify for on-chip memory later, to increase speed by "maximiz[ing] bandwidth." Appx108(col.26:47-49). Although the Board noted that

Zentian's expert disputed whether "putting an acoustic model memory on the same integrated circuit as a calculating apparatus" was known, the Board did not contradict what the expert's testimony plainly admitted—skilled artisans understood the benefits of using on-chip memory. Appx19-20 (citing Appx3383(Tr.79:11-14)).

These undisputed facts support only a conclusion of obviousness. *CRFD*, 876 F.3d at 1347 (reversing where "Board failed to consider whether [prior art] *suggests*" allegedly missing limitation; Court's emphasis)).

**B. The Board Concluded Otherwise Based On Legally Erroneous Standards And Unsupported Findings**

The Board upheld the claims despite Smyth's plain teachings by imposing a memory-capacity requirement found nowhere in the claims and limiting its obviousness inquiry to Smyth's specific example of the Motorola DSP56000 without considering what Smyth would have suggested. Appx16-25. The Board's legally flawed and factually unsupported reasoning should be reversed.

*1. The Board erred in imposing a memory-capacity requirement and other requirements found nowhere in the claims*

Despite Smyth's plain disclosures, the unrebutted evidence, and Zentian's expert's admissions, the Board upheld the claims because it believed Apple failed to meet "the burden of showing that the available memory in the integrated circuit of Smyth is large enough to store Smyth's acoustic model" and "not just two acoustic states of Smyth's model." Appx21. The Board agreed with Zentian "that the 1.5

kilobytes of RAM available on the DSP56000 could not store Smyth's acoustic model," which the Board estimated to require "4.7 kilobytes of memory." Appx23, Appx25.

That was legal error. The challenged claims lack the available-memory requirements the Board demanded that Apple prove are disclosed in the prior art. "[T]he claim defines the invention whose obviousness is being assessed." *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 957 (Fed. Cir. 2023). The Board thus errs when it "misconstrues the claim[s]" and imposes on the prior art requirements inconsistent with the challenged patent's own description of the invention. *Belden*, 805 F.3d at 1077. Whether the Board commits such a legal error is a de novo question for the Court. *Intelligent Bio-Sys.*, 821 F.3d at 1366-67.

In *Belden*, the claims related to solving an alignment problem when manufacturing cables, and they included a requirement to "jacket[] the closed cable." 805 F.3d at 1068. In upholding the claims, the Board faulted the challenger for lacking evidence or explanation about *insulated* jackets. *Id.* at 1077 But "[t]he claim language concerning the final jacketing step does not require that the jacket be insulating." *Id.* Nor did the patent's specification suggest such a requirement in describing the invention. *Id.* The Court thus rejected the Board's demand for evidence about insulation and reversed the Board's conclusion of nonobviousness. *Id.* at 1077, 1082.

22

The Board's reasoning is similarly flawed here. In reciting the "memory" that must be "on a single integrated circuit" with the calculating apparatus, claim 1 simply requires "memory for storing an acoustic model defining a plurality of acoustic states." Appx114-115(col.38:55-col.39:2). That text does not impose any capacity requirement like the ones the Board relied on. Appx114-115(col.38:55-col.39:2). It requires no specific structure at all, beyond "memory." Appx114-115(col.38:55-col.39:2). Instead, it recites a function, and a broad one, merely requiring memory that can store data for an acoustic model with at least two states. Appx20-21 (Board recognizing same). Other claims are similar, such as claim 23 which recites that "the acoustic model memory includes a plurality of storage locations," without setting any lower limit besides at least two. Appx115(col.40:26-28). And far from describing the claimed invention as requiring a specific memory capacity, the specification does the opposite, explaining that acoustic model data "may be optionally stored in a compressed format" to fit within an acoustic model memory that is *smaller* than the model itself. Appx97(col.4:49-50).

Simply, nothing in the claim text nor the '789 patent supports distinguishing the claims here from Smyth because Smyth purportedly fails to disclose or suggest an integrated memory with the capacity the Board demanded. In response to Apple's showing of obviousness, Zentian offered no evidence that the memories Smyth

discloses or suggests would be insufficient to store compressed acoustic model data for a model having at least two states. *See* Appx3300-3301(¶7) (Apple's expert estimating 32 bytes per state); Appx3845-3846(¶43) (Zentian's expert estimating 320 bytes per state); Appx97(col.4:49-50) ('789 patent allowing the model to further be "stored in a compressed format"). On the contrary, even the "1.5 kilobytes" the Board attributed to one specific example in Smyth would have been more than enough based on Zentian's own expert's statements. Appx3845-3846(¶43); Appx3380(Tr.76:7-23) (Smyth's "abbreviated model" is "why Smith could do the type of recognition he did.").

### 2. The Board wrongly failed to consider Smyth for all it teaches and instead focused on bodily incorporation of certain exemplary embodiments

The Board compounded its error with another: it narrowly considered only certain express disclosures from Smyth and not what Smyth as a whole would have suggested to an ordinary artisan.

In an obviousness analysis, a "reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." *CRFD*, 876 F.3d at 1349. *Belden* is again on point. 805 F.3d at 1076. There, a prior art reference taught a technique for aligning conductors in a cable, giving an example using uninsulated wire. *Id.* In considering the reference, the Board considered only its application for uninsulated-wire usages, refusing to consider applying the

reference's teachings to use with insulated cables. *Id.* This Court held that was "legal error[]"—the "alignment problem" that the reference addressed and the "solution" it taught "do not depend on whether the wires are insulated." *Id.* at 1075-76. The correct obviousness analysis required considering the reference "for everything it *teaches* by way of technology," not simply for the specific examples given to illustrate those teachings. *Id.* (Court's emphasis).

Such an error is particularly clear when a reference expressly states that its teachings apply more broadly yet the Board fails to apply that breadth. *See Sony Interactive Ent. LLC v. Intell. Pixels*, No. 2022-2118, 2023 WL 6773879, at *4 (Fed. Cir. Oct. 13, 2023); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (finding error in "trial court's disregard of the clear *teaching* of the German patent to corrugate or crimp wires"; Court's emphasis). The prior art reference in *Sony* had broadly defined "game" to encompass video games with pre-loaded images as well as games creating new images. 2023 WL 6773879, at *4. Yet the Board refused to credit the broader teaching because the reference's "detailed examples" were limited to embodiments with pre-loaded images. *Id.* This Court rejected that reasoning for incorrectly "narrow[ing] the disclosure" of the prior art. *Id.*

The Board committed the same errors here when it limited its analysis to a subset of the models and hardware Smyth expressly discloses and refused to consider

everything Smyth teaches "by way of technology." *Belden*, 805 F.3d at 1076. Relying on Mr. Schmandt's estimates for a large-vocabulary acoustic model, the Board reasoned that "the acoustic model of Smyth requires 4,800 bytes of memory," so "the available memory on the DSP56000 of 1.5 kilobytes would have been too small to store the acoustic model." Appx25, Appx23. But that was doubly flawed—it wrongly limits Smyth to only its specific mention of the DSP56000, and it further narrows Smyth only to teachings related to large-vocabulary models.

Smyth is not so limited, and the Board legally and factually erred in constraining its teachings in those ways. To start, Smyth itself discloses that its "classifier processor 341" may take different forms. The processor "*may* be" a "digital signal processing (DSP) device" "*or* similar device." Appx1115(col.5:49-53, 6:5-8) (emphasis added). Smyth offers examples of suitable DSP devices "*such as* the Motorola DSP 56000, *or* the Texas Instruments TMC C 320." Appx1115(col.5:49-53) (emphasis added). Apple and its expert directed the Board to this breadth. Appx1022-1023(¶165) ("classifier processor 341 *may* be a DSP (*e.g.*, Motorola DSP56000)." (emphasis added)); Appx167 ("Smyth teaches the classifier processor 341 *may* be a DSP, *such as* the Motorola DSP56000." (emphasis added)). Smyth's teachings of a processor with integrated on-chip memory thus go well beyond the particular exemplary hardware, and the Board was obligated to consider those teachings. *Belden*, 805 F.3d at 1077.

Smyth's teachings were similarly broad in the types of acoustic models to which its teachings could be applied. Smyth expressly describes using its technology with an abbreviated model for recognizing digits, while also acknowledging larger models for larger vocabularies. Appx1117(col.9:23-28). It describes an "extremely simple" example with the "recognisable digits being 1, 2, 3, 4." Appx1117(col.9:23-28); Appx167 (relying on Figure 3's "state memory 342"). Zentian's expert acknowledged this disclosure of a smaller "abbreviated model" where fewer states would have to be stored in memory. Appx3380(Tr.76:7-23). The Board was required to consider this breadth in evaluating obviousness. *Sony*, 2023 WL 6773879, at *4.

Instead, the Board refused to consider any smaller acoustic models absent a precise calculation of the memory required to store the abbreviated model. Appx23-25. The Board thus went down the same misguided path as the Board in *Sony*, considering only select teachings. Indeed, the Board's error is even more apparent here because Smyth's examples focus almost entirely on the abbreviated digits model that the Board disregarded. *Sony*, 2023 WL 6773879, at *4. And that error is compounded by the claims' scope because, as the Board acknowledged, claim 1 merely requires an acoustic model to have a "plurality of states," meaning as few as two. Appx20-21; *supra*, Part I.B.1. Although the Board asserted that Apple raised the potential for a smaller acoustic model only at the hearing, that is

incorrect. Appx23-24 (citing Appx536-537(Tr.17:22-18:8)). Apple addressed the issue before the hearing, including in its reply where it cited Zentian's own expert. Appx367-370. And both experts agreed that the capacity required to store an acoustic model in memory would be a function of the number of states and the size of each state, which could vary by model. Appx3300-3301(¶7); Appx3845-3846(¶43).

Nor was the Board correct when it suggested that Apple was somehow raising a new argument about whether "Smyth's processor 341 would be able to operate on only two acoustic states of Smyth's acoustic model." *Contra* Appx20. Apple made no such new argument. Apple's point was that the claims require no specific size of acoustic model and Smyth must be considered for all it teaches, including that it teaches integrating on a single chip a calculating apparatus and memory with capacity to accommodate at least some sizes of acoustic models. Nothing more was required for obviousness of these functionally recited claims. *Belden*, 805 F.3d at 1076.

The Board's errors also cannot be pinned on Apple based on the Board's citations to the petition. The Board said it was considering only the "DSP56000" because that was "the integrated circuit relied on in the Petition." Appx25. It likewise said it was considering only "Smyth's acoustic model" because that was what Apple mapped to the claimed "acoustic model." Appx21. But Apple's petition

expressly pointed to Smyth's broader teachings as supporting the obviousness of integrating an acoustic model memory and processor on the same circuit: "*Smyth* teaches the classifier processor 341 *may* be a DSP, *such as* the Motorola DSP56000"; "a DSP *such as* the Motorola DSP56000 would have had both a calculating apparatus (e.g., processor) and memory (e.g., RAM, ROM) on a single chip"; "*Smyth* teaches an *exemplary* DSP is the Motorola DSP56000." Appx167-169 (emphases added). The petition thus was clear that, just like Smyth itself, the petition was citing the DSP56000 as an example of the type of hardware persons of skill in the art would understand Smyth teaches to use. Appx167-169. Also, the Board acknowledged that "the Petition and Mr. Schmandt map Smyth's *abbreviated* model to the 'acoustic model' as recited in claim 1." Appx24 (emphasis added).

By focusing on the Motorola DSP56000 to the exclusion of other hardware, and the large-vocabulary model to the exclusion of smaller models such as an "abbreviated" digit recognizer, the Board failed to consider Smyth for all it teaches. For this reason, too, the Board's decision should be reversed.

\* \* \*

The Board erred by departing from the claims' breadth while simultaneously narrowing Smyth's teachings. Either error alone warrants reversal given the unrebutted evidence and Zentian's expert's concessions. At a minimum, the Court should remand for the Board to consider obviousness under the correct standard.

## II. THE BOARD ERRED ON SMYTH COMBINED WITH MOZER BY AGAIN REQUIRING PHYSICAL COMBINABILITY AMONG OTHER LEGALLY FLAWED REQUIREMENTS

Although Smyth alone is enough to reverse (*supra*, Part I), the Court should alternatively reverse because the Board committed similar errors in considering the combined teachings of Smyth and Mozer. First, though the claim does not limit how or by whom the single integrated circuit is made, the Board required Apple to prove that a skilled artisan could personally fabricate the circuit. Second, though the claims recite no model or memory capacity, the Board again demanded evidence Smyth's large-vocabulary model could be bodily incorporated into the exemplary integrated memories of Apple's prior art references.

### A. Undisputed Facts And Unrebutted Evidence Show That Smyth And Mozer Combined Disclose Putting A Calculating Apparatus And Memory On A Single Integrated Circuit

Even if Smyth alone were not enough to teach or suggest the single integrated circuit, the added teachings of Mozer and undisputed evidence of motivation to combine require a determination of obviousness.

Smyth undisputedly teaches a calculating apparatus (such as a DSP) and an acoustic model memory. The Board found exactly that in finding claim 10 unpatentable for obviousness. Appx39-41. Mozer adds an express disclosure of combining another exemplary calculating apparatus and associated memory "on one integrated circuit" to "offload" processing operations from a main processing unit.

Appx3085(col.9:16-18, col.10:46-52). Mozer specifically teaches an "audio recognition" integrated circuit that "may also include[] a "vector processor 423 and/or memory 460." Appx3085(col.9:22-24). Just like the claimed calculating apparatus and Smyth's DSP, Mozer's vector processor calculates distances for use in speech recognition. Appx3085(col.9:22-26, col.10:7-12). And like the claimed acoustic model memory and Smyth's state memory, Mozer's memory stores "template[s]" used in calculating those distances. Appx3085(col.10:1-30); Appx1023-1024(¶166); Appx169; Appx114-115(col.38:55-col.39:2). Zentian did not dispute these disclosures. Appx451 (disputing only other issues related to Mozer).

Apple also presented undisputed rationales for applying Mozer's "one integrated circuit" teachings to a system like Smyth's. Those rationales start with Zentian's own expert's admissions—"at the time there was this known problem of wanting to get access to the acoustic model," and "it was known that one way of making a system more efficient[] was to reduce the off-chip memory accesses." Appx3393(Tr.89:3-91:10), Appx3383(Tr.79:11-14). That undisputed evidence of a known problem with a known solution was more than enough. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) ("[I]f there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine."). Yet there was more

here, such as Boike's teachings about the advantages of consolidating components—including processors and memory—onto the same chip to avoid the problem of "[e]lectrical energy" that "tends to be wasted" "particularly by the input/output ports" of separate circuits. Appx1123(col.1:19-42); Appx958-960(¶75), Appx1026-1027(¶168); Appx172-173. Ozcelik similarly teaches the "benefits of integrating multiple functions onto the same chip often include greater performance, lower design and manufacturing costs, reduced component size, and reduced power requirements, among others." Appx2591(col.1:47-51); Appx961(¶76), Appx1026-1027(¶168); Appx172-173. None of these express teachings was disputed. *See* Appx483-486 (disputing different motivation theories).

Apple's evidence further showed a skilled artisan would have reasonably expected success in applying the combined teachings of Mozer and Smyth to arrive at the claimed invention. It was undisputed that integrated circuits with a range of memory and processor configurations were widely known and used in the art. There was Smyth's Motorola DSP56000; Boike's integrated circuit with multiple digital signal processors (each with associated memory) such as the "TMS320VC5441 Fixed-Point Digital Signal Processor"; and Mozer's integrated circuit with both "vector processor" and "memory." Appx958-960(¶75), Appx1023-1024(¶166), Appx1026-1027(¶168); Appx1121-1123(Fig.1; col.1:43-50); *see* Appx489 (Zentian acknowledging "exi[s]ting processor and memory architectures"). And Zentian

itself showed that skilled artisans are regular "consumers of integrated circuits fabricated by others," readily using such circuits to build speech recognition systems. Appx491 (citing Appx3853-3854(¶61)); Appx488-490; Appx906-907(¶¶4, 6). Given the widespread use of integrated circuits combining a processor and memory, persons of skill in the art would have reasonably expected success in applying that same approach to Smyth's teachings related to a classifier processor and state memory. Appx1026-1027(¶168).

The undisputed and clear disclosures of both Smyth and Mozer, the well-known and unrebutted advantages of integrating processors and memory on the same integrated circuit, and the ubiquitous nature of that technology all compelled a conclusion of obviousness.

## B. The Board Concluded Otherwise Based On Legally Erroneous Standards And Unsupported Findings

No law or facts supports the Board's upholding of these claims in the face of the clear and unrebutted evidence of obviousness. The Board primarily rested on its conclusion that "fabricating an integrated circuit" with a processor and memory within the claims' scope "was beyond the level of ordinary skill in the art." Appx26-30, Appx36-39. And the Board also repeated some of its analytical errors from when it examined Smyth alone, such as limiting the prior art's teachings to certain exemplary embodiments while simultaneously distinguishing the claimed invention from the prior art based on unclaimed requirements. Appx26-39. Any of

these errors alone undermines the Board's conclusion of nonobviousness. Combined, they compel reversal.

### 1. The Board erred in requiring evidence a skilled artisan could personally fabricate an integrated circuit, a requirement untethered from the claims and the '789 patent disclosure

The Board's primary rationale for upholding the claims despite Smyth's and Mozer's plain teachings was that Apple failed to show "an ordinary artisan in the field of speech recognition could have fabricated an integrated circuit comprising Smyth's processor 341 and state memory 342 with a reasonable expectation of success." Appx26-30. The Board's rationale went like this: Apple's petition "did not map Smyth's state memory to a memory already fabricated on an integrated circuit" with a processor; hence, Apple's proposed combination of Smyth and Mozer must "require[] fabricating Smyth's processor 341 and state memory 342 onto a single integrated circuit"; yet "a person of ordinary skill in the field of speech recognition would not have been a person of ordinary skill in the field of integrated circuit fabrication," which requires highly "specialized knowledge"; thus because a person of ordinary skill in the field could not personally fabricate such a circuit, combining the prior art's teachings "was beyond the level of ordinary skill" and would have been nonobvious. Appx8-9 (parenthetical omitted); Appx26-30. The Board cited Zentian's expert, who assumed the skilled artisan would need to "use the highly specialized design software and tools that are appropriate for integrated

circuit design" and make their own decisions around "signal routing, clock synchronization, signal integrity, the actual design or selection and use of different libraries, and component sizing." Appx3850-3852(¶55).

That reasoning fails from the get-go because it untethers the obviousness analysis from the scope of the claims. Like obviousness generally, "[t]he reasonable expectation of success requirement refers to the likelihood of success in combining" prior art teachings "to meet the limitations of the claimed invention." *Intelligent Bio-Sys.*, 821 F.3d at 1367; *see Axonics*, 73 F.4th at 957 (same for motivation); *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) (same for whether prior art is sufficiently enabling for obviousness challenge at the Board). Failing " 'to consider the appropriate scope of patent's *claimed invention* in evaluating the reasonable expectation of success' " is " 'legal error.' " *Intelligent Bio-Sys.*, 821 F.3d at 1367 (Court's emphasis; alteration and citation omitted).

Here, the claims lack any requirement for "fabricating" an integrated circuit, as the Board seemed to recognize by never suggesting otherwise. Appx114-115(col.38:55-col.39:2); Appx10, Appx26-30. Rather, these apparatus claims are worded passively, merely requiring a calculating apparatus and memory that "*are fabricated* on a single integrated circuit." Appx114-115(col.38:55-col.39:2) (emphasis added). Nothing about that text restricts who does the fabricating or in what manner they do it, so long as the result is that a calculating apparatus and

memory "are fabricated" on a single circuit.  Appx114-115(col.38:55-col.39:2).  Thus, even Zentian conceded in the context of arguing against reasonable expectation of success that the claims "are system claims that require a single integrated circuit that *has been* fabricated."  Appx486 (emphasis altered).

The Board was wrong in saying that it was free to depart from the claims' scope in its analysis because of Apple's petition.  No authority permits the Board in an *inter partes* review to impose a higher standard of obviousness than the one Congress commanded in Section 103.  Pre-AIA 35 U.S.C. § 103(a).  Far from suggesting otherwise, Apple's petition consistently matched the claims' scope.  The petition explained that the "purported novelty" of the claims "is that a calculating apparatus and memory" are "fabricated on a single" integrated circuit.  Appx131-132.  It based obviousness on Smyth's teaching of "a single integrated circuit (IC) on which is fabricated both the classifier processor 341 and state memory 342" and Mozer's teaching of "a single integrated circuit on which" similar components "are fabricated."  Appx167-170.  And although the Board pointed to the petition's use of "the verb 'to fabricate' four times in the future tense and once in the present tense, as well as the verb 'to form' once in the future tense," nothing about the Board's counting of verb tenses supports its departure from settled law.  Appx28.  The petition merely parroted the "fabricate" language from the claims and so could not have somehow raised Apple's burden beyond what the claims require.

The Board's error is also clear by comparing what the Board demanded Apple show of the prior art with the '789 patent's own description of the invention. A patent's specification "must supply" an enabling disclosure of "the novel aspects of an invention." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997); *Enzo Life Scis., Inc. v. Roche Molecular Sys.*, 928 F.3d 1340, 1346 (Fed. Cir. 2019). At the same time, "a patent need not teach, and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986). A patent's specification thus serves as a benchmark for what information a skilled artisan would need to practice the claimed invention. *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1339 (Fed. Cir. 2020).

*Uber* applied these principles to reverse a Board nonobviousness determination like the one here. *Id.* The specification there showed that the disputed claim limitation related to transmitting user locations and maps was not "the alleged novelty of the" challenged patent. *Id.* The specification was "entirely silent on how to transmit user locations and maps from a server to a user's mobile device, suggesting that a person of ordinary skill in the art was more than capable of selecting between the known methods of accomplishing this." *Id.*; *see, e.g., SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192-94 (Fed. Cir. 2008) (affirming summary judgment of invalidity where "[b]oth the '212 patent

37

specification and the [prior art] contain similar sections explaining statistical detection").

Just as in *Uber*, the '789 patent offers no details about fabricating an integrated circuit. It merely describes various options for where to locate memory, whether "on chip" or "off." Appx112(col.34:56-63). Thus, just as in *Uber*, the patent's own disclosure confirms "that a person of ordinary skill in the art was more than capable of selecting between the known methods of accomplishing" what the patent claimed. 957 F.3d at 1339. The Board erred in applying an obviousness standard that requires more from the prior art than the patent itself discloses.

### 2. The Board again erred in restricting prior art to specific embodiments and departing from the claims' breadth

Although the Board purported to make conclusions in the alternative supporting nonobviousness, those conclusions were not truly in the alternative and do not support affirmance. Appx30-39. Throughout, the Board continued to return to its rationale that Apple must show "the knowledge of a person of ordinary skill in the art of speech recognition would have included knowledge of a technique of fabricating an integrated circuit." Appx36-37, Appx38 (similar). That error thus infected the Board's nonobviousness conclusion and alone should require reversal.

Even so, other Board errors require the same result. The Board repeated its flawed approaches from its analysis of Smyth alone by imposing unclaimed requirements and restricting the prior art to only select embodiments rather than

considering the art for all it teaches. *See supra*, Part I.B. For example, the Board required Apple to "explain how a memory located in one of the integrated circuits relied on in the Petition would have been able to store Smyth's state memory." Appx30-39. The Board thus dismissed Mozer because it includes an exemplary embodiment with "4 kilobytes of memory," but Smyth has an exemplary embodiment using a large vocabulary model that "requires at least 4.7 kilobytes." Appx30. The Board did the same with other art, dismissing "the other references relied on in the Petition" because the exemplary memories were "not large enough to store an acoustic model as claimed," a view the Board based on testimony not about the claims but specific embodiments from Apple's "proposed combination of the prior art." Appx36 (citing Appx3395-3396(col.91:21-col.92:21). As shown in Part I.B.1, *supra*, the claims do not impose the Board's memory-capacity requirement. Moreover, it is incorrect to limit the art's teachings in the way the Board did.

The Board's error in wrongly restricting the art's teachings is particularly clear from its refusal to recognize a motivation to combine in the face of Zentian's expert admissions of a known problem with a known solution and similarly clear and unrebutted prior-art evidence. Appx32-36; *see Intel v. PACT XPP*, 61 F.4th at 1380. The Board dismissed Mozer's relevance to motivation because the Board believed Mozer does not "disclose[] a calculating apparatus and an acoustic model

39

memory fabricated on an integrated circuit as claimed." Appx31-32. It repeated

that same rationale with other art, without actually disagreeing the art teaches known

benefits: "to the extent that the advantages from a processor and a memory

fabricated on the same integrated circuit were known, such advantages by

themselves do not show that any of the prior art integrated circuits relied on in the

Petition would have been able to store Smyth's state memory." Appx35-37

(repeatedly distinguishing prior art used to support motivation for not teaching the

specific combination of "a processor and *an acoustic model memory* fabricated on

an integrated circuit"; emphasis added). The Board thus thought teachings about the

benefits of integrating memory and processors on a chip were insufficient unless the

art specifically taught applying those teachings to memory storing an "acoustic

model" of a certain size: Apple "relies on generic knowledge regarding the benefits

of integrated circuits writ large, which cannot serve to render the specific speech

recognition circuit of the challenged claims" invalid. Appx37-38.

That was error. "[A] rationale is not inherently suspect merely because it's

generic in the sense of having broad applicability. Quite the opposite." *Intel Corp.

v. Qualcomm Inc.*, 21 F.4th 784, 797 (Fed. Cir. 2021). That a known benefit is

"'technology-independent', 'universal,' and 'even common-sensical'" is precisely

why "'there exists in these situations a motivation to combine prior art references

*even absent any hint of suggestion* in the references themselves.'" *Id.* (Court's

emphasis; citation omitted).  Here, the reasons to combine came collectively from the references themselves and general knowledge in the art.  Just as in *Intel*, the Board's refusal to consider the art for all it teaches and instead restriction of that art's relevance only to specific exemplary embodiments warrants reversal.  *Id.* at 797-99.

* * *

In the end, the Board lost sight of undisputed facts and evidence compelling a conclusion of obviousness.  The Board agreed with Apple on claim 10 and found that Smyth alone teaches both the claimed calculating apparatus and the claimed acoustic model memory, which Zentian never disputed.  The only question for the Smyth-Mozer combination was thus whether persons of ordinary skill in the art would have been motivated to combine those elements onto "a single integrated circuit" with reasonably expected success.  Given the admissions and other clear evidence that an integrated-circuit approach was broadly applied in the art with known and predictable results, the Court should reverse for these additional reasons.  At a minimum, the Court should remand for the Board to evaluate any unresolved issues on obviousness under the correct legal standards.

**III. THE BOARD *SUA SPONTE* UPHELD CLAIM 29 BASED ON THE SAME LEGALLY FLAWED REQUIREMENTS AND UNSUPPORTED FINDINGS**

The Board incorporated its claim 1 reasoning into its ruling on claim 29, and then repeated its demands for specific memory capacities on specific prior art integrated circuit chips. In doing so, the Board repeated its earlier errors and added new ones.

*First*, although claim 1 and 29 both include "fabricated on a single integrated circuit" language, they differ in *what* must be integrated—a "calculating apparatus" and "memory" for claim 1; versus a "coprocessor" and an additional "processor" for claim 29. Appx114-115(col.38:55-col.39:2, col.40:55-57). It is likely for that reason that Zentian itself never included claim 29 among the only contested claims, all of which recite an "integrated" "calculating apparatus" and "memory." Appx472. The Court should reject for this reason alone the Board's rote extension, without explanation, of analysis based entirely on a different limitation of different claims. Appx56-57.

*Second*, by importing the analysis wholesale from claim 1, the Board just repeated the errors already discussed—demanding evidence that an ordinarily skilled artisan could personally "fabricat[e] an integrated circuit," limiting the prior art's teachings to specific embodiments, and distinguishing the claims from the prior art based on unclaimed requirements. Appx56-57. The Board even added to those

errors, coming up with new arguments—never proposed by Zentian—that the exemplary memory in other prior-art references allegedly would not "have had enough memory to store" one exemplary model in Smyth. Appx56-57 (discussing memory-related limitations inherited from claims 18 and 25, claims the Board had already found unpatentable). Those errors require reversal on claim 29 for the same reasons they require reversal on the other claims. *Supra*, Parts I and II.

*Third*, the Board's decision should at least be vacated and remanded given clear procedural flaws. "[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016); 5 U.S.C. § 554(b)(3); 5 U.S.C. § 554(c)(1). In *Apple v. Corephotonics*, this Court rejected a Board decision upholding claims on a basis that "the parties did not brief, argue, or even suggest" and so "had no reason to anticipate." 81 F.4th 1353, 1360-62 (Fed. Cir. 2023). Here too, Apple had no notice or opportunity to respond to the basis for the Board's decision because Zentian never disputed the obviousness of claim 29. Appx471-491 (response); Appx436-453 (sur reply). Neither Zentian nor the Board brought up claim 29 at the oral hearing. Appx520-570. The disputes Zentian did raise related to a meaningfully different "single integrated circuit" limitation. Appx471-491; Appx436-453. Just as in *Corephotonics*, Apple had no reason to address anticipatorily the issues the Board *sua sponte* raised and decided.

And those issues related to memory-capacity requirements that are not "recited in the challenged claims." 81 F.4th at 1361.

## CONCLUSION

For the reasons given, the court should reverse the Board's conclusion that claims 1, 2, 4, 6-9, 11, 24, and 29 are not unpatentable. At a minimum, the Court should vacate and remand for the Board to address any unresolved issues on obviousness under the correct standards.

Dated:  January 23, 2025

BITA RAHEBI
REBECCA E. WEIRES
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

ROMAN A. SWOOPES
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

Respectfully submitted,

/s/ Brian R. Matsui

BRIAN R. MATSUI
SETH W. LLOYD
NOAH PRILUCK
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8784
BMatsui@mofo.com

# ADDENDUM

**APPLE INC.,**

**V.**

**ZENTIAN LTD.**

**No. 24-2207 (Fed. Cir.)**

**ADDENDUM TABLE OF CONTENTS**

| Date | Document | Page |
|------|----------|------|
| 06/11/2024 | Final Written Decision (IPR2023-00036, IPR2023-01195) | Appx1 |
| | U.S. Patent No. 10,839,789 | Appx67 |

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC., AMAZON WEB SERVICES, INC., and
AMAZON.COM SERVICES LLC
Petitioner,

v.

ZENTIAN LIMITED,
Patent Owner.

———————

IPR2023-00036[1]
Patent 10,839,789 B2

———————

Before KEVIN F. TURNER, JEFFREY S. SMITH, and
CHRISTOPHER L. OGDEN, *Administrative Patent Judges.*

SMITH, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

———

[1] IPR2023-01195 has been joined with this proceeding.

## I.   INTRODUCTION

### A.   Background and Summary

Petitioner filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, 4, 6–14, 16–18, 20–29, 35, 37–39, and 42–45 of U.S.  Patent No. 10,839,789 B2 (Ex. 1001, "the '789 patent").  We issued an Institution Decision (Paper 10, "Dec.") instituting the petitioned review. Patent Owner then filed a Patent Owner Response[2] to the Petition. Petitioner filed a Reply (Paper 21, "Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 27, "PO Sur-Reply") to the Reply.  An oral hearing was held on March 12, 2024, for which the transcript was entered into the record (Paper 33, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1, 2, 4, 6–14, 16–18, 20–29, 35, 37–39, and 42–45 of the '789 patent.  We determine that Petitioner has shown by a preponderance of evidence that claims 10, 12–14, 16–18, 20–23, 25–28, 35, 37–39, and 42–45 are unpatentable.  Petitioner has not shown by a preponderance of evidence that claims 1, 2, 4, 6–9, 11, 24, or 29 are unpatentable.

### B.   Related Matters

The parties indicate that the following matters relate to the '789 patent:  *Zentian Ltd v. Apple Inc.*, 6:22-cv-00122 (W.D. Tex. Feb. 2, 2022); *Zentian Ltd v. Amazon.com, Inc.*, 6:22-cv-00123 (W.D. Tex. Feb. 2, 2022); *Apple Inc. v. Zentian Ltd.*, *Inter Partes* Review No. IPR2023-00033; *Apple*

---

[2] Petitioner also filed a corrected Patent Owner Response (Paper 31, "Pet. Resp.") and a comparison of the Corrected Patent Owner Response to the original (Paper 32).

*Inc. v. Zentian Ltd.*, *Inter Partes* Review No. IPR2023-00034; *Apple Inc. v. Zentian Ltd.*, *Inter Partes* Review No. IPR2023-00035; and *Apple Inc. v. Zentian Ltd.*, *Inter Partes* Review No. IPR2023-00037.  Paper 3, 1; Pet. 78.

### C.  The '789 Patent

The '789 patent is related to "speech recognition circuits and methods," which are particularly applicable to mobile devices.  *See* Ex. 1001, 1:20–23.  The patent describes:

> a circuit for providing state identifiers which identify states corresponding to nodes or groups of adjacent nodes in a lexical tree, and for providing scores corresponding to said state identifiers. The lexical tree includes a model of words. The speech recognition circuit also has a memory structure for receiving and storing state identifiers identified by a node identifier identifying nodes or groups of adjacent nodes, the memory structure being adapted to allow lookup to identify particular state identifiers, reading of the scores corresponding to the state identifiers, and writing back of the scores to the memory structure after modification of the scores.

*Id*. at 2:31–43.  A "selector circuit is used for selecting at least one node or group of nodes of the lexical tree according to said scores."  *Id*. at 2:49–50. A "distance calculation engine may calculate one or more of a wide range of distance metrics and probability distributions."  *Id*. at 4:12–14. The distances may represent the likely correspondence of feature vectors to states in an acoustic model, such that "the distances can indicate the similarity of an audio data frame to each possible state in an acoustic model."  *Id*. at 4:14–17.

Figure 16 shows a block diagram of a speech recognition system of the '789 patent, and is reproduced below.

3



Functions performed by the accelerator are shown in grey

Functions performed by other hardware or software systems are shown in white

Figure 16 above shows a speech recognition system, including microphone 100, distance calculation engine 104, acoustic model 105, and search stage 106, which provides the distance calculation engine 104 with active state list 108. Ex. 1001, 23:52–24:59.

*D. Illustrative Claims*

Claim 1 of the '789 patent recites:

1. An acoustic coprocessor for processing data associated with an audio signal, comprising:
 a first interface for receiving at least one feature vector, wherein the feature vector is determined from the audio signal;
 an acoustic model memory for storing an acoustic model defining a plurality of acoustic states;
 a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and respective acoustic states of the acoustic model read from the acoustic model memory; and
 a second interface for sending at least one distance calculated by the calculating apparatus;
 wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit.

4

Claim 10 recites:

> 10. An acoustic coprocessor, comprising:
> a first interface for receiving at least one feature vector;
> a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and at least one acoustic state of an acoustic model read from an acoustic model memory; and
> a second interface for sending at least one distance calculated by the calculating apparatus.

### E. Evidence

Petitioner relies on the following prior art:

U.S. Patent No. 5,819,222, issued October 6, 1998 (Ex. 1005, "Smyth");

U.S. Patent No. 6,959,376 B1, issued October 25, 2005 (Ex. 1006, "Boike");

"The Motorola DSP56000 Digital Signal Processor," IEEE Micro, pp. 29–48, published December 1986 (Ex. 1009, "Kloker");

U.S. Patent No. 4,567,606, issued January 28, 1986 (Ex. 1038, "Vensko");

U.S. Patent No. 5,774,859, issued June 30, 1998 (Ex. 1040, "Houser");

U.S. Patent No. 7,171,358 B2, issued January 30, 2007 (Ex. 1041, "Whittaker");

U.S. Patent No. 7,478,041 B2, issued January 13, 2009 (Ex. 1042, "Ichikawa");

U.S. Patent No. 7,587,318 B2, issued September 8, 2009 (Ex. 1043, "Seshadri");

U.S. Patent Appl. Publ. No. 2002/0091826 A1, published July 11, 2002 (Ex. 1044, "Comeau");

U.S. Patent Appl. Publ. No. 2003/0012347 A1, published January 16, 2003 (Ex. 1045, "Steinbiss");

U.S. Patent No. 6,832,194 B1, issued December 14, 2004 (Ex. 1046, "Mozer"); and

U.S. Patent No. 6,879,954 B2, issued April 12, 2005 (Ex. 1047, "Nguyen").

*F.   Prior Art and Asserted Grounds*

Petitioner asserts that claims 1, 2, 4, 6–14, 16–18, 20–29, 35, 37–39, and 42–45 of the '789 patent are unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 10, 11, 14, 17 | 103(a) | Smyth, Mozer |
| 2, 4, 6–9, 12, 16, 18, 20, 21 | 103(a) | Smyth, Mozer, Nguyen |
| 13 | 103(a) | Smyth, Mozer, Houser |
| 22–24 | 103(a) | Smyth, Mozer, Nguyen, Vensko |
| 25–28, 37 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau |
| 29 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Boike |
| 35 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Whittaker |
| 38, 39 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa |
| 42–44 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, Seshadri |
| 45 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, Steinbiss |

6

Pet. 2. Petitioner relies on the declaration testimony of Christopher Schmandt. Ex. 1003. Patent Owner relies on the testimony of David Anderson, Ph.D. Ex. 2020.

## II. ANALYSIS

### A. Legal Standards

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *see also* 37 C.F.R. § 42.104(b) (requiring a petition for *inter partes* review to identify how the challenged claim is to be construed and where each element of the claim is found in the prior art patents or printed publications relied upon).

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences

7

and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")). Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### B. Level of Ordinary Skill in the Art

Petitioner contends that a person having ordinary skill in the art ("POSITA") would have had "a master's degree in computer engineering, computer science, electrical engineering, or a related field, with at least two years of experience in the field of speech recognition, or a bachelor's degree in the same fields with at least four years of experience in the field of speech recognition," and that "[a]dditional education or experience might substitute for the above requirements." Pet. 3 (citing Ex. 1003 ¶¶ 24–25).

Patent Owner contends that the Petition and supporting evidence, including the testimony of Mr. Schmandt, does not demonstrate that a person of ordinary skill in the field of speech recognition would have been able to fabricate an integrated circuit. PO Resp. 1. Patent Owner contends that a person of ordinary skill in the field of speech recognition would not also be expected to have specialized knowledge in integrated circuit fabrication in

8

addition to speech recognition. *Id*. at 2–4 (citing Ex. 2020 ¶¶ 17–19). Petitioner does not present arguments to the contrary. *See generally* Reply.

We agree with Petitioner, that a person of ordinary skill in the field of speech recognition would have had a master's degree in computer engineering, computer science, electrical engineering, or a related field, with two years of experience in the field of speech recognition, or a bachelor's degree in the same fields with four years of experience in the field of speech recognition.[3] Ex. 1001, 1:25–2:27 (describing in the "Background of Invention" section of the '789 patent various speech recognition systems and methods). We also agree with Patent Owner, and rely on the supporting testimony of Dr. Anderson, in finding that a person of ordinary skill in the field of speech recognition would not have been a person of ordinary skill in the field of integrated circuit fabrication, and would not have had the education, experience, or skill necessary to fabricate an integrated circuit.

### C. Claim Interpretation

We interpret the challenged claims

> using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b) (2022). "In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record,

---

[3] Petitioner's formulation is open-ended as to the maximum number of years of experience in the field of speech recognition. *See* Pet. 3. This ambiguity has no bearing on whether the ordinarily skilled artisan would have had any experience in the field of integrated circuit fabrication. Thus, our decision would be the same with or without this ambiguity.

9

examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006). Claim terms are given their plain and ordinary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Petitioner "applies the plain and ordinary meaning of all claim terms as understood by a POSITA for all terms." Pet. 5.

We conclude that no terms require express construction to resolve a dispute. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("Because we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy,' we need not construe [a particular claim limitation] where the construction is not 'material to the . . . dispute.'" (internal citation omitted)).

### D.  Challenge Based on Smyth and Mozer

Petitioner contends that claims 1, 10, 11, 14, and 17 are unpatentable over the combination of Smyth and Mozer. Pet. 4.

#### 1.  Overview of Smyth

Smyth is a patent entitled "Task-Constrained Connected Speech Recognition of Propagation of Tokens Only If Valid Propagation Path Is Present." Ex. 1005, code (54). Smyth is related to "applying grammar constraints to connected speech recognition," particularly "in the area of

10

task-constrained connected word recognition where the task, for example, might be to recognise one of a set of account numbers or product codes." *Id*. at 1:15–21.

Smyth states that it "is common in speech recognition processing to input speech data, typically in digital form, to a so-called front-end processor, which derives from the stream of input speech data a more compact, perceptually significant set of data referred to as a front-end feature set or vector." Ex. 1005, 1:23–27. Smyth also states that, commonly, a "stored representation of the word or phrase, known as a template or model, comprises a reference feature matrix of that word as previously derived from, in the case of speaker independent recognition, multiple speakers." *Id*. at 1:33–36. "The input feature vector is matched with the model and a measure of similarity between the two is produced." *Id*. at 1:36–38. Smyth notes that, while it "is possible to construct a network enumerating all the possible word sequences, perhaps in the form of a tree," this "becomes problematic as the recognition task size grows large." *Id*. at 2:29–33. Smyth's "system replaces a full tree network with a very much smaller one." *Id*. at 3:4–5.

11

Figure 2, reproduced below, is a schematic diagram of the functional elements of a recognition processor according to Smyth.



Figure 2 above shows a schematic of Smyth's recognition processor 3 showing input 31, frame generator 32, feature extractor 33, classifier 34, sequencer 35, end pointer 36, and output port 38.  Ex. 1005, 5:1–18.

Figure 3, reproduced below, is a block diagram of classifier 34.



Figure 3 above shows classifying processor 341 and state memory 342. State memory 342 comprises state field 3421 and 3422, for example, for each of the plurality of speech states. Ex. 1005, 5:55–59. "[C]lassification processor 34 is arranged to read each state field within the memory 342 in turn, and calculate for each, using the current input feature coefficient set, the probability that the input feature set or vector corresponds to the corresponding state." *Id*. at 5:63–67.

*2. Overview of Mozer*

Mozer is a patent entitled "Audio Recognition Peripheral System." Ex. 1046, code (54). Mozer concerns "providing an audio recognition peripheral system allowing for a highly efficient implementation of an audio recognition process." *Id*. at 1:7–11. Mozer describes that "audio

13

recognition systems are problematic to realize because they typically require large amounts of data processing to implement." *Id*. at 1:25–27. Mozer also describes that "application specific audio recognition systems have the disadvantage of increasing the costs of the overall system." *Id*. at 1:39–41. Therefore, according to Mozer, "what is needed is an audio recognition system that allows users to efficiently implement audio recognition functionality into larger systems at reduced costs with both ease and flexibility of use." *Id*. at 1:60–63. To address this need, Mozer "provides an audio recognition peripheral and audio recognition peripheral system," which "allows system designers to easily add audio recognition functionality into a system by simply adding a low cost audio recognition peripheral to operate in conjunction with a processor." *Id*. at 2:2–7.

Figure 3, reproduced below, illustrates an architectural diagram of an audio recognition peripheral on a single integrated circuit according to one embodiment of Mozer.



Figure 3 above illustrates an audio recognition peripheral 300 on a single integrated circuit, including feature extractor output lines 340, memory input lines 342, and memory interface lines 344. Ex. 1046, 6:1–67.

Petitioner's annotated version of Mozer's Figure 4, reproduced below, illustrates an audio recognition peripheral integrated circuit 400 according to another embodiment of Mozer. Pet. 23.



FIG. 4

Annotated Figure 4 above illustrates an example of an audio recognition peripheral according to another embodiment of Mozer, highlighting interface controller 421 (in brown), feature extractor 422 (in blue), memory 460 (in yellow), feature extractor output lines 440 (in blue), and memory input lines 444 (in green). Ex. 1046, 7:53–9:56. Figure 4 also shows vector processor 423, and its configuration registers and address generators 427. *Id*. at 9:22–42.

15

### 3. *Claim 1*

*Analysis of Smyth alone*

Claim 1 recites "wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit." Petitioner contends that Smyth alone teaches this limitation, because, according to Petitioner, Smyth's classifier processor 341 teaches the claimed "calculating apparatus" and Smyth's state memory 342 teaches the claimed "acoustic model memory." Pet. 38. Petitioner contends that Smyth's classifier processor 341 may be a suitably programmed digital signal processor (DSP) such as the Motorola DSP56000, and that a person of ordinary skill would have understood that the Motorola DSP56000 would have had a processor and memory on an integrated circuit. *Id*. at 39 (citing Ex. 1009). Petitioner contends because the DSP56000 provides for a single integrated circuit with a processor and memory, Smyth alone teaches "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as claimed. *Id*. at 40.

Patent Owner contends that Smyth's classifier processor 341 is a distinct structure from its state memory 342. PO Resp. 1. Patent Owner contends that Smyth teaches that classifying processor 341 constitutes its own DSP, but does not teach that both classifying processor 341 and state memory 342 are on the same DSP or on a single integrated circuit. *Id*. at 5 (citing Ex. 2020 ¶ 35). In Reply, Petitioner contends that even though Smyth shows processor 341 and state memory 342 as separate components, a patent drafter would label distinct structures on the same integrated circuit with separate reference numerals and illustrate them as separate components in a figure. Reply 10–11 (citing Ex. 1006). Patent Owner contends that Petitioner's Reply does not substantively rebut Patent Owner's evidence and

16

argument that processor 341 and state memory 342 are not fabricated on a single integrated circuit. *See* PO Sur-Reply 1 (citing Ex. 2020 ¶¶ 34–45). Patent Owner contends that Petitioner's Reply contention—that processor 341 and state memory 342 have separate reference numerals does not necessarily mean that they are distinct structures—fails to meet its burden of proof to show that processor 341 and state memory 342 are in fact fabricated on a single integrated circuit. *Id*. at 1–2 (citing Reply 10–11).

We agree with Patent Owner that Petitioner has not shown, by a preponderance of evidence, that state memory 342 of Smyth is fabricated on the same integrated circuit as processor 341. Petitioner, in asserting that processor 341 and state memory 342 are on the same integrated circuit, cites the following testimony of Mr. Schmandt:

> In my opinion, the Motorola DSP56000 provides both memory and a processor fabricated on a single integrated circuit (IC). *Kloker* (Ex. 1009), 1 (discussing the Motorola DSP56000 includes "a core processor, RAM, ROM, peripheral interfaces, and a memory expansion interface on a single, 88-pin chip[")]. . . . A POSITA would have understood or at least found obvious that *Smyth* thus teaches a single IC on which both classifier processor 341 and state memory 342 are fabricated.

Ex. 1003 ¶ 165; Pet. 39. We do not credit Mr. Schmandt's testimony because it is inconsistent with Smyth's disclosure. Smyth discloses that classifier 34 comprises classifying processor 341 and state memory 342, and that "classifying processor 341 may be a suitably programmed digital signal processing (DSP) device." Ex. 1005, 5:55–57, 6:5–6. Thus, Smyth itself, in discussing classifier 34, distinguishes processor 341 from state memory 342 in stating that only processor 341, and not both processor 341 and state memory 342, may be located on the DSP.

17

Further, Dr. Anderson persuasively testifies that Smyth does not describe processor 341 and state memory 342 as being fabricated on a single integrated circuit. Ex. 2020 ¶¶ 34–37. Dr. Anderson persuasively explains that processor 341 and state memory 342 could not be fabricated on the same integrated circuit, because the design of the DSP for processor 341 does not include any memory that meets the requirements of state memory 342. *Id*. ¶¶ 38–45. We rely on the testimony of Dr. Anderson in finding that Petitioner has not shown that Smyth teaches that processor 341 and state memory 342 are fabricated on a single integrated circuit.

Petitioner, in its Reply, contends that (a) Smyth's DSP has a processor and memory on a single integrated circuit, and that the advantages from a processor and memory on an integrated circuit were known and (b) the memory of Smyth's DSP is sufficient to store Smyth's acoustic model. Reply 1–10. Patent Owner contends that Petitioner's Reply presents a new theory, that the memory on the Motorola DSP56000 itself, which is not state memory 342, is sufficient to meet the claim. PO Sur-Reply 2. Patent Owner contends that this new theory is improper and should not be considered. *Id*. We need not reach the issue of whether Petitioner's Reply presents a new theory, because even considering Petitioner's Reply arguments, we find that Petitioner has not shown by a preponderance of evidence that the memory on Smyth's DSP would have been able to store Smyth's state memory, which the Petition maps to the claimed "acoustic model."

Petitioner, in arguing that advantages from a processor and memory on an integrated circuit were known, contends that Dr. Anderson admitted that reducing off-chip memory access due to the processor and memory of the DSP56000 fabricated on an integrated circuit makes the system more efficient by performing some operations more quickly. Reply 1–2 (citing

18

Ex. 1069, 79:11–14, 91:8–10). Petitioner then contends that because Dr. Anderson admits that integrated circuits for speech recognition were known to have efficiency advantages, and because Smyth discloses a DSP56000 having a processor and memory for use as a classifying processor in speech recognition, Smyth alone teaches limitation 1(e). *Id*.

We disagree with Petitioner's contention that Dr. Anderson admitted that the memory of the DSP56000 would have been able to store the claimed "acoustic model." In particular, we disagree that Dr. Anderson's testimony that "they put memory on the chip so that you could do some operations more quickly" and that "one way of making a system more efficient, was to reduce the off-chip memory access" means that "Dr. Anderson admits that ICs for speech recognition were known to have efficiency advantages." *See* Reply 1–2 (quoting Ex. 1069, 79:11–14, 91:8–10). Dr. Anderson testified that "they put memory on the chip so that you could do *some operations* more quickly. And yet, *it was only a few K of memory*." Ex. 1069, 79:12–15 (emphasis added). Similarly, immediately before testifying that it was known that reducing off-chip memory accesses makes a system more efficient, Dr. Anderson testified that "*I couldn't tell you* . . . if there were people that said 'Oh yeah. That's it. We just have to make a distance calculator that has all the memory on chip.'" *Id*. at 91:4–10 (emphasis added).

We find that Dr. Anderson testified that the teachings of the '789 patent itself, namely, putting an acoustic model memory on the same integrated circuit as a calculating apparatus, were unknown in the prior art. We find that Dr. Anderson did not admit that the memory of the DSP taught by Smyth would have been able to store the claimed "acoustic memory." Further, to the extent that the advantages from a processor and a memory

19

fabricated on the same integrated circuit were known, such advantages by themselves do not show that the memory of the DSP taught by Smyth would have been able to store the claimed "acoustic model memory" such that the claimed "calculating apparatus and the acoustic model memory" would have been "fabricated on a single integrated circuit" as claimed.

Petitioner, in arguing that the memory of Smyth's DSP is sufficient to store the claimed "acoustic model," contends that the claim does not recite a required memory size for the acoustic model memory, but rather, recites that the acoustic model defines a plurality of states. Reply 2–3. We stated in our Decision to Institute that "[t]he scope of the claimed 'acoustic model memory' encompasses a memory storing 'an acoustic model defining a plurality of acoustic states,' such as two acoustic states." Dec. 22. Petitioner, in the Reply, did not address our statement, other than to cite to it in contending that "the claims recite storing a plurality of states, which is met by at least two states." Reply 22 (citing Dec. 22). Petitioner, however, did not provide evidence or argument, either in the Petition or in the Reply, to show that only two acoustic states of Smyth's state memory 342 would define an acoustic model as claimed. Nor did Petitioner explain how or why Smyth's processor 341 would be able to operate on only two acoustic states of Smyth's acoustic model, rather than the entire model, in order to successfully perform recognition.

We find that Petitioner has not provided sufficient evidence or argument to show that only two acoustic states of Smyth's state memory teach the "acoustic model memory" as recited in claim 1. In particular, we find that Smyth discloses that the "classification processor 34 is arranged to read *each state field* within the memory 342," not just two state fields, "and calculate *for each [state field]* the probability that the input feature set or

20

vector corresponds to the corresponding state." Ex. 1005, 5:63–67 (emphasis added); *see id*. at 6:1–4. Further, in both the Petition and the Reply, Petitioner maps the claimed "acoustic model" to Smyth's acoustic model stored in state memory 342. Reply 3, 4, 11; Pet. 11, 38, 41–42, 44; *see* Tr. 16:18–17:12. Therefore, in light of Smyth's disclosure that the classification processor reads each state field within memory 342, and in light of Petitioner's theory of unpatentability, in which "*Smyth's* state memory 342 is mapped as the 'acoustic model memory'" (Pet. 11), Petitioner has the burden of showing that the available memory in the integrated circuit of Smyth is large enough to store Smyth's acoustic model of state memory 342, not just two acoustic states of Smyth's model.

Petitioner contends that the scope of the recited "acoustic model" encompasses Smyth's abbreviated model used to recognize digits. Reply 3. Petitioner, relying on the testimony of Dr. Anderson, contends that the memory of the DSP56000 is large enough to store Smyth's abbreviated acoustic model. *Id*. at 3–4 (citing Ex. 1069, 76:7–23). We disagree with Petitioner's interpretation of Dr. Anderson's testimony. Dr. Anderson, in answering the question "[i]s the size of the acoustic model and, therefore, the number of states within the acoustic model dependent upon the lexicon being modeled," answered "[i]f you had something that was very small, like a digits recognizer or something for account numbers like, I think, Smith was doing, then you might have an abbreviated model. And that's why Smith could do the type of recognition he did." Ex. 1069, 76:7–9, 76:19–23. Dr. Anderson did not state that Smyth's abbreviated model is stored in the memory of the DSP56000. He also did not state that the memory available in the DSP56000 would have been large enough to store Smyth's abbreviated acoustic model. Dr. Anderson's testimony, at best, shows that

21

Dr. Anderson believes that the size of an acoustic model for a digits recognizer would be abbreviated, or less than, the size of a full acoustic model, which would allow a processor with limited capabilities to "do the type of recognition [that is, the type limited to recognition of digits] he did."

Patent Owner contends that the on-chip memory of the Motorola DSP56000 is not nearly large enough to serve as Smyth's state memory 342. PO Resp. 1. Patent Owner, relying on the testimony of Dr. Anderson, contends that only about 1.5 kilobytes of RAM memory on the DSP56000 could have been used for storing data structures such as Smyth's state memory 342. *Id*. at 7–8 (citing Ex. 1009, Fig. 4; Ex. 2020 ¶¶ 38–45). Patent Owner contends that Smyth's state memory 342 requires at least 720 kilobytes of memory. *Id*. at 8–9 (citing Ex. 2020 ¶ 43). Patent Owner contends that because the 1.5 kilobytes of memory available on the DSP56000 could not hold state memory 342, Smyth does not teach or suggest that its processor 341 and state memory 342 were fabricated on a single integrated circuit as claimed. *Id*. at 9–10 (citing Ex. 2020 ¶¶ 44–45).

Petitioner contends that Dr. Anderson is mistaken regarding the memory size required to store an acoustic model as taught in Smyth. Reply 5. According to Petitioner, "Mr. Schmandt testified that for *Smyth's* allophone-based model, the size would be 'around 4,700 bytes.'" *Id*. at 6 (quoting Ex. 2016, 55:11–13). Petitioner contends that Mr. Schmandt testified that the DSP56000 provides a large set of on-chip memory sufficient to store a large language model. *Id*. at 7 (citing Ex. 2016, 55:11–56:24). Petitioner relies on the testimony of Mr. Schmandt in contending that the large set of on-chip memory on the DSP56000 is sufficient to store an acoustic model. *Id*. Petitioner also contends that Patent Owner admitted that the DSP56000 has 9 kilobytes of RAM as well as ROM, which is

22

sufficient to store an acoustic model that requires 4.8 kilobytes of memory. *Id.* (citing PO Resp. 9).

Patent Owner contends that Mr. Schmandt does not testify about the amount of the available memory in the DSP56000, and that Dr. Anderson's testimony that the DSP56000 contained at most 1.5 kilobytes of available memory is unrebutted. *See* PO Sur-Reply 3–4. Patent Owner contends that Smyth's acoustic model, even accepting Mr. Schmandt's testimony that Smyth's acoustic model requires 4.7 kilobytes of memory, would have been too large for the available 1.5 kilobytes of available memory on the DSP56000. *Id.* at 2–4 (citing Ex. 2020 ¶¶ 40–41; Ex. 1068 ¶¶ 7–8).

We agree with Patent Owner and rely on Dr. Anderson's unrebutted supporting testimony in finding that Smyth's DSP contained at most 1.5 kilobytes of available memory in RAM to store Smyth's state memory 342. Neither Petitioner nor Mr. Schmandt provides sufficient evidence to rebut Dr. Anderson's persuasive declaration testimony. We rely on the testimony of Dr. Anderson in finding that the ROM on the DSP56000 would not be available for storing the acoustic model, because it is used for storing code for specialized operations, and is not modifiable by a user of the DSP. Ex. 2020 ¶ 42. We agree with Patent Owner that the 1.5 kilobytes of RAM available on the DSP56000 could not store Smyth's acoustic model, even accepting Mr. Schmandt's testimony that Smyth's acoustic model requires 4.7 kilobytes of memory.

During the hearing, Petitioner contended that Mr. Schmandt testified that four or five kilobytes of memory are needed to store a large language model, but that the amount of memory required for an abbreviated acoustic model would have been far less than that. *See* Tr. 17:22–18:8. However, Petitioner did not make this contention in the Petition or in the Reply.

23

Therefore, Petitioner's contention made at the hearing is untimely. *See, e.g.*, Consolidated Trial Practice Guide 86 (Nov. 2019), https://www.uspto.gov/ TrialPracticeGuideConsolidated ("TPG") (stating that a party "may only present arguments relied upon in the papers previously submitted"). Further, Petitioner did not cite, and we do not discern, testimony from Mr. Schmandt contending that the memory required to store Smyth's acoustic model would have been far less than the memory required to store a large language model. Also, Petitioner does not explain why Mr. Schmandt would testify to the amount of memory required by a large acoustic model, but not to the amount of memory required by Smyth's abbreviated acoustic model. This is especially pertinent because the Petition and Mr. Schmandt map Smyth's abbreviated model to the "acoustic model" as recited in claim 1. *See* Pet. 11; Ex. 1003 ¶ 150 ("In my opinion, *Smyth's* collection of speech states in state memory 342 . . . is an acoustic model, as claimed.").

Even were we to accept Petitioner's untimely contention that the memory required by an abbreviated acoustic model would have been less than that required by a large language model, this contention does not allege, let alone support with evidence, that 1.5 kilobytes of memory would have been sufficient to store the abbreviated acoustic model. We decline to speculate on whether the memory required by Smyth's abbreviated acoustic model would have been satisfied by the 1.5 kilobytes of available memory on Smyth's DSP. Petitioner had the burden of identifying evidence to support its challenge and did not do so. We emphasize that "[i]n an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with

24

particularity . . . the evidence that supports the grounds for the challenge to each claim")).  Here, neither Petitioner nor Mr. Schmandt provides persuasive evidence showing that Smyth's acoustic model could have been stored in the 1.5 kilobytes of memory available on Smyth's DSP.

Although Petitioner contends that the "Petition and supporting Declaration (Ex. 1003) established the ubiquity of ICs with processors and memories fabricated thereon" (Reply 2), the Petition and supporting Declaration do not establish that Smyth's integrated circuit with a processor and a memory fabricated thereon could have stored an acoustic model as claimed.  We rely on the unrebutted testimony of Dr. Anderson in determining that the integrated circuit relied on in the Petition to show that Smyth alone teaches limitation 1(e) (*see* Pet. 38–40), namely, the DSP56000, had 1.5 kilobytes of available memory, and that, even were we to accept Mr. Schmandt's testimony that the acoustic model of Smyth requires 4,800 bytes of memory, the available memory on the DSP56000 of 1.5 kilobytes would have been too small to store the acoustic model.  We find that Petitioner has not shown that processor 341 of Smyth and state memory 342 of Smyth, which Petitioner maps to the claimed "acoustic model memory," could have both been on the DSP of Smyth.  Petitioner has not shown, by a preponderance of evidence, that Smyth alone teaches that the "calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as claimed.

*Analysis of Smyth and Mozer*

Petitioner contends that Mozer discloses "a single integrated circuit on which a vector processor 423 (i.e., calculating apparatus) and memory 460 (i.e., acoustic model memory) are fabricated."  Pet. 40.  Petitioner contends that a person of ordinary skill in the art would have "been motivated to

modify *Smyth* to fabricate classifier processor 341 and state memory 342 of classifier 34 on a single integrated circuit according to *Mozer's* teachings." *Id*. at 41–42.

Patent Owner contends that the Petition's proposed modification requires that the ordinary artisan in the field of speech recognition would have fabricated a single integrated circuit with Smyth's processor 341 and state memory 342, but that such task would have been beyond the skill of an ordinary artisan in the field of speech recognition. PO Resp. 14 (citing Ex. 2020 ¶ 55). Patent Owner contends that the Petition and supporting evidence do not show that an ordinary artisan in the field of speech recognition could have fabricated an integrated circuit comprising Smyth's processor 341 and state memory 342 with a reasonable expectation of success. *Id*. at 16.

Petitioner contends that the Petition did not assert that a person of ordinary skill in the art would have fabricated the processor and memory on a single integrated circuit. Reply 22. Petitioner contends that the '789 patent is silent on how the calculating apparatus and memory are fabricated on an integrated circuit, which suggests that a person of ordinary skill in the art would have known how to achieve that step, such as by purchasing a commercially available integrated circuit. *Id*. at 23–24.

Patent Owner contends that Petitioner's contention that the Petition did not assert that a person of ordinary skill would have fabricated Smyth's processor and state memory onto a single integrated circuit is false. PO Sur-Reply 12. Patent Owner contends that the Petition stated that "[a] POSITA would have found it obvious and been motivated to modify Smyth *to fabricate* classifier processor 341 and state memory 342 of classifier 34 on a single integrated circuit." *Id*. at 12–13 (quoting Pet. 41–42). Patent Owner

26

contends that neither Petitioner nor Mr. Schmandt disputes Dr. Anderson's showing that a person of ordinary skill would not have been capable of fabricating Smyth's processor 341 and state memory 342 onto a single integrated circuit, as the Petition's combination requires. *Id*. at 12 (citing Ex. 2020 ¶¶ 54–62).

In our Decision to Institute, we understood Petitioner's theory based on the combination of Smyth and Mozer to include fabricating an integrated circuit in stating that we were sufficiently persuaded "that fabricating a single integrated circuit that includes a calculating apparatus and an acoustic model memory . . . was within the level of ordinary skill." Dec. 23. Our understanding was based on the Petition's multiple contentions that a person of ordinary skill would have found it obvious to fabricate Smyth's processor and state memory on a single integrated circuit. *See* Pet. 41–44. For example, the Petition contends that "[a] POSITA would have found it obvious . . . *to fabricate* [Smyth's processor and state memory] on a single integrated circuit" (Pet. 41–42 (emphasis added)); "a POSITA would have understood and found obvious . . . *to fabricate* a calculating apparatus and acoustic model memory on a single integrated circuit" (Pet. 42 (emphasis added)); "[s]uch a use of a known technique of *fabricating* a memory and processor on a single integrated circuit" (*id*. (emphasis added)); "it would have been obvious to modify Smyth *to form* the classifier processor and associated memory on a single IC" (Pet. 43 (emphasis added)); ("it was well known in the prior art *to fabricate* a single integrated circuit" (Pet. 43–44 (emphasis added)); "[t]hus, a POSITA would have been motivated . . . *to fabricate* [Smyth's processor and state memory] on a single integrated circuit" (Pet. 44 (emphasis added)).

27

Petitioner, in its Reply, attempts to shift its theory from fabricating an integrated circuit to using integrated circuits that were already fabricated. Reply 22–25. According to Petitioner, "the Petition did not map a POSITA physically fabricating an IC, but rather mapped a POSITA modifying *Smyth* according to *Mozer's* undisputed teachings of a single IC on which a calculating apparatus and acoustic model memory were <u>already fabricated</u>." *Id*. at 23–24. However, as discussed in the previous paragraph, when discussing the combination of a processor and an acoustic model memory on an integrated circuit, the Petition used the verb "to fabricate" four times in the future tense and once in the present tense, as well as the verb "to form" once in the future tense. The Petition did not use the past tense phrase "were already fabricated" as alleged in the Reply.

Moreover, the Petition did not map Smyth's state memory (which the Petition contends teaches the claimed "acoustic model memory" (*see* Pet. 11)) to a memory already fabricated on an integrated circuit in the prior art. Rather, the Petition relied on Mozer to support its contention that a person of ordinary skill would have fabricated the calculating apparatus and acoustic model memory of Smyth on an integrated circuit. *See* Pet. 42, 44. The Petition cited Boike and Ozcelik in contending that fabricating an integrated circuit with processors and memories was well known, and cited Toyoda in contending that fabricating an integrated circuit with a calculating apparatus and an acoustic model memory was well known. Pet. 43–44 (citing Ex. 1006; Ex. 1029; Ex. 1034). However, the Petition did not explain how a memory located in one of the integrated circuits of Mozer, Boike, Ozcelik, or Toyoda would have been able to store Smyth's state memory.

Therefore, we disagree with Petitioner's contention that "the Petition did not map a POSITA physically fabricating an IC, but rather mapped a

28

POSITA modifying *Smyth* according to *Mozer's* undisputed teachings of a single IC on which a calculating apparatus and acoustic model memory were <u>already fabricated.</u>" Reply 23–24. We find that this contention was untimely presented in the Reply. We do not permit Petitioner to propose a mapping of the prior art in the Petition and then completely change that mapping after Patent Owner argues the initial mapping was flawed. A "petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability." TPG 73; *see also Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016) (holding that the Board did not err in refusing the reply brief as improper under 37 C.F.R. § 42.23(b) because petitioner relied on an entirely new rationale to explain why one of skill in the art would have combined the references at issue); 37 C.F.R. § 42.23(b); *Apple Inc. v. eWatch, Inc.*, IPR2015-00412, Paper 50, 44 (PTAB May 6, 2016) ("'Respond,' in the context of 37 C.F.R. § 42.23(b), does not mean embark in a new direction with a new approach as compared to the position originally taken in the Petition. Accepting such belatedly presented new arguments would be unjust to the Patent Owner and we decline to do so.").

We agree with Patent Owner and rely on the testimony of Dr. Anderson in finding that the Petition's combination requires fabricating Smyth's processor 341 and state memory 342 onto a single integrated circuit, which was beyond the level of ordinary skill in the art for a person in the field of speech recognition. *See* Pet. 3; Ex. 2020 ¶¶ 54–62; PO Resp. 13–18; PO Sur-Reply 12–15. Because Petitioner has not shown that fabricating an integrated circuit was within the level of ordinary skill for a person within the field of speech recognition, we find that the Petition does

29

not show by a preponderance of evidence that the combination of Smyth and Mozer teaches "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as claimed.

Even if we were to accept Petitioner's untimely contention that "[i]f a POSITA can be a consumer of an IC fabricated by others, then a POSITA does not need to be able to perform the actual fabrication" and that a person of ordinary skill would have mapped Smyth's teachings to an integrated circuit that was already fabricated (Reply 24), we still would disagree. The Petition does not explain how a memory located in one of the integrated circuits relied on in the Petition would have been able to store Smyth's state memory.

For example, Mozer discloses that an "external processor loads . . . a second vector representing a template into the memory 460," where memory 460 is 4 kilobytes. Ex. 1046, 10:17–21. Petitioner has not explained how Smyth's state memory, which, as Mr. Schmandt testifies, requires at least 4.7 kilobytes, would have been stored in Mozer's 4kilobytes of memory. Similarly, Petitioner has not shown that Toyoda's, Boike's, or Ozcelik's memory would have been large enough to store Smyth's acoustic model. Further, we agree with Patent Owner and Dr. Anderson, that Boike and Ozcelik are not directed to speech recognition, and do not teach an integrated circuit that has an acoustic model memory as recited in claim 1. PO Sur-Reply 13–14 (citing Ex. 2020 ¶¶ 57–58).

We also agree with Patent Owner that Petitioner has not persuasively shown that the processor and acoustic model memory of Toyoda were fabricated on an integrated circuit. PO Sur-Reply 14. Although Petitioner relies on the testimony of Mr. Schmandt to show that Toyoda teaches an acoustic model memory and a processor fabricated on an integrated circuit,

30

Mr. Schmandt does not identify persuasive evidence to support this conclusion. *See* Ex. 1003 ¶ 74. Missing from Mr. Schmandt's analysis is evidence to show that a person of ordinary skill in the art would have understood that the sensor signal processor would have been fabricated as an integrated circuit. *See id*. In contrast, Dr. Anderson testifies that Toyoda does not teach fabricating an integrated circuit with a processor and acoustic model memory. Ex 2020 ¶¶ 57–58; *see id*. ¶ 62. Given the persuasive testimony from Dr. Anderson and the lack of evidence to support Mr. Schmandt's conclusion, we agree with Patent Owner (PO Resp. 16–18; PO Sur-Reply 14) in finding that Petitioner has not shown by a preponderance of evidence that the components of Toyoda's sensor signal processor were fabricated on an integrated circuit.

Similarly, we agree with Patent Owner that Petitioner has not shown that Mozer discloses a calculating apparatus and an acoustic model memory fabricated on an integrated circuit as claimed. PO Sur-Reply 13. The Petition contends that "*Mozer* teaches a single integrated circuit on which a vector processor 423 (i.e., calculating apparatus) and memory 460 (i.e., acoustic model memory) are fabricated." Pet. 40. We disagree. Petitioner has not persuasively explained how the memory of Mozer, which stores a vector representing a template (Ex. 1046, 10:17–21), teaches the claimed acoustic model memory. In particular, Petitioner has not explained how a vector representing a template teaches "an acoustic model defining a plurality of states" as claimed. We rely on the cross-examination testimony of Mr. Schmandt in which he agreed with Patent Owner that Mozer does not teach a single integrated circuit on which "the calculating apparatus and the acoustic model memory are fabricated" as recited in claim 1. PO Sur-Reply 13 (citing Ex. 2021, 31:15–21 (Mr. Schmandt testifying that the "vector

31

memory [460 of Mozer] is not the same as the full acoustic template memory")).

Petitioner's specific motivation statements to the contrary are not persuasive, because Mozer does not teach a calculating apparatus and an acoustic model memory fabricated on an integrated circuit as recited in claim 1. Therefore, the benefits of Mozer identified in the Petition are benefits that are achieved without "the calculating apparatus and the acoustic model memory [being] fabricated on a single integrated circuit" as recited. Petitioner presents two specific benefits taught by Mozer, namely, offloading vector processing operations, and not requiring a CPU HOLD to access data in the acoustic model memory. However, both of these benefits are achieved without fabricating the calculating apparatus and the acoustic model memory on an integrated circuit as discussed below. Petitioner further contends that Dr. Anderson provided a motivation to combine Smyth and Mozer in testifying that increasing on-chip memory to hold part of an acoustic model would have limited off-chip memory transfers as taught by Nguyen. Reply 12. Petitioner also contends that the Petition established that the combination of Smyth and Mozer was the use of the known technique of utilizing a memory and a processor fabricated on a single integrated circuit. *Id*. at 13–14. We address Petitioner's specific motivation statements in the following paragraphs.

Petitioner contends that Mozer teaches the benefit of offloading vector processing operations to an audio recognition peripheral, and that this advantage is due to the processor and memory of the peripheral being on one integrated circuit. Pet. 42; Reply 15. In contrast, Patent Owner contends that Smyth already offloads vector processing operations to its classifier 34 without fabricating processor 341 and state memory 342 on a single

32

integrated circuit. PO Resp. 10–11; PO Sur-Reply 5. Patent Owner further contends that the advantage of offloading taught by Mozer exists with respect to all embodiments of Mozer, not only to Mozer's embodiments that have a vector processor and memory on the same integrated circuit. PO Sur-Reply 6–7.

We agree with Patent Owner. Mozer discloses that "embodiments described herein are illustrative of the advantages of providing a recognition peripheral system on one integrated circuit" (Ex. 1046, 9:16–18), where some embodiments of the recognition peripheral system, such as Figures 3 and 4, disclose a processor and memory on the same integrated circuit, and other embodiments, such as Figures 1 and 2, do not. *See id*. at 5:3–7, Fig. 2. Mozer teaches that "*the addition of a vector processor* on the audio recognition peripheral 220 (of Figure 2)," not the addition of a vector processor and memory, "*further reduces the loading on the CPU 210*." *Id*. at 5:61–64 (emphasis added). Dr. Anderson testifies that a person of ordinary skill would have known that Smyth, without modification, already achieves the benefit of offloading without fabricating processor 341 and state memory 342 on a single integrated circuit. Ex. 2020 ¶¶ 48–49. We rely on Dr. Anderson's testimony in finding that the advantage of offloading vector processing taught by Mozer is achieved by both Mozer and Smyth without fabricating a processor and acoustic model memory on a single integrated circuit.

Petitioner contends that Mozer teaches a benefit in disclosing an embodiment where "the vector processor does not generate a CPU HOLD signal on control line 428 to carry out the vector operation because both vector inputs are accessed from peripheral memory 460." Reply 16 (quoting Ex. 1046, 10:27–30) (emphasis omitted). Petitioner then cites to another

33

embodiment of Mozer where the vector processor generates a CPU HOLD and "accesses the template vector in external memory . . . over vector processor interface lines 446." *Id*. at 18 (quoting Ex. 1046, 10:1–16). Petitioner contends that when the template vector is stored in memory on the same chip as the vector processor, a CPU HOLD is not required, but when the template vector is stored in external memory, a CPU HOLD is required. *Id*. at 19. Petitioner contends that Mozer's no CPU HOLD embodiment is a benefit that results from fabricating an acoustic model memory such as Smyth's state memory and a calculating apparatus on the same integrated circuit. *Id*.

Patent Owner contends that a CPU HOLD is only required where an external memory is shared between multiple devices. PO Sur-Reply 8–9 (citing Ex. 1068 ¶ 10; Ex. 2021, 35:2–6, 36:2–12). Patent Owner contends that an external memory that is not shared between multiple devices, such as a vector processor and a CPU, would not require a CPU HOLD. *Id*. at 9. Patent Owner contends that Petitioner's comparison between Mozer's embodiment discussed at 9:35–10:16 with the embodiment discussed at 10:16–34 is incorrect, because the distinction is not between on-chip versus off-chip memory, but between a memory shared between devices and a memory accessible by only one device. *Id*. Patent Owner contends that Petitioner has not shown that Smyth's state memory 342 is shared between multiple devices and would require a CPU HOLD. *Id*. at 10.

We agree with Patent Owner. Dr. Anderson testifies that the purpose of a CPU HOLD is to prevent memory collisions that would occur if two processors were to attempt to access the same memory at the same time. Ex. 2020 ¶ 53. Dr. Anderson testifies that Mozer's "vector processor does not generate a CPU HOLD . . . because both vector inputs are accessed from

peripheral memory 460." *Id*. ¶ 52 (quoting Ex. 1046, 10:17–34) (alteration in original). Dr. Anderson testifies that Smyth does not have multiple processors connected to its state memory, therefore, it already has the benefit of not requiring a CPU HOLD to access information from state memory. *Id*. ¶ 53.

Petitioner contends that Dr. Anderson admitted that limiting transfers from off-chip memory would make a system more efficient, and that there are benefits to Nguyen's batch-based approach that could hold part of an acoustic model. Reply 12 (citing Ex. 1047; Ex. 1069, 79:18–21, 89:3–92:21). Patent Owner, in contrast, contends that Petitioner is citing to Dr. Anderson's testimony about the teachings of the '789 patent, not the prior art, and to Dr. Anderson's testimony discussing the reason that Nguyen does not teach an acoustic model memory as claimed. PO Sur-Reply 10–11 (citing Ex. 1069, 88:17–91:10, 92:12–21).

We agree with Patent Owner. As discussed above in our analysis of Smyth alone, Dr. Anderson testified that the teachings of the '789 patent itself were unknown in the prior art, and, to the extent that the advantages from a processor and a memory fabricated on the same integrated circuit were known, such advantages by themselves do not show that any of the prior art integrated circuits relied on in the Petition would have been able to store Smyth's state memory.

With respect to Dr. Anderson's testimony regarding the teachings of Nguyen, we disagree with Petitioner's conclusion. Dr. Anderson testifies that "Ng[u]yen proposes . . . this batched-based approach . . . does provide some modest benefits to have . . . on-chip memory that could hold part of an acoustic model, but . . . that's not something I considered closely, because that's not what the claim requires . . . . [The claim requires] memory for

storing the acoustic model." Ex. 1069, 92:12–21. Placing this testimony in the context of Dr. Anderson's complete answer to the question "Is it beneficial to have a larger memory that is on chip to hold more of the acoustic states of the acoustic model" (*id.* at 91:21–23), he answered that the amount of memory in the Petition's proposed combination of prior art would have to be increased by a factor of 480 in order to hold the acoustic model as claimed. *Id*. at 91:24–92:21. Contrary to Petitioner's contention, Dr. Anderson was testifying that the memory of Nguyen, as well as the memory of the other references relied on in the Petition, was not large enough to store an acoustic model as claimed.

We highlight that the Petition did not rely on the teachings of Nguyen to support the contention that the combination of Smyth and Mozer teaches a processor and an acoustic model memory fabricated on an integrated circuit. Nor did the Petition identify any portion of Nguyen that teaches a processor and an acoustic model memory fabricated on an integrated circuit. Having reviewed Nguyen, we do not find that Nguyen teaches a processor and an acoustic model memory fabricated on an integrated circuit. We find that Dr. Anderson's testimony with respect to Nguyen is consistent with his testimony in the context of his entire answer and is consistent with his declaration testimony that the prior art cited in the Petition neither discloses nor teaches a processor and an acoustic model memory fabricated on an integrated circuit as claimed.

Petitioner contends that "the Petition established the combination would have been 'use of a known technique of fabricating a memory and processor on a single integrated circuit.'" Reply 13 (quoting Pet. 42) (emphasis omitted). Again, Petitioner is contending that the knowledge of a person of ordinary skill in the art of speech recognition would have included

36

knowledge of a technique of fabricating an integrated circuit. However, as discussed above, the Petition did not establish that a person of ordinary skill in the art of speech recognition would have known how to fabricate an acoustic model memory and processor on a single integrated circuit.

In Reply, Petitioner contends that "if there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine." Reply 13 (quoting *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023)). Petitioner contends that Patent Owner does not dispute that a processor and memory fabricated on an integrated circuit is known, that fabricating the components on the same integrated circuit improves efficiency, and that integrated circuits for speech recognition were ubiquitous. *Id.* Petitioner contends that the Smyth-Mozer combination would not have been beyond the level of ordinary skill because integrated circuits with a processor and a memory fabricated thereon were commonly available. *Id.* at 14. Petitioner contends that "the Petition established the *Smyth-Mozer* combination was use of a known technique of utilizing a memory and processor fabricated on a single IC, and [Patent Owner] admitted it was within the POSITA's skillset to procure such hardware to utilize in a speech recognition system." *Id.*

Patent Owner contends that Petitioner has not presented persuasive evidence showing that fabricating a single integrated circuit with a "calculating apparatus" and "an acoustic model memory for storing an acoustic model defining a plurality of states" as claimed was known. PO Sur-Reply 11. Patent Owner contends that Petitioner relies on generic knowledge regarding the benefits of integrated circuits writ large, which cannot serve to render the specific speech recognition circuit of the

37

challenged claims. *Id.* Patent Owner contends that Petitioner cannot identify the specific speech recognition circuit of the challenged claims anywhere in the prior art. *Id.*

We agree with Patent Owner. Petitioner has not shown that any of the integrated circuits cited in the Petition would have been able to include the claimed acoustic model memory. Further, we find, contrary to Petitioner's contention, that Patent Owner did not admit that procuring a processor and a memory capable of storing an acoustic model memory fabricated on an integrated circuit was within the level of ordinary skill. To the contrary, throughout the entire proceeding, Patent Owner has consistently argued that the claimed "calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" was unknown in the prior art. Petitioner has not shown that using the prior art elements relied on in the Petition according to their established functions would have resulted in "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as recited in claim 1.

In summary, Petitioner relies on Mozer to teach the benefits of fabricating a calculating apparatus and an acoustic model memory on the same integrated circuit, but Mozer does not teach a calculating apparatus and an acoustic model memory fabricated on the same integrated circuit. Further, the benefits of Mozer identified by Petitioner are benefits that both Mozer and Smyth already have, without fabricating the calculating apparatus and the acoustic model memory on the same integrated circuit. Also, even if Petitioner had shown there was a reason to combine Smyth and Mozer, Petitioner does not persuasively show that the combination teaches "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as recited in claim 1. The Petition identifies only

38

one integrated circuit that would have been able to include an "acoustic model memory for storing an acoustic model defining a plurality of acoustic states" as claimed, which is the one that "a POSITA would have been motivated . . . to fabricate" (Pet. 44), which was beyond the level of ordinary skill. We find that the Petition has not shown that claim 1 is unpatentable over Smyth and Mozer.

*4. Claim 10*

Petitioner relies on its contentions with respect to claim 1 for how the combination of Smyth and Mozer teaches the subject matter of independent claim 10. Pet. 44.

*A first interface . . . .*

Claim 10 recites "a first interface for receiving at least one feature vector." Petitioner contends that the combination of Smyth and Mozer teaches this limitation. Pet. 17. Petitioner contends that Smyth describes "wherein the feature vector is determined from the audio signal" in disclosing a classifier that receives feature vectors generated from frames of speech samples. Pet. 17–19. Petitioner contends that Smyth describes "a first interface for receiving at least one feature vector" in disclosing a signal line that transmits feature vectors to the classifier. Pet. 19–22.

Petitioner contends that to the extent Smyth does not teach the claimed first interface, it would have been obvious to modify Smyth's system to include Mozer's signal lines. Pet. 22. Mozer describes "a 'first interface' for receiving at least one feature vector" in disclosing memory input lines and memory interface lines that send feature vectors from a feature extractor to memory. Pet. 22–23 (citing Ex. 1046, 6:55–7:27, 9:54–56, Fig. 3; Ex. 1003 ¶ 138). Petitioner, relying on the testimony of Mr. Schmandt, contends that Mozer's technique of transmitting data between

39

electronic components over signal lines would have improved Smyth's feature vector extractor in the same way, namely, providing for transmission of data between the extractor and the classifier. Pet. 23–24 (citing Ex. 1003 ¶ 139); *see KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

Patent Owner does not present arguments to the contrary. We find that Petitioner has shown that Smyth alone as well as the combination of Smyth and Mozer teaches this limitation.

*A calculating apparatus . . . .*

Claim 10 recites "a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and at least one acoustic state of an acoustic model read from an acoustic model memory." Petitioner contends that Smyth describes this limitation in disclosing a classifier that calculates state probabilities indicating the likelihood that the input feature vector corresponds to each acoustic state of the acoustic model read from state memory 342. Pet. 29–30. Petitioner contends that the probabilities are distances, because each probability represents the likelihood that the input feature vector corresponds to the corresponding acoustic state. Pet. 30–33.

Patent Owner does not present arguments to the contrary. We find that Petitioner has shown that Smyth teaches this limitation.

*A second interface . . . .*

Claim 10 recites "a second interface for sending at least one distance calculated by the calculating apparatus." Petitioner contends that Smyth

describes this limitation in disclosing a signal line that transmits state probabilities from the classifier to the sequencer. Pet. 33–37.

Petitioner contends that to the extent that Smyth alone does not teach this limitation, the combination of Smyth and Mozer teaches this limitation. Pet. 37–38. Petitioner contends that Mozer describes this limitation in disclosing an interface for sending a calculated distance. Pet. 37–38. Petitioner contends that a person of ordinary skill in the art would have been motivated to combine the second interface of Mozer with the classifier and sequencer of Smyth for the reasons given in Petitioner's analysis of the claimed "first interface." Pet. 37.

Patent Owner does not present arguments to the contrary. We find that Petitioner has shown that Smyth alone as well as the combination of Smyth and Mozer teaches this limitation. We find that Petitioner has shown, by a preponderance of evidence, that claim 10 is unpatentable over Smyth alone as well as the combination of Smyth and Mozer.

### 5. *Dependent Claims 11, 14, and 17*

Claim 11 depends from claim 10 and recites "wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit." Petitioner contends that a person of ordinary skill would have been motivated to modify Smyth according to Mozer's teachings for the reasons given in Petitioner's analysis of the term "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" recited in claim 1. Pet. 44.

We find that the combination of Smyth and Mozer does not teach this limitation for the reasons given in our analysis of claim 1. We find that the Petition has not shown that claim 11 is unpatentable over Smyth and Mozer.

41

Claim 14 depends from claim 10 and recites "wherein the second interface for sending distances is a serial bus." Petitioner contends that the combination of Smyth and Mozer teaches this limitation. Pet. 44–45. Petitioner contends that Smyth teaches a second interface for sending distances, and Mozer teaches sending information over a serial bus. *Id.* (citing Ex. 1046, 4:17–28; Ex. 1003 ¶ 174).

Petitioner contends that a person of ordinary skill would have been motivated to modify Smyth according to Mozer's teachings for the reasons given in Petitioner's analysis of the term "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" recited in claim 1, namely, to reduce resource loading on the programmable processing unit. Pet. 45 (citing Pet. 38–44; Ex. 1003 ¶ 175; Ex. 1046, 4:44–49). Petitioner also contends that a person of ordinary skill in the art would have understood that transmitting data in serial format provides the benefit of reducing trace complexity of a printed circuit board such as an integrated circuit by using a single line instead of multiple copper traces and thus requires less space. *Id.* (citing Ex. 1003 ¶ 175). Mr. Schmandt testifies that a person of ordinary skill would have understood that in some circumstances, using a serial bus would have been more efficient due to a limited number of connection lines. Ex. 1003 ¶ 175 (citing Ex. 1064, 6:64–7:11). Patent Owner does not present arguments to the contrary.

We find that fabricating an integrated circuit was beyond the level of ordinary skill in the art as discussed in our analysis of claim 1. Therefore, we find that a person of ordinary skill in the art would not have modified Smyth according to Mozer's teachings for the reasons given in Petitioner's analysis of the term "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" recited in claim 1, nor

42

for the benefit of reducing trace complexity of a printed circuit board such as an integrated circuit.

However, we are persuaded by Mr. Schmandt's testimony that a person of ordinary skill in the art would have used a serial bus for the benefit of increasing efficiency due to a limited number of interconnection lines. The reference relied on by Mr. Schmandt teaches employing a serial bus to exchange data with an external device "due to the limited number of interconnection lines or yet other conditions where exchange of serial data is more feasible and practical." Ex. 1064, 6:64–7:11. Further, Mozer teaches that a person of ordinary skill in the art would have understood that a serial bus may be used instead of a parallel bus to connect one device to another. Ex. 1046, 4:17–28 ("[T]he programmable processing unit 110 also transmits . . . information to the audio recognition peripheral 120 over the general purpose bus 130. . . . The bus 130 may include . . . parallel lines. . . . Of course, a serial bus may also be employed."). We find that employing a serial bus instead of a parallel bus was within the knowledge of a person of ordinary skill. We rely on Mr. Schmandt's testimony in finding that a person of ordinary skill in the art would have used a serial bus as Smyth's second interface for sending distances for the benefit of increasing efficiency due to a limited number of interconnection lines or other conditions where exchange of serial data is more practical. We find that the Petition has shown by a preponderance of evidence that claim 14 is unpatentable over Smyth and Mozer.

Claim 17 recites "wherein the acoustic coprocessor is capable of, in response to receiving a feature vector, autonomously calculating the distances for each acoustic state of the acoustic model." Petitioner contends that Smyth's classifier is configured to autonomously calculate distances

43

because classifier processor 341 reads each state field stored in state memory 342 and calculates a distance for each state in response to receiving a feature vector. Pet. 46–47 (citing Ex. 1005, 5:7–9, 5:63–67; Ex. 1003 ¶ 176). Patent Owner does not present arguments to the contrary.

We agree with Petitioner and Mr. Schmandt in finding that Smyth teaches this limitation of claim 17. We find that the Petition has shown by a preponderance of evidence that claim 17 is unpatentable over Smyth and Mozer.

### E. Challenge Based on Smyth, Mozer, and Nguyen

Petitioner contends that claims 2, 4, 6–9, 12, 16, 18, 20, and 21 are unpatentable over Smyth, Mozer, and Nguyen. Pet. 4.

#### 1. Overview of Nguyen

Nguyen discloses a method for improving pattern matching in a speech recognition system having a plurality of acoustic models. Ex. 1047, Abstract. Nguyen discloses that the method performs a similarity measure for a group of vectors by loading an acoustic model into memory, where Gaussian distribution data is the basis for the acoustic model. *Id*. at 3:35–46. Nguyen discloses computing a similarity measure for each acoustic feature vector by performing a Gaussian computation. *Id*. at 3:50–54.

#### 2. Claims 2, 4, 6–9, 12, 16, 18, 20, and 21

Claims 2, 4, and 6–9 depend from claim 1. Petitioner has not shown that claim 1 is unpatentable over the combination of Smyth and Mozer, because the Petition has not shown that the combination teaches the claim limitation "the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit" as discussed above in our analysis of claim 1. Petitioner does not rely on Nguyen to teach this limitation. *See*

44

Pet. 47–59.  Therefore, Petitioner has not shown that claims 2, 4, and 6–9 are unpatentable over the combination of Smyth, Mozer, and Nguyen.

Claim 12 depends from claim 10 and recites "wherein the acoustic model contains Gaussian parameters and the distances are probabilities." Petitioner contends that this claim is unpatentable for the reasons given in the Petition's analysis of claims 2 and 10.  Pet. 58.  Petitioner contends that Nguyen teaches this limitation in disclosing a method that performs a similarity measure for a group of vectors where Gaussian distribution data serves as the basis for the acoustic model, and the similarity measure is computed by performing a Gaussian computation for each acoustic feature vector.  Pet. 47–48 (citing Ex. 1047, 2:30–38, 3:35–46, 3:50–54).  Petitioner contends that Nguyen discloses that a mixture of Gaussian distributions may be used to represent probability values.  Pet. 48 (citing Ex. 1047, 2:49–67, Fig. 1; Ex. 1003 ¶ 177).  Petitioner contends that a person of ordinary skill in the art would have modified Smyth's acoustic model to represent probability in terms of a Gaussian distribution for the benefits of providing probability values associated with each state that are more complex than a single value could represent and for providing a more robust model.  Pet. 49 (citing Ex. 1003 ¶ 178).

Patent Owner does not present arguments to the contrary.  We agree with Petitioner and rely on Mr. Schmandt's testimony in finding that claim 12 is unpatentable over the combination of Smyth, Mozer, and Nguyen.

Claim 16 recites a "speech recognition system comprising the acoustic coprocessor of claim 10, the speech recognition system further comprising at least one CPU, wherein: the CPU executes software to perform or initiate a speech recognition word search using one or more distances calculated by the acoustic coprocessor in response to receiving a first feature vector, and a

45

time period for the speech recognition word search overlaps with a time period for the acoustic coprocessor to calculate one or more distances in response to receiving a second feature vector."

Petitioner contends that this claim is unpatentable for the reasons given in the Petition's analysis of claims 9 and 10. Pet. 58. Petitioner contends that Smyth teaches "at least one CPU" in describing that parsing processor 351 may be a microprocessor such as the Intel 486 microprocessor or the Motorola 68000 microprocessor. Pet. 53 (citing Ex. 1005, 6:47–51; Ex. 1003 ¶ 185). Petitioner contends that Smyth teaches that "the CPU . . . perform[s] . . . a speech recognition word search" as claimed in describing that the parsing processor reads probabilities, or "distances calculated by the acoustic processor" as claimed, output by classifying processor 341 and compares the probabilities with stored state sequences, where each state sequence corresponds to a word or phrase. Pet. 53–54. Petitioner contends that parsing processor 351 outputs the most probable state sequence indicating the recognized word or phrase. *Id*. (citing Ex. 1005, 6:36–61; Ex. 1003 ¶ 187).

Petitioner contends that Nguyen teaches that the "time period for the . . . word search overlaps with a time period . . . to calculate . . . distances" as claimed in disclosing computing a similarity measure for each feature vector in a first group of feature vectors, performing a word search process based on the similarity measures, and, contemporaneous with the word search process, retrieving a subsequent group of feature vectors and computing a similarity measure for each feature vector in the subsequent group. Pet. 55–57 (citing Ex. 1047, 2:30–38, 3:11–24, 3:51–52, 3:61–4:22, Fig. 1; Ex. 1003 ¶¶ 189–193). Petitioner contends that a person of ordinary skill in the art would have modified Smyth's system so that classifier processor 341

46

performs distance calculations contemporaneous with parser processor 351 performing a word search for the benefit of improving system performance as taught by Nguyen.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in finding that claim 16 is unpatentable over the combination of Smyth, Mozer, and Nguyen.

Claim 18 depends from claim 17 and recites "one or more result memories configured to store the distances for each acoustic state of the acoustic model." Petitioner contends that this claim is unpatentable for the reasons given in Petitioner's analysis of claim 7. Pet. 58. Petitioner contends that Nguyen teaches a result memory in disclosing an output memory space that stores resulting similarity measures and is accessible to the processor performing computations. Pet. 50 (citing Ex. 1047, 4:1–7). Petitioner contends that a person of ordinary skill in the art would have added the result memory of Nguyen to Smyth's classifier for the benefit of writing distances to memory without waiting for the sequencer to be ready to accept the results. Pet. 51 (citing Ex. 1003 ¶ 182).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in finding that claim 18 is unpatentable over the combination of Smyth, Mozer, and Nguyen.

Claim 20 depends from claim 18 and recites "the calculating apparatus is capable of computing distances using acoustic models representing Gaussian probability distributions." Petitioner contends that this claim is unpatentable for the reasons given in Petitioner's analysis of claims 2 and 18. Pet. 58. Petitioner contends that Nguyen teaches this limitation in disclosing a method that performs a similarity measure for a group of vectors where Gaussian distribution data serves as the basis for the

47

acoustic model, and the similarity measure is computed by performing a Gaussian computation for each acoustic feature vector. Pet. 47–48 (citing Ex. 1047, 2:30–38, 3:35–46, 3:50–54). Petitioner contends that Nguyen discloses that a mixture of Gaussian distributions may be used to represent probability values. Pet. 48 (citing Ex. 1047, 2:49–67, Fig. 1; Ex. 1003 ¶ 177). Petitioner contends that a person of ordinary skill in the art would have modified Smyth's acoustic model to represent probability in terms of a Gaussian distribution for the benefits of providing probability values associated with each state that are more complex than a single value could represent and for providing a more robust model. Pet. 49 (citing Ex. 1003 ¶ 178).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in finding that claim 20 is unpatentable over the combination of Smyth, Mozer, and Nguyen.

Claim 21 depends from claim 20 and recites "the acoustic model uses a neural network to calculate at least one of the distances." Petitioner contends that Mozer teaches an acoustic coprocessor using a neural network to calculate distances. Pet. 59 (citing Ex. 1046, 10:35–52). Petitioner contends that a person of ordinary skill in the art would have calculated distances in the system of Smyth using a neural network as taught by Mozer for the benefit of using Mozer's known technique of calculating distances using a neural network to improve Smyth's speech recognition system in the same way. Pet. 59 (citing Ex. 1003 ¶ 204). Mr. Schmandt testifies that using a neural network would improve Smyth's system, citing to Jelinek to support his conclusion. Ex. 1003 ¶ 204; *see id.* ¶ 67 (citing Ex. 1020, 43). Jelinek teaches that "it is possible to use models other than HMMs as a basis

of speech recognition. Among these, artificial neural networks . . . are preeminent." Ex. 1020, 43.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in finding that claim 21 is unpatentable over the combination of Smyth, Mozer, and Nguyen.

### F. Challenge Based on Smyth, Mozer, and Houser

Petitioner contends that claim 13 is unpatentable over the combination of Smyth, Mozer, and Houser. Pet. 4.

### 1. Overview of Houser

Houser discloses an information system having a speech interface for implementing spoken control of electronic devices. Ex. 1040, 2:19–21. The system includes a ROM for storing speech recognition software and phoneme definitions, a RAM for storing vocabulary, and a flash memory for maintaining the vocabulary after power is removed. *Id*. at 15:29–34. A processor performs speech recognition using the stored speech recognition software and vocabulary. *Id*. at 15:42–46. When words are spoken, the processor uses phonemic definitions and speech recognition software stored in ROM to compare the spoken words with the vocabulary data stored in RAM and/or flash memory. *Id*. at 15:48–55.

### 2. Claim 13

Claim 13 recites "the acoustic model memory is a FLASH memory." Petitioner contends that Houser teaches a speech recognition system including flash memory for storing phonemic or template vocabulary data. Pet. 59 (citing Ex. 1040, 15:33, 15:46–48). Petitioner contends that a person of ordinary skill in the art would have modified Smyth to use flash memory for state memory 342 (which Petitioner maps to the claimed "acoustic model

49

memory") for the benefits of providing fast and non-volatile memory. Pet. 60 (citing Ex. 1003 ¶ 205).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on the testimony of Mr. Schmandt in finding that claim 13 is unpatentable over the combination of Smyth, Mozer, and Houser.

### G. *Challenge Based on Smyth, Mozer, Nguyen, and Vensko*

Petitioner contends that claims 22–24 are unpatentable over the combination of Smyth, Mozer, Nguyen, and Vensko. Pet. 4.

#### 1. *Overview of Vensko*

Vensko discloses a continuous speech recognition system that includes a plurality of processors doing template comparisons of speech data. Ex. 1038, Abstract. Vensko discloses a plurality of template processors, where each template processor compares each received distance vector with its assigned templates stored in its memory using a dynamic programming algorithm (DPA). *Id.* at 5:67–6:3. When each template processor has run the DPA on each of the assigned templates for the distance vector and obtained a result, the template processors generate an interrupt to a master processor to inform the master processor that the results are ready for transfer. *Id.* at 6:29–33.

#### 2. *Claims 22–24*

Claim 22 depends from claim 21 and recites "the acoustic coprocessor is capable of generating an interrupt in response to a completion of calculation of a set of distances." Petitioner contends that Vensko teaches this limitation in describing a template processor that performs comparisons between a distance vector and its assigned templates, and generates an interrupt when results are ready for transfer. Pet. 60 (citing Ex. 1038, 6:22–

50

29; Ex. 1003 ¶ 206). Petitioner contends that a person of ordinary skill in the art would have modified Smyth's classifier 34 to generate an interrupt to inform Smyth's sequencer 35 that a set of distances have been calculated as taught by Vensko for the benefit of increasing the efficiency of transmitting data to the sequencer. Pet. 60–61 (citing Ex. 1003 ¶ 207).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 22 is unpatentable over the combination of Smyth, Mozer, Nguyen, and Vensko.

Claim 23 depends from claim 22 and recites "the acoustic model memory includes a plurality of storage locations within a static random access memory (SRAM)." Petitioner contends that Mozer teaches using SRAM to store a feature vector and a vector representing a template. Pet. 61 (citing Ex. 1046, 9:22–28; Ex. 1003 ¶ 208). Petitioner, relying on the testimony of Mr. Schmandt, contends that a person of ordinary skill in the art would have implemented Smyth's state memory using SRAM as taught by Mozer for the benefits of providing fast memory access and low power consumption. Pet. 60–61 (citing Ex. 1003 ¶ 209).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 23 is unpatentable over the combination of Smyth, Mozer, Nguyen, and Vensko.

Claim 24 depends from claim 23 and recites "the SRAM and the calculating apparatus are fabricated on a single integrated circuit." Petitioner contends that a person of ordinary skill would have been motivated to modify Smyth according to Mozer's teachings for the reasons given in Petitioner's analysis of the term "the calculating apparatus and the

51

acoustic model memory are fabricated on a single integrated circuit" recited in claim 1. Pet. 62.

We find that the combination of Smyth and Mozer does not teach this limitation for the reasons given in our analysis of claim 1. Petitioner does not rely on Nguyen or Vensko to teach this limitation. *See* Pet. 62. We find that the Petition has not shown that claim 24 is unpatentable over the combination of Smyth, Mozer, Nguyen and Vensko.

### H. Challenge Based on Smyth, Mozer, Nguyen, Vensko, and Comeau

Petitioner contends that claims 25–28 and 37 are unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau. Pet. 4.

#### 1. Overview of Comeau

Comeau discloses a resource sharing system which makes a resource connected to one processor available to a second processor. Ex. 1044, Abstract. Comeau discloses a coprocessor mailbox/status register 102 that notifies a host processor 40 when a host FIFO memory 76 that is used to transmit data from a coprocessor 48 to the host processor is full, empty, or not empty. *Id.* ¶¶ 151–161, 168, 181–182. Comeau discloses that status register 102 includes a bit to indicate that host FIFO 76 is empty, and a bit to indicate that host FIFO 76 is full. *Id.* ¶ 342 (Table 5).

#### 2. Claims 25–28 and 37

Claim 25 depends from claim 22 and recites "a status register, wherein the acoustic coprocessor is capable of setting one or more bits in the status register to values that indicate the completion of calculation of the set of distances." Petitioner contends that Smyth teaches an acoustic coprocessor for the reasons given in Petitioner's analysis of claim 1, and that Comeau teaches a status register that sets a bit to notify a host processor whether the register is empty, full, or not empty. Pet. 62–63. Petitioner

52

contends that a person of ordinary skill would have modified the acoustic coprocessor of Smyth to include the status register of Comeau for the benefit of providing a flexible mechanism for status information to be shared with another processor. Pet. 64 (citing Ex. 1003 ¶¶ 215–216). Mr. Schmandt testifies that modifying the acoustic coprocessor of Smyth to include a status register and setting a bit in the status register when distance calculations are available provides the benefit of informing parsing processor 351 that distance calculations are available, thus providing a flexible mechanism for status information to be shared with the parsing processor as taught by Comeau. Ex. 1003 ¶¶ 213–215 (citing Ex. 1044 ¶ 201).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 25 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau.

Claim 26 depends from claim 25 and recites "the acoustic coprocessor further comprises a direct memory access (DMA) controller capable of copying distances from the one or more result memories to a buffer memory." Petitioner contends that Vensko teaches a plurality of template processors that each compare speech data to templates, where each processor has an associated memory shared with other processors by direct memory access (DMA) through a shared data bus. Pet. 65 (citing Ex. 1038, 7:48–53). Petitioner contends that Vensko teaches that DMA transfers may be used to transfer vector data from an end processor to each template processor, to transfer template data among template processors, or to transfer template processor results data to a master processor. *Id*. (citing Ex. 1038, 10:3–9, 10:19–31, Figs. 4, 5, 7; Ex. 1003 ¶ 218). Petitioner contends that a person of ordinary skill in the art would have included a DMA controller as

53

taught by Vensko in Smyth's recognition processor 3 in order to copy distances from a result memory to a buffer memory for the benefit of reducing the load on the processors of Smyth. Pet. 65–66 (citing Ex. 1003 ¶ 219).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 26 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau.

Claim 27 depends from claim 26 and recites "the DMA controller is capable of copying distances in a plurality of sequential bursts." Petitioner, relying on the testimony of Mr. Schmandt, contends that a person of ordinary skill would have understood that a DMA controller as taught by Vensko would have transferred distances in a plurality of sequential bursts, such as 10 transfers of 50 bytes, rather than transferring 500 bytes all at once, for the benefit of accommodating other traffic on the bus. Pet. 66 (citing Ex. 1003 ¶¶ 220–224).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 27 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau.

Claim 28 depends from claim 26 and recites "the speech recognition system further comprises at least one processor configured to execute software to perform or initiate a speech recognition word search using one or more distances calculated by the acoustic coprocessor in response to receiving a first feature vector, and a time period for the speech recognition word search overlaps with a time period for the acoustic coprocessor to calculate one or more distances in response to receiving a second feature

54

vector." Petitioner contends that this claim is unpatentable for the reasons given in Petitioner's analysis of claims 16 and 26. Pet. 67.

Patent Owner does not present arguments to the contrary. We agree with Petitioner in finding that claim 28 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau.

Claim 37 depends from claim 27 and recites "the speech recognition system further comprising at least one microphone." Petitioner contends that Smyth teaches this limitation in disclosing a speech recognition system with a microphone. Pet. 67 (citing Ex. 1005, 1:24–32, 4:22–24, 4:38–40, 4:46–67, Fig. 1; Ex. 1003 ¶ 228).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 37 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, and Comeau.

I. *Challenge Based on Smyth, Mozer, Nguyen, Vensko, Comeau, and Boike*

Petitioner contends that claim 29 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Boike. Pet. 4.

1. *Overview of Boike*

Boike discloses a system-on-a-chip (SoC) integrated circuit containing multiple DSPs. Ex. 1006, 2:1–9, Fig. 1. Boike discloses that by placing more than one DSP on a chip, the DSP/SoC system reduces the number of chips needed to perform digital signal processing, which leads to a decrease in power consumption and heat generation and a savings in cost, as well as an increase in processing speed and a decrease in circuit complexity. *Id.* at 2:21–35.

55

### 2.  *Claim 29*

Claim 29 depends from claim 28 and recites "the acoustic coprocessor and the at least one processor are fabricated on a single integrated circuit." Petitioner contends that Smyth's classifier 34 corresponds to the recited "acoustic coprocessor" and Smyth's sequencer 35 corresponds to the recited "at least one processor."  Pet. 68 (citing Ex. 1005, 5:55–57, 6:13–19). Petitioner, relying on the testimony of Mr. Schmandt, contends that a person of ordinary skill in the art would have implemented the three distinct processing circuits of Smyth on a single integrated circuit as taught by Boike for the benefits of reducing space and costs as well as conserving power. Pet. 68–70 (citing Ex. 1003 ¶¶ 230–233).

Given that Petitioner maps the claimed "acoustic coprocessor" to Smyth's classifier 34, which includes classifier processor 341 and state memory 342, that the Petition has not shown that any of the integrated circuits cited in the Petition would have had enough memory to include both classifier processor 341 and state memory 342, and that the Petition has not shown that fabricating an integrated circuit was within the level of ordinary skill as discussed in our analysis of claim 1, we find that the Petition does not show that the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Boike teaches an "acoustic coprocessor . . . fabricated on a single circuit" as recited in claim 29.  In addition to the reasons given in our analysis of claim 1, we also find that the Petition does not show how an acoustic coprocessor located in the integrated circuit of Boike would have included one or more results memories as recited in claim 18 that would have had enough memory to store the distances for each acoustic state of the acoustic model of Smyth.  We also find that the Petition does not show how

56

an acoustic coprocessor in the integrated circuit of Boike would have included a status register as recited in claim 25.

Petitioner maps the claimed "at least one processor" to Smyth's sequencer 35. Pet. 68. Smyth's state sequencer 35 includes state probability memory 353, which stores the state probabilities output by classifier processor 341. Ex. 1005, 6:13–15. Petitioner maps the buffer memory recited in claim 26 to state probability memory 353. Pet. 64. We find that the Petition does not show how Smyth's state sequencer, when located in the integrated circuit of Boike, would have included the claimed buffer memory that would have been large enough to store the distances copied from the one or more results memories. We find that the combination does not show "at least one processor fabricated on a single circuit" as claimed.

We find that the Petition does not show by a preponderance of evidence that claim 29 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Boike.

### J. Challenge Based on Smyth, Mozer, Nguyen, Vensko, Comeau, and Whittaker

Petitioner contends that claim 35 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Whittaker. Pet. 4.

#### 1. Overview of Whittaker

Whittaker teaches integer values that represent a vocabulary of a language model of an automated speech recognition system. Ex. 1041, 2:32–38. Whittaker teaches providing for the compression of ordered integer arrays of the language model. *Id*. at 2:20–23. In particular, Whittaker converting ordered lists of monotonically increasing integer values of the language model into a variable-bit width tree structure so that

57

the most memory efficient configuration is obtained for each original list. *Id.* at 2:23–28.

### 2. *Claim 35*

Claim 35 depends from claim 26 and recites "the acoustic model includes parameters represented with integer data." Petitioner contends that a person of ordinary skill in the art would have modified Smyth's acoustic model to include parameters represented with integer data for the benefit of obtaining a reduction in size of the language model with no increase in the word error rate as taught by Whittaker. Pet. 71 (citing Ex. 1003 ¶¶ 234–236).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's supporting testimony in determining that claim 35 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Whittaker.

### K. *Challenge Based on Smyth, Mozer, Nguyen, Vensko, Comeau, and Ichikawa*

Petitioner contends that claims 38 and 39 are unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Ichikawa. Pet. 4.

### 1. *Overview of Ichikawa*

Ichikawa discloses a speech recognition system and a method for eliminating noise by using a microphone array, where the microphone array includes a plurality of microphones. Ex. 1042, 1:8–10, 1:28–29.

### 2. *Claims 38 and 39*

Claim 38 depends from claim 27 and recites "a plurality of microphones." Petitioner contends that a person of ordinary skill in the art would have modified the microphone of Smyth to use a plurality of

58

microphones for the benefit of eliminating noise as taught by Ichikawa. Pet. 72 (citing Ex. 1003 ¶¶ 237–238).

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 38 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Ichikawa.

Claim 39 depends from claim 38 and recites the "speech recognition system . . . further comprising the buffer memory." Petitioner contends that the combination teaches the claimed "buffer memory" for the reasons given in Petitioner's analysis of claim 26. Pet. 73.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and find that claim 39 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, and Ichikawa.

## L. Challenge Based on Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Seshadri

Petitioner contends that claims 42–44 are unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Seshadri. Pet. 4.

### 1. Overview of Seshadri

Seshadri discloses a speech recognition device that receives audio signals and video signals, and converts the audio signals and the video signals to recognizable speech. Ex. 1043, Abstract. Seshadri discloses configuring the speech recognition system on a laptop computer, a mobile phone, a PDA, an audio/video recording device, a home computer, a game console, a remote controller, or other comparable device. *Id*. at 3:54–65.

59

## 2. Claims 42–44

Claim 42 recites a "laptop or tablet personal computer comprising the speech recognition system of claim 39." Petitioner contends that Seshadri teaches implementing a speech recognition system in a laptop computer, and that a person of ordinary skill would have done the same with Smyth's system. Pet. 73 (citing Ex. 1003 ¶¶ 240–242). Mr. Schmandt testifies that a modifying the Smyth combination to be implemented using a laptop computer would have advantageously captured additional market share. Ex. 1003 ¶ 242.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 42 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Seshadri.

Claim 43 recites a "mobile phone comprising the speech recognition system of claim 39." Petitioner contends that Seshadri teaches implementing a speech recognition system in a mobile phone, and that a person of ordinary skill would have done the same with Smyth's system. Pet. 73–74 (citing Ex. 1003 ¶¶ 243–245). Mr. Schmandt testifies that modifying the Smyth combination to be implemented using a mobile phone would have advantageously captured additional market share. Ex. 1003 ¶ 245.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 43 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ishikawa, and Seshadri.

Claim 44 recites an "electronic entertainment product comprising the speech recognition system of claim 39." Petitioner contends that Seshadri

teaches implementing a speech recognition system in an electronic entertainment product in disclosing that the speech recognition system can be configured to a home computer, game console, audio/video recording device, or a PDA. Pet. 74–75 (citing Ex. 1003 ¶¶ 246–248). Mr. Schmandt testifies that modifying the Smyth combination to be implemented using an electronic entertainment product would have advantageously captured additional market share. Ex. 1003 ¶ 248.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 44 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ishikawa, and Seshadri.

*M. Challenge Based on Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Steinbiss*

Petitioner contends that claim 45 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Steinbiss. Pet. 4.

*1. Overview of Steinbiss*

Steinbiss discloses a speech recognition device, which is used to act upon functions of an electrical appliance, such as a mobile telephone, television sets, video recorders, hi-fi music systems, or kitchen appliances. Ex. 1045 ¶¶ 1–2.

*2. Claim 45*

Claim 45 recites an "appliance comprising the speech recognition system of claim 39." Petitioner contends that Steinbiss discloses an appliance that includes a speech recognition system. Pet. 75–76 (citing Ex. 1003 ¶¶ 249–252). Mr. Schmandt testifies that modifying the Smyth

61

combination to be implemented using an appliance would have advantageously captured additional market share. Ex. 1003 ¶ 252.

Patent Owner does not present arguments to the contrary. We agree with Petitioner and rely on Mr. Schmandt's testimony in determining that claim 45 is unpatentable over the combination of Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, and Steinbiss.

### III. CONCLUSION

In summary, we determine a preponderance of the evidence establishes that claims 10, 12–14, 16–18, 20–23, 25–28, 35, 37–39, and 42–45 are unpatentable, but does not establish that claims 1, 2, 4, 6–9, 24 and 29 are unpatentable, as shown in the following table:[4]

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 10, 11, 14, 17 | 103(a) | Smyth, Mozer | 10, 14, 17 | 1, 11 |
| 2, 4, 6–9, 12, 16, 18, 20, 21 | 103(a) | Smyth, Mozer, Nguyen | 12, 16, 18, 20, 21 | 2, 4, 6–9 |
| 13 | 103(a) | Smyth, Mozer, Houser | 13 | |
| 22–24 | 103(a) | Smyth, Mozer, Nguyen, Vensko | 22, 23 | 24 |
| 25–28, 37 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau | 25–28, 37 | |

---

[4] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 29 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Boike | | 29 |
| 35 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Whittaker | 35 | |
| 38, 39 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa | 38, 39 | |
| 42–44 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, Seshadri | 42–44 | |
| 45 | 103(a) | Smyth, Mozer, Nguyen, Vensko, Comeau, Ichikawa, Steinbiss | 45 | |
| **Overall Outcome** | | | 10, 12–14, 16–18, 20–23, 25–28, 35, 37–39, 42–45 | 1, 2, 4, 6–9, 11, 24, 29 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 10, 12–14, 16–18, 20–23, 25–28, 35, 37–39, and 42–45 of the '789 patent have been proven by a preponderance of evidence to be unpatentable;

FURTHER ORDERED that claims 1, 2, 4, 6–9, 11, 24, and 29 of the '789 patent have not been proven by a preponderance of evidence to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2023-00036
Patent 10,839,789 B2

FOR PETITIONER:

Jennifer C. Bailey,
Adam P. Seitz,
Kevin Rongish
ERISE IP, P.A.
jennifer.bailey@eriseIP.com
adam.seitz@eriseIP.com
kevin.rongish@eriseip.com

J. David Hadden
Dargaye Churnet
Saina Shamilov
FENWICK & WEST LLP
dhadden@fenwick.com
dchurnet@fenwick.com
sshamilov@fenwick.com

FOR PATENT OWNER:

Peter C. Knops
Kayvan B. Noroozi (*Pro Hac Vice*)
NOROOZI P.C.
peter@noroozipc.com
kayvan@noroozipc.com

Katherine Rhoades
BARTLITBECK L.L.P.
katherine.rhoades@bartlitbeck.com

66



US010839789B2

## (12) United States Patent
### Larri et al.

(10) **Patent No.:** **US 10,839,789 B2**
(45) **Date of Patent:** *\*Nov. 17, 2020**

(54) **SPEECH RECOGNITION CIRCUIT AND METHOD**

(71) Applicant: **Zentian Limited**, Cambridge (GB)

(72) Inventors: **Guy Larri**, Cambridge (GB); **Mark Catchpole**, Cambridge (GB); **Damian Kelly Harris-Dowsett**, Coventry (GB); **Timothy Brian Reynolds**, Cambridge (GB)

(73) Assignee: **Zentian Limited**, Cambridge (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/058,722**

(22) Filed: **Aug. 8, 2018**

(65) **Prior Publication Data**

US 2019/0043485 A1 Feb. 7, 2019

### Related U.S. Application Data

(60) Division of application No. 14/788,164, filed on Jun. 30, 2015, now Pat. No. 10,062,377, which is a (Continued)

(30) **Foreign Application Priority Data**

Sep. 14, 2004 (GB) .................................. 0420464.0

(51) **Int. Cl.**
*G10L 15/10* (2006.01)
*G10L 15/08* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *G10L 15/08* (2013.01); *G10L 15/02* (2013.01); *G10L 15/06* (2013.01); *G10L 15/10* (2013.01); *G10L 15/285* (2013.01)

(58) **Field of Classification Search**
CPC ....................................................... G10L 15/10
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,881,312 A 3/1999 Dulong
6,374,220 B1 4/2002 Kao
(Continued)

FOREIGN PATENT DOCUMENTS

EP 1 178 466 A2 2/2002
GB 2 333 172 A 7/1999
(Continued)

OTHER PUBLICATIONS

Glinski et al., "Spoken Language Recognition on DSP Array Processor" IEEE Transactions on Parallel and Distributed Systems, vol. 5, No. 7, pp. 697-703, Jul. 1, 1994.
(Continued)

*Primary Examiner* — Susan I McFadden
(74) *Attorney, Agent, or Firm* — Finnegan Henderson Farabow Garrett & Dunner LLP

(57) **ABSTRACT**

An acoustic coprocessor is provided. The acoustic coprocessor may include an interface for receiving at least one feature vector and a calculating apparatus for calculating distances indicating the similarity between the at least one feature vector and at least one acoustic state of an acoustic model read from an acoustic model memory. The acoustic coprocessor may also include an interface for sending at least one distance calculated by the calculating apparatus.

**45 Claims, 27 Drawing Sheets**



Functions performed by the accelerator are shown in grey

Functions performed by other hardware or software systems are shown in white

IPR2023-00036

Apple EX1001 Page 1

## Related U.S. Application Data

continuation of application No. 13/735,091, filed on Jan. 7, 2013, now Pat. No. 9,076,441, which is a continuation of application No. 13/162,128, filed on Jun. 16, 2011, now Pat. No. 8,352,262, which is a division of application No. 11/662,704, filed as application No. PCT/GB2005/003554 on Sep. 14, 2005, now Pat. No. 7,979,277.

(51) **Int. Cl.**

| *G10L 15/28* | (2013.01) |
|---|---|
| *G10L 15/06* | (2013.01) |
| *G10L 15/02* | (2006.01) |

(58) **Field of Classification Search**

USPC .......................................................... 704/251

See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| 7,328,153 B2 | 2/2008 | Wells et al. | |
|---|---|---|---|
| 7,979,277 B2 * | 7/2011 | Larri | ...................... G10L 15/10 |
| | | | 704/238 |
| 8,036,890 B2 | 10/2011 | Catchpole | |
| 8,352,262 B2 * | 1/2013 | Larri | ...................... G10L 15/10 |
| | | | 704/238 |
| 8,612,227 B2 | 12/2013 | Kato | |
| 9,076,441 B2 | 7/2015 | Larri et al. | |
| 10,062,377 B2 * | 8/2018 | Larri | ...................... G10L 15/10 |
| 2003/0061046 A1 | 3/2003 | Zhao et al. | |
| 2004/0111264 A1 | 6/2004 | Wang et al. | |

### FOREIGN PATENT DOCUMENTS

| GB | 2 391 679 A | 2/2004 |
|---|---|---|
| WO | WO 01/48737 A2 | 7/2001 |
| WO | WO 01/75862 A2 | 10/2001 |
| WO | WO 03/067572 A2 | 8/2003 |

### OTHER PUBLICATIONS

S. Chatterjee et al., "Connected Speech Recognition on a Multiple Processor Pipeline." ICASSP 89, pp. 774-777, May 23, 1989.

* cited by examiner

IPR2023-00036

Apple EX1001 Page 2

# Figure 1A



# Figure 1B



IPR2023-00036
Apple EX1001 Page 4

Appx70



Figure 2A

IPR2023-00036

Apple EX1001 Page 5



IPR2023-00036

Apple EX1001 Page 6

Appx72

# Figure 3A



IPR2023-00036
Apple EX1001 Page 7

# Figure 3B



IPR2023-00036

Apple EX1001 Page 8



# Figure 4

# Figure 5







**Figure 6**

IPR2023-00036
Apple EX1001 Page 11

# Figure 7



# Figure 8A



# Figure 8B



Figure 9



Figure 10



IPR2023-00036
Apple EX1001 Page 16

Appx82

# Figure 11



# Figure 12



IPR2023-00036
Apple EX1001 Page 18

# Figure 13



IPR2023-00036
Apple EX1001 Page 19

Appx85

# Figure 14



IPR2023-00036
Apple EX1001 Page 20

Appx86

# Figure 15



# Figure 16



IPR2023-00036

Apple EX1001 Page 22

# FIGURE 17



IPR2023-00036
Apple EX1001 Page 23



Figure 18

IPR2023-00036

Apple EX1001 Page 24

## Figure 19





Figure 20

# FIGURE 21





Figure 22

IPR2023-00036
Apple EX1001 Page 28



**Figure 23**

IPR2023-00036
Apple EX1001 Page 29

Appx95

# SPEECH RECOGNITION CIRCUIT AND METHOD

This is a divisional of application Ser. No. 14/788,164, filed Jun. 30, 2015, which is a continuation of application Ser. No. 13/735,091, filed Jan. 7, 2013, now U.S. Pat. No. 9,076,441, which is a continuation of application Ser. No. 13/162,128, filed Jun. 16, 2011, now U.S. Pat. No. 8,352, 262, which is a divisional of application Ser. No. 11/662, 704, filed Mar. 14, 2007, now U.S. Pat. No. 7,979,277, which is a 371 of PCT/GB2005/003554, filed Sep. 14, 2005, which claims priority to UK Application No. 0420464.0, filed Sep. 14, 2004, the disclosures of—which are hereby incorporated by reference in their entireties.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to speech recognition circuits and methods. These circuits and methods have wide applicability, particularly for devices such as mobile electronic devices.

### 2. Description of the Related Art

There is growing consumer demand for embedded speech recognition in mobile electronic devices, such as mobile phones, dictation machines, PDAs (personal digital assistants), mobile games consoles, etc. For example, email and text message dictation, note taking, form filling, and command and control applications are all potential applications of embedded speech recognition.

However, when a medium to large vocabulary is required, effective speech recognition for mobile electronic devices has many difficulties not associated with speech recognition systems in hardware systems such as personal computers or workstations. Firstly, the available power in mobile systems is often supplied by battery, and may be severely limited. Secondly, mobile electronic devices are frequently designed to be as small as practically possible. Thus, the memory and resources of such mobile embedded systems tends to be very limited, due to power and space restrictions. The cost of providing extra memory and resources in a mobile electronic device is typically much higher than that for a less portable device without this space restriction. Thirdly, the mobile hardware may be typically used in a noisier environment than that of a fixed computer, e.g. on public transport, near a busy road, etc. Thus, a more complex speech model and more intensive computation may be required to obtain adequate speech recognition results.

These restrictions have made it difficult to implement effective speech recognition in mobile devices, other than with very limited vocabularies.

Some prior art schemes have been proposed to increase the efficiency of speech recognition systems, in an attempt to make them more suitable for use in mobile technology.

In an article entitled "A low-power accelerator for the SPHINX 3 speech recognition system", in University of Utah, International conference on Compilers, Architectures and Synthesis for Embedded Systems, November 2003, Davis et al have proposed the idea of using a special purpose co-processor for up-front calculation of the computationally expensive Gaussian output probabilities of audio frames corresponding to particular states in the acoustic model. In an article entitled "Hardware Speech Recognition in Low Cost, Low Power Devices", University of California,

Berkeley, CS252 Class Project, Spring 2003, Sukun Kim et al describe using special purpose processing elements for each of the nodes in the network to be searched. This effectively implies having a single processing element for each phone in the network. An alternative suggested by Sukun Kim et al is to provide a processor for each state in the network.

In an article entitled "Dynamic Programming Search for Continuous Speech Recognition" in IEEE Signal Processing Magazine, September 1999, Ney et al discuss language model lookahead. Language model lookahead involves computation of a language model factor for each node (i.e. phone) in the lexical tree. This technique is also known as smearing. Each phone instance in the search network can be given a language model factor when it is used in the lexical tree search. Ney et al show that for an example bigram language model, the average number of states per 10 ms frame can be reduced from around 168,000 states with no language model lookahead to around 8,000 states when language model lookahead is used. They also show that bigram language model lookahead requires about a quarter of the states compared with unigram language model lookahead.

Although these prior art documents provide improvements to speech recognition in embedded mobile technology, further improvement is still needed to provide a larger vocabulary and better accuracy.

## SUMMARY OF THE INVENTION

One aspect of the present invention provides a speech recognition circuit including a circuit for providing state identifiers which identify states corresponding to nodes or groups of adjacent nodes in a lexical tree, and for providing scores corresponding to said state identifiers. The lexical tree includes a model of words. The speech recognition circuit also has a memory structure for receiving and storing state identifiers identified by a node identifier identifying nodes or groups of adjacent nodes, the memory structure being adapted to allow lookup to identify particular state identifiers, reading of the scores corresponding to the state identifiers, and writing back of the scores to the memory structure after modification of the scores. An accumulator is provided for receiving score updates corresponding to particular state identifiers from a score update generating circuit which generates the score updates using audio input, for receiving scores from the memory structure, and for modifying said scores by adding said score updates to said scores. A selector circuit is used for selecting at least one node or group of nodes of the lexical tree according to said scores.

One suitable type of hardware for the memory structure includes a content addressable memory (CAM). A CAM is a memory unit which stores a series of data items using a series of addresses. However, the memory is accessed by specifying a data item, such that the CAM returns the corresponding address. This contrasts with a random access memory (RAM) in which the memory is accessed by specifying an address, such that the RAM returns the corresponding data item.

However, the memory structure is not limited to including a CAM. Other types of hardware are also possible, to provide this functionality. For example, a single chip which operates in the same way as a CAM and RAM may be used instead.

Embodiments of the present invention provide a solution to the problem of how to map a lexical tree search to a CAM system architecture. The realisation by the present inventors

IPR2023-00036

Apple EX1001 Page 30

3

that certain speech recognition data structures can be mapped into the CAMs allows a lexical tree search to be performed using a CAM system architecture.

Further embodiments of the invention include a counter for sequentially generating state identifiers, and using said generated state identifiers to sequentially lookup said states in the memory structure.

The node identifier may comprise a direct reference to the lexical tree. However, in some embodiments, the node identifier for at least some of the states includes a pointer to a node identifier for another state. For example, a state corresponding to the furthest part of the search path in the lexical tree may be referenced by a node identifier which directly links to a particular node or group of nodes in the lexical tree. In a lexical tree comprising phones, using a state model of triphones, the node identifier may indicate the position of a triphone in the lexical tree.

However, in this example, for states occurring further back in the search path, instead of supplying a node identifier linking directly to the lexical tree, instead a pointer to a node identifier of another state may be supplied. E.g. a triphone instance may have a pointer to another triphone instance, which has a pointer to another triphone instance, which has a pointer to a node or group of nodes in the lexical tree. Chains of reference may be set up in this way, where only the last state in the chain has a direct pointer to the lexical tree.

There may not be a one-to-one correspondence between the nodes of the lexical tree and the node identifiers. This will occur for a branched lexical tree, where the nodes represent monophones, but the acoustic model states represent triphones, i.e. groups of three adjacent monophones. Then, paths of three monophones will have unique identifiers to be stored in the memory structure, rather than single monophones having unique identifiers.

Phone instance numbers may be generated, and used to uniquely label each phone instance. They can be generated sequentially, using a counter. The phone instance numbers may be used as pointers between phone instances to assist in node identification. It is thus not essential to provide a direct node identifier for each phone instance to directly indicate a location in the lexical tree. The dynamic network of phone instances provided in the memory structure may thus include both direct and relative references to the lexical tree.

The memory structure may be divided into one part which stores phone instance identifiers and direct references to the lexical tree, and a second part which stores phone instance identifiers and corresponding states. This can speed up the processing, by only storing the phone instances which are furthest on in the lexical tree in the first part of the memory structure.

The memory structure may also be divided into separately accessible units, to reduce the amount to data in each unit, thereby decreasing the chance of finding the same two states identifiers in different phone instances in any single memory unit, and increasing the chance of some state identifiers being completely absent from any single memory unit. This makes it easier to deal with the situation when the same two state identifiers are found, because a spare time slot is available for processing when a state identifier is not present.

A further aspect of the invention provides a distance calculation engine within a speech recognition system. The distance calculation engine may be included within an accelerator. The accelerator may include logic to interface with other parts of a speech recognition circuit, in addition to the distance engine, although this is not essential. For example, the accelerator may include one or more results

4

memories for storing distances calculated by the distance calculation engine. The accelerator may also include at least one of a memory for storing one or more acoustic models, a decompressor for decompressing acoustic data that has been stored in a compressed format, a memory for storing feature vectors, a checksum or data signature calculation means, buffers for data storage, and data registers. The accelerator may be implemented in software or in hardware, or in a combination. It may be physically separate to the rest of the speech recognition circuit, although this is not essential.

The distance calculation engine may calculate one or more of a wide range of distance metrics and probability distributions. The distances may represent the likely correspondance of feature vectors to states in an acoustic model. In other words, the distances can indicate the similarity of an audio data frame to each possible state in an acoustic model

There are a wide variety of probability distributions that can be used for the distance calculation stage of a speech recogniser, and a wide variety of distance metrics used. These are widely documented in the literature. A point is a simple example of a probability distribution.

A common choice is to use Gaussian Distributions and correspondingly the Mahalanobis Distance metric. The Gaussian probability distribution is then defined by a mean vector, which defines centre point in the N-dimensional space, and a Covariance matrix which defines the shape of the probability distribution. It is common to restrict the Covariance matrix to be a diagonal matrix (only N non-zero values along the diagonal of the N×N matrix) which significantly lowers the implementation cost by reducing the number of arithmetic operations.

In particular embodiments, the distance calculated is a Mahalanobis distance. Particular examples of this are described later in the specification.

In one embodiment, the distance engine autonomously computes all of the distances associated with a given feature vector. This may comprise computing distances for every state in the lexicon. The distance engine may operate in a pipelined manner with other stages of the recognition process. In this context a distance is an indication of the probability or likelihood that a feature vector corresponds to a particular state. An important class of distance computation in speech recognition is the calculation of output state probabilities in recognisers using Hidden Markov Models. Another possible use is in recognisers using Neural Networks.

The distance engine reads data from the acoustic models to use as parameters in the calculation. The acoustic models may be optionally stored in a compressed format. The distance engine may read and de-compress the acoustic models one (or more) times for each feature vector processed. Each reading of the acoustic models may require reading the entire acoustic model, or various optimisations may be implemented to avoid reading parts of the acoustic model that are not required to be used for calculations with the current feature vector. The distance engine may use a de-compression method where the de-compression is sign or zero extension or may otherwise convert data of narrow or variable width to a wider data format. The distance engine may use a de-compression method where the de-compression is sign or zero extension or may otherwise convert data of narrow or variable width to IEEE standard single or double precision floating point format. The distance engine may use a decompression method where decompression is a codebook decompression of a binary bitstream, where the codebook is stored as part of the acoustic model data. The

IPR2023-00036

Apple EX1001 Page 31

5

distance engine may use a decompression method where the decompression is decompression of a Huffman or Lempel-Ziv compressed stream. The distance engine may use a decompression method where decompression is decompression of run length encoded data. The distance engine may use a decompression method where decompression is decompression of difference encoded data. The distance engine may use a decompression method using any well known lossy or lossless compression scheme. The distance engine may use a decompression method using subspace distribution clustering. The distance engine may use a decompression method comprising any combination of the above described decompression types. The distance engine may read the acoustic models from a dedicated on-chip memory. The distance engine may read the acoustic models from a dedicated off-chip memory. The distance engine may read the acoustic models from a shared on-chip memory. The distance engine may read the acoustic models from a shared off-chip memory. Any of these acoustic models may be compressed.

The distance engine may compute a CRC or checksum or similar signature as it reads in the acoustic model and compares this to a stored CRC, checksum, or signature, in order to check that the acoustic model has not been corrupted, and signals an error condition if such corruption is detected. The stored CRC, Checksum, or signature may had been pre-computed and stored in the model data, or it may be computed at the time the model data is loaded into the Acoustic Model Memory. It may be held in Acoustic Model Memory, or it may be loaded into a register or another memory from where it can be accessed and compared when the CRC/checksum/signature is computed each time the Acoustic Model is loaded.

The distance engine may support the pass-through of data from the front-end to the search-stage. The data to be passed through will be supplied to the distance engine as an adjunct to the feature vector, and the distance engine will pass it to the search stage as an adjunct to the distance results. This provides a simple mechanism for passing frame-specific data that is not involved in the distance calculation through to the search stage, and keeping it associated with the correct frame, which may otherwise be complex in pipelined systems with multiple processors. The data passed through may be for any purpose. Examples might include silence detected, end-of-audio-stream detected, a frame number, information that some intervening frames have been dropped, or data from another input device such as a button or keyboard in a multi-modal interface.

The distance engine may be implemented in hardware, software, or a combination. Other stages may be implemented in hardware, software, or a combination. The distance engine may be implemented with any number representation format including fixed point or floating point arithmetic, or any mixture of number representation formats.

In particular, the other stages may be implemented on a CPU, or on a DSP and CPU. The "DSP" and "CPU" may each be implemented as software programmable devices.

The distance engine may implement one or more additional pipeline stages to overcome delays introduced by low bandwidth, high latency, or conflicted bus interfaces. The distance engine may also implement additional pipeline stages to maintain the same throughput while allowing more time for each distance calculation. Particular embodiments of the invention may include one or more of the above aspects.

A further aspect of the invention comprises a speech recognition circuit, comprising: an audio front end for calculating a feature vector from an audio signal, wherein the feature vector comprises a plurality of extracted and/or derived quantities from said audio signal during a defined audio time frame; calculating circuit for calculating a distance indicating the similarity between a feature vector and a predetermined acoustic state of an acoustic model; and a search stage for using said calculated distances to identify words within a lexical tree, the lexical tree comprising a model of words; a buffer memory between the calculating circuit and the search stage, for receiving data passing from the calculating circuit to the search stage, wherein a processor in the search stage has higher bandwidth and/or lower latency access to the buffer compared to the bandwidth and/or latency of direct transfer between the calculating circuit and the search stage. The data transfer from the calculating circuit to the buffer memory and/or from the buffer memory to the search stage may be performed as one or more sequential bursts.

The data transfer to the buffer memory may be performed in parallel with data transfer to the calculating circuit and/or in parallel with data transfer to the search stage. A second buffer memory may be provided between the audio front end and the calculating circuit.

A further aspect of the invention comprises a speech recognition circuit, comprising: an audio front end for calculating a feature vector from an audio signal, wherein the feature vector comprises a plurality of extracted and/or derived quantities from said audio signal during a defined audio time frame; calculating circuit for calculating a distance indicating the similarity between a feature vector and a predetermined acoustic state of an acoustic model; and a search stage for using said calculated distances to identify words within a lexical tree, the lexical tree comprising a model of words; comprising an elastic buffer between at least one of the front end and calculating circuit, or the calculating circuit and search stage, and/or for buffering said audio signal.

A further aspect of the invention comprises an accelerator for a speech recognition circuit, the accelerator comprising: calculating means for calculating a distance indicating the similarity between a feature vector and a predetermined acoustic state of an acoustic model, wherein the feature vector comprises a plurality of extracted and/or derived quantities from an audio signal during a defined audio time frame; means for comparing a first version of a stored checksum of data representing said acoustic model and a second version of said stored checksum, wherein the second version is obtained from an updated measurement and calculation of the checksum; and means for indicating an error status if the checksums do not match.

A further aspect of the invention comprises an accelerator for a speech recognition circuit, the accelerator comprising: calculating means for calculating a distance indicating the similarity between a feature vector and a predetermined acoustic state of an acoustic model, wherein the feature vector comprises a plurality of extracted and/or derived quantities from an audio signal during a defined audio time frame; wherein said accelerator is configured to autonomously compute distances for every acoustic state defined by the acoustic model.

A further aspect of the invention comprises an accelerator for calculating distances for a speech recognition circuit, the accelerator comprising: calculating circuit for calculating distances indicating the similarity between a feature vector and a plurality of predetermined acoustic states of an acoustic model, wherein the feature vector comprises a plurality of extracted and/or derived quantities from an audio signal

IPR2023-00036
Apple EX1001 Page 32

7 8

during a defined audio time frame; first and second storage circuit, which may be referred to as result memories, each for storing calculated distances for at least one said audio time frame, and for making said stored distances available for use by another part of the speech recognition circuit; control circuit for controlling read and write access to the first and second storage circuit, said control means being configured to allow writing to one said storage means while the other said storage means is available for reading, to allow first calculated distances for one audio time frame to be written to one said storage means while second calculated distances for an earlier audio time frame are made available for reading from the other said storage means.

Embodiments of the invention may comprise means for generating a checksum or computed signature for the acoustic model data stored in the memory, and means for comparing checksums or computed signatures that have been calculated at different times, to indicate an error status if the checksums do not match, one possible cause of such mismatch being that the acoustic model data has been overwritten by said other data and said error status being used to indicate that the acoustic model should be re-loaded into the said memory.

A further aspect of the invention comprises a speech recognition circuit comprising: lexical memory containing lexical data for word recognition, said lexical data comprising a lexical tree data structure comprising a model of words; means for accessing a state model corresponding to each phone or each group of phones in the lexical tree; a content addressable memory for storing content addressable data for each phone or group of phones, including states corresponding to said phone or group of phones, and for storing an address value for each said phone or group of phones; a RAM configured to store accumulated scores for each said phone or group of phones, the accumulated scores being addressable by said address value for each said phone or group of phones; means to obtain scores that each of a plurality of frames of an audio signals corresponds to each of a plurality of said states; a counter to sequentially search for each said state in the content addressable memory, to obtain the corresponding address value if the state is found in the content addressable memory; means to use said address value to access an accumulated likelihood and an accumulator to add said likelihood to the accumulated likelihood; means to use the phones or groups of phones with the highest accumulated scores to obtain a plurality of next phones from the lexical tree which correspond to the next phone; and output means for outputting a lexical tree path of highest likelihood.

A further aspect of the invention comprises speech recognition apparatus comprising: a lexical tree having a corresponding state model; means for obtaining scores of an audio input corresponding to each of a plurality of states in said state model; a content addressable memory for storing a marker indicating a part of the lexical tree, and one or more states associated with said part of the lexical tree; a random access memory addressable by the CAM output, to output accumulated scores for states corresponding to said parts of the lexical tree; adder means for adding likelihood to said accumulated likelihood, to be stored back in the RAM.

A further aspect of the invention comprises speech recognition apparatus, comprising: a CAM-RAM arrangement for storing records including pointers to a lexical tree, and accumulative scores for states within the lexical tree; input means for obtaining scores that an audio frame corresponds to a particular state in the lexical tree; an accumulator for calculating the updated scores and modifying the records in

the CAM-RAM accordingly; output means for outputting a path of highest likelihood in the lexical tree.

A further aspect of the invention comprises a speech recognition method comprising: storing state identifiers which identify states corresponding to nodes or groups of adjacent nodes in a lexical tree, and scores corresponding to said state identifiers in a memory structure, the lexical tree comprising a model of words and the memory structure being adapted to allow lookup to identify particular state identifiers, reading of the scores corresponding to the state identifiers, and writing back of the scores to the memory structure after modification of the scores; repeating the following sequence of steps for each of a plurality of incoming frames of an audio signal; obtaining score updates corresponding to the likelihoods that said frame of the audio signal corresponds to each of a plurality of said states; accessing said memory structure to obtain scores, updating the scores by adding score updates to the scores, and writing back the updated scores to the memory structure; determining if scores for states furthest on in the lexical tree correspond to a significant likelihood, and if so, then accessing the lexical tree to determine the next set of possible states; and storing the next set of possible states and said scores of significant likelihood in the memory structure.

A further aspect of the invention comprises speech recognition circuit comprising: a circuit for providing state identifiers which identify states corresponding to phones or groups of adjacent phones in a lexical tree, and for providing scores corresponding to said state identifiers, the lexical tree comprising a model of words; a memory structure for receiving and storing state identifiers and phone instance identifiers uniquely identifying instances of phones or groups of phones in the lexical tree; said memory structure being adapted to allow lookup to identify particular state identifiers, reading of the scores corresponding to the state identifiers, and writing back of the scores to the memory structure after modification of the scores; an accumulator for receiving score updates corresponding to particular state identifiers from a score update generating circuit which generates the score updates using audio input, for receiving scores from the memory structure, and for modifying said scores by adding said score updates to said scores; and a selector circuit for selecting at least one phone instance identifier according to said scores.

A speech recognition apparatus according to the invention may be embedded in or included in a mobile electronic device such as a mobile telephone, PDA (personal digital assistant), etc.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention will now be described, by way of example only, with reference to the accompanying drawings, in which:

FIGS. 1A-1B are a block diagram of the system architecture for a speech recognition apparatus according to an embodiment of the invention;

FIGS. 2A-2B are a block diagram showing the main data structures used in the speech recognition apparatus of FIGS. 1A-1B;

FIGS. 3A-3B show a block diagram of the Single Phone Instance Network Engine (PINE) of FIG. 1B;

FIG. 4 is a block diagram showing the Wave Front Manager architecture;

FIG. 5 shows the use of link nodes to permit path merging;

IPR2023-00036
Apple EX1001 Page 33

FIG. **6** shows a block diagram of a Path Merge Unit in the Phone Level;

FIG. **7** shows the Phone Book architecture;

FIGS. **8A-8B** show Lexical tree storage;

FIG. **9** shows the data structure for the word link record;

FIG. **10** shows a block diagram of Word Engine;

FIG. **11** shows a Language Model interface architecture;

FIG. **12** shows an example of a simple Loop Grammar;

FIG. **13** shows a block diagram of grammar engine;

FIG. **14** shows a single frame of the Audio Codec link protocol; and

FIG. **15** illustrates the system timing which may be used in the embodiment of FIGS. **1A-1B**;

FIG. **16** is a block diagram showing a speech recognition circuit according to an embodiment of the invention, and illustrating data flow between parts of the circuit;

FIG. **17** is a block diagram showing a distance calculation engine according to an embodiment of the invention;

FIG. **18** shows ideal data flow over several time steps within a speech recognition circuit having separate front end and search stages, in an embodiment of the invention;

FIG. **19** shows an example of actual data flow over several time steps within a speech recognition circuit having separate front end and search stages, in a further embodiment of the invention;

FIG. **20** shows ideal data flow over several time steps within a speech recognition circuit having a shared processor for front end and search stages, in an embodiment of the invention;

FIG. **21** shows an example of actual data flow over several time steps within a speech recognition circuit having a shared processor for front end and search stages, in an embodiment of the invention;

FIG. **22** shows ideal data flow in a speech accelerator pipeline with two data transfer stages, according to an embodiment of the invention; and

FIG. **23** shows an example of actual data flow in a speech accelerator pipeline with two data transfer stages according to an embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIGS. **1A-1B** show a speech recognition system architecture for an embodiment of the invention. The speech recognition system is divided into several levels of operation: a state level, a phone level, a word level, a grammar level, and a system level. Each level is shown in FIGS. **1A-1B** as a, interconnected to other levels of the system.

The information passed between different levels or sub-circuits of FIGS. **1A-1B** is indicated on FIGS. **1A-1B** using the following identifiers.

| Identifier | Definition |
| --- | --- |
| grammar_id | Identifies which grammar model is currently being used |
| grammar_node_id | Identifies a node in the grammar model |
| word_id | Uniquely identifies a word |
| wordlat_node_id | Identifies a node in the word lattice |
| LT_id | Lexical tree identifier. Identifies the lexical tree to be used |
| LT_branch_id | Identifies a unique branch in a lexical tree. A branch is defined as all of the monophones subsequent to and including the first monophone in a tree. |
| LT_node_id | Identifies a node in a lexical tree |
| monophone_id | Identifies a monophone |

-continued

| Identifier | Definition |
| --- | --- |
| transvec_id | Identifies which transition vector to use |
| state_id | Identifies the state |
| phone_no | Unique phone instance identifier |
| prev_phone_no | Phone number of previous phone in network |
| triphone_id | Triphone identifier |
| LML_factor | Language model lookahead factor. The smeared language model score that must be added |

The system level includes a general purpose processor and cache, a system controller, a DMA (direct memory access) controller, clocks, PLL (phased locked loop), GPIO (general purpose I/O interface), timer watch dog, memory interfaces to interface to main memory and non volatile storage, serial, host, debug and display interfaces. The system level also includes a model adaptation engine, a language model factor engine, a speech recognition system controller, a language model interface, and a recognition output interface.

The processor organises the transfer of the various models from the non volatile storage to the various model memories. It handles the language model factor requests. Language model factors are used to by the state level to apply the language model score. The language model (LM) interface provides the mechanism for obtaining LM factors as and when they are needed. The processor keeps a copy of the wave front in memory which is updated simultaneously with that in the wave front manager. Using its copy of the lexical tree, the processor can determine which language model scores may be needed in the coming frames. Once calculated, the language model factors can be kept in memory for use in subsequent frames. The system level is also used for forming speech model adaptation, and acting as an overflow for the various buffers used by the architecture.

The system level includes the audio codec interface and the audio front end interface, connected to the processor via a APB (advanced peripheral bus) to AHB (advanced high performance bus) bridge.

The grammar level includes a grammar engine and grammar model(s). The grammar level sets out the rules of the particular recognition task at the highest level. During system initialisation a number of grammar models might be loaded, for example a command grammar and a dictation grammar. Command mode grammar is a restricted grammar which includes only a very limited lexical tree with command specific words. Some branches of this lexical tree may include multiple words together, where a command has such a structure, e.g. "open file menu". Typically, only a single instance of the lexical tree will be needed. Command mode is used because it can obtain a higher accuracy, due to the lexical tree constraint. In dictation mode grammar, a full lexical tree structure is used.

The grammar may be selected by a user during the recognition process. For example, the command grammar may be selected when the user presses a command button. The architecture supports fast swapping of grammar models. For example, a user may be in the middle of dictating a message when a "punctuation button" is pressed and the phrase "question mark" uttered. At this point, a punctuation grammar could be loaded, in order to increase recognition accuracy.

The word level comprises a word engine, which includes a word lattice and a word graph generator. The word level has two main functions, of keeping a record of the search path at the word level using a word lattice, and interfacing

IPR2023-00036

Apple EX1001 Page 34

11 12

to the language model via a cache. The word lattice is a record of all of the words that have been searched up to the current frame. As new words are searched, they are appended into the lattice at the appropriate place. After the final frame in the current sentence, the n-best word lattice node identifiers from the n-best scoring tokens are passed back to the word lattice. This enables the n-best sentences to be traced back through the lattice. The word lattice can also be post processed to produce a word graph which is essentially a compact version of the word lattice.

At the word level, a record is kept of all tokens that have passed through a word end. This results in a lattice of words. When the final feature vector has been processed, the best scoring token is identified and used to trace back the search path back to the start of the search.

The phone level includes a "phone book" for generating new triphone instances, a wave front manager for sending requests to the phone book to generate new phone instances, a phone request arbiter, and a path merge unit.

The phone book includes a lexical tree, which comprises a vocabulary of words, sounds and/or phrases organised according to the phones or monophones making up the sound. A lexical tree is commonly used in speech recognition rather than a linear lexicon, because it greatly reduces the amount of storage space required to store a word vocabulary, by avoiding duplication of common word beginnings. It is also easier to search when the word beginning is known. Although it is possible to search a lexical tree based on monophones, it is well known that better results can be achieved in speech recognition by basing the lexical tree search on groups of more than one monophone, since the sound of one syllable commonly affects the pronunciation of the next syllable in the same word, or the first syllable in the next word. In this embodiment, groups of three monophones are used, and these are known as triphones. It is alternatively possible to use a different number of monophones for each group. The phone generator in the "phone book" uses data from the lexical tree to generate triphones.

In one embodiment of the invention, approximately 45 different cued mono-phones are considered. This gives of order 60,000 tri-phones. Each triphone in this embodiment is modelled by a Hidden Markov Model (HMM) with three states. There is no correspondence between individual states and individual phones of the triphone. Alternatively, it is possible to model each triphone by a single state, or by any other number of states.

The phone level is responsible for generating the search space according to the word structure specified in the grammar model and the phone structure specified by the lexical tree. The search space can be envisaged as a wave moving through an acousto-linguistic search space. In order that the wave can be dynamically created, a record of the wave front phone instances must be maintained. This is done in a wave front phone CAM/RAM structure, within the wave front manager. When a token occurs in the final state of a phone instance in the PINE array at the front of the wave, a new phone instance must be generated at the phone level and passed to the PINE array.

The phone instance includes a phone_no, which is a phone instance identifier to identify the phone uniquely in the current search. The phone instance also includes a word lattice node identifier (labelled "word_lat_node_id") to identify the phone's position in the word lattice, state identifiers (labelled "state_ids") for the HMM, storage to hold the tokens as they move through the HMM and LM_factor which is used to by the PINE to apply the language model score. To handle the connectivity between phone instances, a phone instance points to a previous phone instance using the phone_no of the previous phone. This allows tokens to be passed between phones. A "token" is a hypothesized search path, represented by a non-zero score at a particular state, and tokens are propagated through the HMM with each time frame.

The phone instance network can be visualised as a wave with new phone instances being added to the front of the wave, and empty phone instances being removed from the back of the wave. In some circumstances, the back of the wave may be in the same position as the wave front. The back of the wave moves on through the lexical tree as tokens are either moved on or pruned.

Tokens, each representing a particular hypothesis, hop through the states in the HMMs, each hop consuming a feature vector. Each token explores all possible next states which typically involves placing a token in the next state and keeping one in the current state. When there is more than one token in a state, the least likely token can be removed because both have the same word history. When a token reaches the last state of a phone instance at the from of the wave, the next phone instance(s) are requested from the phone level. The phone level uses the lexical tree to create the new phones. As well as looking up the state identification numbers for each HMM state, it also incorporates the correct language model factor.

The language model factor engine is used to smear the language model scores across the lexical tree. This operates in two ways depending on whether the factor is needed for a word start phone(s) or word internal phones. For word internal phones, LM factors can be computed as needed, provided that the LM scores are available in cache. This is because in general the storage requirements for the LM scores are less than the storage of the LM factors for all of the factors in the branch. However when a token is in a word end phone there may a significant number of word start phones e.g. up to (monophones)$^2$ requiring a large amount of computation. To avoid this the LM engine will pre compute word start LM factors when it seems highly likely that a token will be passed to the word starts. These word start LM factors will be held in the LM factors cache. The phone level is responsible for generating the search space according to the word structure specified in the grammar model and the phone structure specified by the lexical tree.

The state level shown in FIG. 1B includes a phone instance network engine (PINE) array, a MHD (Mahalanobis distance) engine, an audio front end, a feature vector buffer for model adaptation, and compressed acoustic models. The state level is the lowest level, in which a network of phones is dynamically created.

The audio input for speech recognition is input to the front end unit of the state level. This audio input may be digital audio, or it may be analog audio which is converted to digital audio using an analog to digital converter. The audio input is divided into time frames, each time frame typically being of the order of 10 ms.

For each audio input time frame, the audio signal is converted into a feature vector. This may be done by splitting the audio signal into spectral components. For example, in the present embodiment, the audio input signal is split into 12 frequency bands and one energy band, and a feature vector is constructed using these 13 components, plus their first and second derivatives, a total of 39 components.

The feature vector is passed to the MHD (Mahalanobis distance) engine. This computes all possible state output

IPR2023-00036
Apple EX1001 Page 35

13

likelihoods for the current frame as the state mean and covariance data is read from the acoustic model memory.

The likelihood of each state is determined by the distance between the feature vector and each state. To reduce the number of states, a technique known as "state tying" may be used. Multiple states are grouped together in 39D space, according to their proximity to one another. An average or central value from each group is used to represent the entire group. Thus, the effective number of states may be reduced from 40,000 to 8,000. The accuracy may be improved using a language model in addition to the word recognition lexical tree. A language model is based on the probability of sequential words. The above figure of 8,000 states gives best recognition results when used with a language model.

The MHD (Mahalanobis Distance) is a distance between two N-dimensional points, scaled by the statistical variation in each component. In embodiments of the invention, the Mahalanobis distance between the feature vector and each state is calculated, to determine similarity of the feature vector to each state.

The Feature Vector represents a point in an N-dimensional space. Different embodiments of the invention may use different values of N. Generally we see values of N in the range of 20 to 39, although values outside this range are not excluded.

The distance calculator stage of the recognition process computes a probability or likelihood that a feature vector corresponds to a particular state. Each state has an associated probability distribution in the N-dimensional space. The distance calculator computes the distance in the N-dimensional space from the Feature Vector to the probability distribution for each state. In some embodiments, the calculation is performed only when the search stage algorithms determine that the distance for that particular state is needed by the search stage. In some embodiments, the distances for all of the states are calculated and made available to the search stage, which allows pipelined operation. Embodiments that do the calculations on demand are preferable.

The Mahalanobis Distance (MHD) is extensively described in the literature. It may be calculated using the formula

$$\text{MHD value}=\ln(P(x))=-0.5[N^**\ln(2^*pi)+\ln|\text{Cov}|)]+(-0.5^*[(x-u)'^*\text{inverse}(\text{Cov})^*(x-u)])$$

where
N=number of dimensions in the space
x=feature vector, a point in the N dimensional space
u=mean vector
Cov=covariance matrix
|Cov|=determinant of covariance matrix
(a)'=transpose of matrix a

Different embodiments may use variations on this equation, for example the base for the logarithm is not always the natural base e that is used in the above example. The log of the probability is preferably calculated, rather than the probability, as it simplifies the implementation. Not all embodiments do this. In alternative embodiments, the likelihoods rather than probabilities are computed as it leads to simpler implementations of computations in the search stage.

The feature vector is used to calculate 8,000 MHD distances for each time frame, i.e. one distance for each of the 8,000 states. It is beneficial, although not essential, to perform the MHD calculations separately in a pre-processor, known as a MHD engine, because MHD calculation is a computationally intensive process.

14

Due to the 10 ms frame length, a feature vector arrives at the MHD engine of the state level every 10 ms. The MHD engine calculates the likelihood of each feature vector corresponding to each of a number of states derived from an acoustic model. Each state is also a 39 dimensional vector, having the same spectral components as the feature vector. The MHD engine calculates the difference in 39-D space between the feature vector and each state to obtain the likelihood for that state. A parallel MHD or a single MHD arrangement may be used.

The feature vectors may be sent to a feature vector buffer for model adaptation, which determines whether the observed features fit well with the acoustic model, and may initiate an adaptation of the model if the fit is not sufficiently good.

Scores indicating the state likelihoods or probabilities are output from the MHD engine to the PINE array. It is preferable to use likelihoods rather than probabilities, because likelihoods can be added together to give a total likelihood. Probabilities must be multiplied, which can give rise to rounding errors. In this embodiment, eight separate pines are used, each of 4 kilobytes, thus storing 4000 phones per pine.

During recognition, the Phone Instance Network Engine (PINE) Array will contain a network of phone instances. Tokens representing search hypotheses in the form of a probability (likelihood) will exist in some of the HMM states of the phone instances. The tokens are propagated into all available states and updated with the corresponding state output probabilities. Maximum model, word end and beam pruning are applied to the tokens to ensure the search space is kept bounded. When a token is in the final state of a phone model and has avoided being pruned, the PINE makes a next phone request to the Phone level. The PINE array may receive a number of new phone models from the phone level which must be appended to the appropriate existing phone.

FIG. 2B shows the data structures stored in the PINE array, and other main data structures used during the acoustic search. Each PINE includes a phone instance CAM and a phone instance RAM. The phone instance CAM stores the phone instance number (labelled "phone_no") which uniquely identifies each phone instance. The phone instance CAM also stores the state IDs of the three HMM states used to model the phone, and flags indicating the position of the phone. The "back" flag indicates if the phone is at the back of the wavefront. The "front" flag indicates if the phone is at the front of the wavefront. The "empty" flag indicates if there are no tokens in any of the three states for that phone. The "end" flag indicates if the phone is at the end of a word.

The phone instance RAM stores the token scores for each of the three states corresponding to each phone. The st_dum field indicates a dummy state, which is used to represent a state prior to the first state of the first phone. The "tmp" field is used for passing a token from a previous phone in the lexical tree to the current phone. This will be explained in more detail later. The prev_phone_no field is for storing a pointer to the previous phone instance in the network. The wordlat_node_id identifies the position of the phone instance on the word lattice node, and the LM_factor stores the language model factor for that phone instance.

At the phone level a record of all phones on the wave front must be maintained. If a phone instance is on the wave front, the phone_no stored in the phone instance CAM will point to the details in the wave front phone CAM and RAM.

The wave front phone CAM and RAM keeps pointers into the grammar and lexical tree. When a token in a wave front phone reaches the last state, the PINE array makes a request

IPR2023-00036

Apple EX1001 Page 36

**15**

to the phone level by passing back the phone_id. The phone_id is used as a key to determining the token's grammer_node_id and LT_node_id within the wave front CAM/RAM structure. If the token is at a word end the grammar model is checked. A grammar identifier points to the type of grammar.

At the word level, FIGS. 2A-2B show an example word lattice structure, with silence having a word_id of 0, and a wordlat_node_id of 6. This is shown as connected to two word nodes—"which" has a word_id of 238 and a wordlat_node_id of 4, and "neither" has a word_id of 3556 and a wordlat_node_id of 5.

At the highest level, i.e. the grammar level, a simple grammar model is shown which will allow the phrase 'silence which house silence' or 'silence neither house silence' to be spoken. Whenever a word end is reached during the search, the grammar model must be consulted to determine the next possible word(s) or lexical tree(s). This allows the word lattice at the word level, consisting of a network of words, to be assembled. Whenever a word end is reached, the word is added to the lattice and the wordlat_node_id updated accordingly.

FIGS. 3A-3B show a single phone instance network engine (PINE). At system power up the state transition RAM will be loaded with the appropriate state transition vector but the CAM and RAM memories will be empty. When the system is initialised an initial set of phone model(s) will be instantiated with a token in the dummy state and a path score of zero. The phone models are received from the phone level.

When the audio data is processed, a stream of all possible state output probabilities will be received from the MHD engine. A counter that is synchronous to the stream of state output probabilities from the MHD produces a concurrent stream of state_ids. The job of the CAM is to perform a search to see if the state_id is instantiated anywhere in the CAM state_id fields. If it exists and the location doesn't have its empty flag set then this indicates that a token may need to be updated. The match signal from the CAM must be encoded into an address for the RAM. The corresponding RAM address can then be read. Any token that will end up in the identified state can then have it's path score updated and including any transition vector likelihood.

It is possible that a single state_id generates multiple CAM matches. To handle this situation the CAM and RAM are effectively decoupled by means of a match fifo and repeat count fifo. The state_id and corresponding state_output_probability are stored in the repeat count fifo. During a subsequent frame when there is no match, this state_id can be revisited, ignoring the matches already dealt with.

All searched phone instances corresponding to words in the current possible lexical tree are stored in the CAM-RAM. This includes phone instances at the beginning of the word, middle of the word and end of the word. These phone instances are connected by the "previous phone instance" field, which allows traceback through an entire word within the CAM-RAM.

A mechanism is thus required to pass tokens from one phone instance to the next. This mechanism is provided by the tmp field in the RAM.

The tmp field in the RAM holds tokens during token passing.

At the start of each time frame, the audio input is converted into a feature vector, the MHD values calculated, and the MHD values used to update the token scores. After update of all tokens, 2 passes are made through the CAM-RAM, firstly for pruning, and then for token passing. The

**16**

pruning in this example removes tokens of below a threshold score, although other types of pruning are also possible. The pruning may involve removing a predetermined proportion of the tokens, chosen as those of lowest likelihood. A third possible method of pruning is removing all tokens with scores below a first predetermined value, but at word ends removing all tokens with scores below a second predetermined value, the second predetermined value being greater than the first predetermined value.

The token passing works as follows. Each phone instance points back to a previous phone, due to the prev_phone_no field stored in the RAM. During the token passing, the third token of a previous phone is grabbed and put into the tmp field of the current phone.

In other words, if a token is on the third state, and it is not pruned, it must enter the next state of the next phone. To do this, the tokens that lie in the third state are moved across to the tmp field.

For example, phone no. 345 needs to look at phone no. 320 to see if any tokens are in the third state. If yes, it takes these tokens and puts them in the tmp field.

One field in the CAM is labelled "front". This indicates whether the phone is on the wave front. If the phone is not on the wave front, then another phone will have picked up the token in the third state. However, if the phone is on the wave front, then no other phone will have picked up the token on the third state. Therefore, if there is a token in the third state, and the phone is on the wavefront, it is necessary to generate a next phone request.

The current phone number, word lattice identifier and word end flag are sent to the wave front manager, to request a next phone. If the word end flag indicates a word end, then the score is also passed to the wave front manager. The score can be passed in any case, but it is only required at a word end.

The phone level generates the next phone or phones. A new phone instance starts, and all of state1, state2 and state3 have scores pre-set to zero. The old score is provided in the tmp field.

The old phone is still within the wave, but it is unlikely to be at the back of the wave at this stage. When it gets to the back of the wave, it is deleted. Until it gets there, it remains in the CAM-RAM as before. The third token remains where it was, since tokens can either stay in the third state or move on.

Note that it is possible to end up with more that one token in each state. If this occurs, then the token with the poorer score is deleted. This does not affect the result of the lexical tree search, because both tokens on the same state have exactly the same word history.

FIG. 4 shows a block diagram of the wave front manager. The wave front manager is responsible for maintaining a record of the set of phone models that exist at the front of the acoustic search space. This set of phone models is referred to as the "wave front." The key requirement for this block as to minimise the time between receiving a "next phone request" and generating the appropriate responses. The wave front manager receives the next phone requests from the PINE array and generates appropriate responses for the Phone Book, Word Engine, Path Merge Unit and Grammar engine

The wave front manager also receives new wave front phone models from the Phone Book and updates the wave front.

The wave front manager receives the next phone request from the PINE array, via the phone request arbiter. The next

IPR2023-00036

Apple EX1001 Page 37

17 18

phone request consists of a phone_no, word_end_flag and wordlat_node_id. If this phone is at the end of a word, the word_end_flag will be set.

The wave front manager uses the phone_no as input to the wave front phone CAM. As each phone_no is unique, it is guaranteed that only a single match will be generated. The wave front manager uses the CAM generated address to access the RAM. It then sends retrieved data from the RAM to the phone book, grammar engine, Path Merge Unit and word engine.

The wave front manager removes phone instance from CAM and RAM by writing 0's into CAM and RAM, and increments the empty count by one.

Sometime later, the wave front manager receives new phone instances from the phone book and place them in a fifo. The phone instances are taken from the fifo and written into the CAM and RAM at the next_empty_address. The empty_count is decremented by one. A match is run on the "occupy" flag, and the address is placed into next_empty_address register.

Both the phone level and the state level make use of a path merge unit to reduce the number of possible paths, by path merging. FIG. 5 shows the use of link nodes to permit path merging. In the present embodiment, all word end phone instances are linked to word start triphones with a link node. During each frame the path merge unit looks for word end tokens that can be recombined. This is done by looking for word end phones that have the same word_id and word history. When they are found a link is added using the path merge unit in the PINE array.

FIG. 6 shows a diagram of the architecture at the Phone level, showing the path merge unit. The path merge unit includes a path merge CAM and a path merge RAM. The path merge CAM stores word_id, word history for two words, and an "occupy" field. The path merge RAM stores a link_node_id. A CAM RAM occupancy manager keeps track of the empty addresses in the CAM and RAM. The path merge unit is only passed information from the wave front manager if the phone is a word end phone. For each frame, there is a check to see if there is an identical word with the same history, and if there is, the link_node_id is passed to the path merge unit. If there isn't an identical word with the same history, a new record is written into the Path merge CAM-RAM.

FIG. 7 is a block diagram showing the Phone Book architecture. The Phone Book is tasked with generating the next phone models when given a pointer into the lexical tree. The key requirement for this block as to minimise the time between receiving a "lexical tree address" and generating the appropriate responses, in particular the next phone model instance(s).

The lexical tree is used to build the next triphones based on the current context.

| Current triphone | Next triphone | comments |
|---|---|---|
| Left context = a | discarded | |
| Central context = b | Left context = b | next_leftmph_id stored in |
| Right context = c | Central context = c | wave front manager current |
| | Right context = ? | LT_node_id stored in wave front manager must be looked up. Large (<45) for new word start |

The LT_node_id, next_left_mph_id and prev_phone_no are received at the phone generator from the wavefront manager. The LT_node_id is then used to address the lexical

tree store and return the central monophone_id. One or more further accesses to memory are performed using the micro-coded instructions, each memory access returning the right monophone_id.

A two stage lookup is accessed using the three monophone_ids (giving a triphone), the associated state_ids. The phone model is assembled, and returned to the PINE array. The wavefront manager is then updated by sending it relevant parts of the phone model.

The lexical tree store is a micro-coded ROM with both instruction and data fields. The lexical tree store holds a number of lexical trees. Each lexical tree may hold single words or multiple words. Each lexical tree comprises lexical tree elements, and each element has three fields. For now, the fields will be integers and will be converted to std_logic_vector later. The following is an example of the lexical tree store, with the LT data in word_id order.

| | | | |
|---|---|---|---|
| ZERO | z iy r ow | 19 8 12 11 0 0 0 0 | sp 0 |
| ONE | w ah n | 18 2 10 0 0 0 0 0 | sil 1 |
| TWO | t uw | 14 16 0 0 0 0 0 0 | ah 2 |
| THREE | th r iy | 15 12 8 0 0 0 0 0 | ay 3 |
| FOUR | f ow r | 6 11 12 0 0 0 0 0 | eh 4 |
| FIVE | f ay v | 6 3 17 0 0 0 0 0 | ey 5 |
| SIX | s ih k s | 13 7 9 13 0 0 0 0 | f 6 |
| SEVEN | s eh v ih n | 13 4 17 7 10 0 0 0 | ih 7 |
| EIGHT | ey t | 5 14 0 0 0 0 0 0 | iy 8 |
| NINE | n ay n | 10 3 10 0 0 0 0 0 | k 9 |
| OH | ow | 11 0 0 0 0 0 0 0 | n 10 |
| | | | ow 11 |
| | | | r 12 |
| | | | s 13 |
| | | | t 14 |
| | | | th 15 |
| | | | uw 16 |
| | | | v 17 |
| | | | w 18 |
| | | | z 19 |

The following shows the LT data in MP (monophone) start order.

| | | |
|---|---|---|
| EIGHT | ey t | 5 14 0 0 0 0 0 0 |
| FIVE | f ay v | 6 3 17 0 0 0 0 0 |
| FOUR | f ow r | 6 11 12 0 0 0 0 0 |
| NINE | n ay n | 10 3 10 0 0 0 0 0 |
| OH | ow | 11 0 0 0 0 0 0 0 |
| SEVEN | s eh v ih n | 13 4 17 7 10 0 0 0 |
| SIX | s ih k s | 13 7 9 13 0 0 0 0 |
| TWO | t uw | 14 16 0 0 0 0 0 0 |
| THREE | th r iy | 15 12 8 0 0 0 0 0 |
| ONE | w ah n | 18 2 10 0 0 0 0 0 |
| ZERO | z iy r ow | 19 8 12 11 0 0 0 0 |

The following is an example of the three fields of a lexical tree element. The first field is an instruction field, and the second and third fields are data fields.

| Fields: | 1st | 2nd | 3rd | |
|---|---|---|---|---|
| | instr | data | data | |
| | 2b | 6b | 6b | |
| | 00 | MP | MP | - raw data field. |
| | 01 | br | br | - branch address. |
| | 10 | br | br | - branch address. |
| | 11 | word_id | br | - double field. |

Note that there might be no difference between "01" and "10"

To build the "ey" tree, we only have to consider "EIGHT", because this is the only word in the lexical tree which starts with "ey". EIGHT is represented as "ey t", with

IPR2023-00036
Apple EX1001 Page 38

19

phone_nos 5 14 0 0 0 0 0 0. The first lexical tree element stores the raw data specifying the phone_nos, the second lexical tree element is an end field, and the subsequent lexical tree element is set to zero.

```
0 00 5 14      - raw data
1 11 8 0       - end field
2 00 0 0
```

To build the "f" tree, we have:

```
FIVE    f ay v    6 3 17 0 0 0 0 0
FOUR    f ow r    6 11 12 0 0 0 0 0
0 01 4 0 -- branch forward four places as well
1 00 6 3 -- as the implied other brach of next (one).
2 00 3 17
3 11 5 0 -- all addresses are relative offsets.
4 00 6 11
5 00 11 12
6 11 4 0
7 00 0 0
```

To build the "n" tree, we have:

```
NINE    n ay n    10 3 10 0 0 0 0 0
0 00 10 3
1 00 3 10
2 11 9 0
3 00 0 0
```

To build the "ow" tree, we have "ow" in both the first and second data fields, as no tree is going to be a single monophone long.

```
OH      ow    11 0 0 0 0 0 0 0
0 11 11 0
1 00 0 0
```

To build the "s" tree, we have:

```
SEVEN    s eh v ih n    13 4 17 7 10 0 0 0
SIX      s ih k s       13 7 9 13 0 0 0 0
0 01 6 0 -- branch forward six places.
1 00 13 4
2 00 4 17
3 00 17 7
4 00 7 10
5 11 7 0
6 00 13 7
7 00 7 9
8 00 9 13
9 11 6 0
10 00 0 0
```

To build the "t" tree, we have:

```
TWO    t uw    14 16 0 0 0 0 0 0
0 00 14 16
1 11 2 0
2 00 0 0
```

20

To build the "th" tree, we have:

```
THREE    th r iy    15 12 8 0 0 0 0 0
0 00 15 12
1 00 12 8
2 11 3 0
3 00 0 0
```

To build the "w" tree, we have:

```
ONE    w ah n    18 2 10 0 0 0 0 0
0 00 18 12
1 00 12 10
2 11 1 0
3 00 0 0
```

To build the "z" tree, we have:

```
ZERO    z iy r ow    19 8 12 11 0 0 0 0
0 00 19 8
1 00 8 12
2 00 12 11
3 11 0 0
4 00 0 0
```

Once all of the branches have been built, the next stage is to concatenate the tree. It appears that four elements make a page, and each element is two bytes.

```
                                          page
ey:    00 5 14 11 8 0 00 0 0 00 0 0        5
f:     01 4 0 00 6 3 00 3 17 11 5 0        6
       00 6 11 00 11 12 11 4 0 00 0 0      7
n:     00 10 3 00 3 10 11 9 0 00 0 0       8
ow:    11 11 0 00 0 0 00 0 0 00 0 0        9
s:     01 6 0 00 13 4 00 4 17 00 17 7      10
       00 7 10 11 7 0 00 13 7 00 7 9       11
       00 9 13 11 6 0 00 0 0 00 0 0        12
t:     00 14 16 11 2 0 00 0 0 00 0 0       13
th:    00 15 12 00 12 8 11 3 0 00 0 0      14
w:     00 18 12 00 12 10 11 1 0 00 0 0     15
z:     00 19 8 00 8 12 00 12 11 11 0 0     16
```

Then, the start lookup header is defined. Each row (page) is 8 bytes and hence the header takes 3 rows. The end lookup header is two rows. Therefore, the lexical tree store proper starts at the 6th (#5) page.

```
sp   sil  ah  ay  eh  ey  f   ih      - MP
0    1    2   3   4   5   6   7        - MP_id
3    0    0   0   5   0   6   0        - data stored.
iy   k    n   ow  r   s   t   th
8    9    10  11  12  13  14  15
0    0    8   9   0   10  13  14
uw   v    w   z   .   .   .   .
16   17   18  19  .   .   .   .
0    0    15  16  0   0   0   0
```

The end_lookup header is defined. 20 is out of bounds.

```
ey   f   n   ow  s   t   th  w
5    6   10  11  13  14  15  18
z    .   .   .   .   .   .   .
19   20  20  20  20  20  20  20
```

IPR2023-00036
Apple EX1001 Page 39

Appx105

21

To put the above information all together:

| START | sp: ih | 3 0 | 0 0 | 5 0 | 6 0 | 0 |
|---|---|---|---|---|---|---|
| LOOKUP | iy: th | 0 0 | 8 9 | 0 10 | 13 14 | 1 |
| | uw: v | 0 0 | 15 16 | 0 0 | 0 0 | 2 |
| END | ey: w | 5 6 | 10 11 | 13 14 | 15 18 | 3 |
| LOOKUP | z | 19 20 | 20 20 | 20 20 | 20 20 | 4 |
| LEXICAL | ey: | 00 5 14 | 11 8 0 | 00 0 0 | 00 0 0 | 5 |
| TREE | f: | 01 4 0 | 00 6 3 | 00 3 17 | 11 5 0 | 6 |
| STORE | | 00 6 11 | 00 11 12 | 11 4 0 | 00 0 0 | 7 |
| | n: | 00 10 3 | 00 3 10 | 11 9 0 | 00 0 0 | 8 |
| | ow: | 11 11 0 | 00 0 0 | 00 0 0 | 00 0 0 | 9 |
| | s: | 01 6 0 | 00 13 4 | 00 4 17 | 00 17 7 | 10 |
| | | 00 7 10 | 11 7 0 | 00 13 7 | 00 7 9 | 11 |
| | | 00 9 13 | 11 6 0 | 00 0 0 | 00 0 0 | 12 |
| | t: | 00 14 16 | 11 2 0 | 00 0 0 | 00 0 0 | 13 |
| | th: | 00 15 12 | 00 12 8 | 11 3 0 | 00 0 0 | 14 |
| | w: | 00 18 12 | 00 12 10 | 11 1 0 | 00 0 0 | 15 |
| | z: | 00 19 8 | 00 8 12 | 00 12 11 | 11 0 0 | 16 |

| 3 0 | 0 0 | 5 0 | 6 0 |
|---|---|---|---|
| 0 0 | 8 9 | 0 10 | 13 14 |
| 0 0 | 15 16 | 0 0 | 0 0 |
| 5 6 | 10 11 | 13 14 | 15 18 |
| 19 20 | 20 20 | 20 20 | 20 20 |
| 00 5 14 | 11 8 0 | 00 0 0 | 00 0 0 |
| 01 4 0 | 00 6 3 | 00 3 17 | 11 5 0 |
| 00 6 11 | 00 11 12 | 11 4 0 | 00 0 0 |
| 00 10 3 | 00 3 10 | 11 9 0 | 00 0 0 |
| 11 11 0 | 00 0 0 | 00 0 0 | 00 0 0 |
| 01 6 0 | 00 13 4 | 00 4 17 | 00 17 7 |
| 00 7 10 | 11 7 0 | 00 13 7 | 00 7 9 |
| 00 9 13 | 11 6 0 | 00 0 0 | 00 0 0 |
| 00 14 16 | 11 2 0 | 00 0 0 | 00 0 0 |
| 00 15 12 | 00 12 8 | 11 3 0 | 00 0 0 |
| 00 18 12 | 00 12 10 | 11 1 0 | 00 0 0 |
| 00 19 8 | 00 8 12 | 00 12 11 | 11 0 0 |

This information is converted to hexidecimal. The first five are byte fields.

The rest are:

```
2 bit - uCode.
6 bit - data.
2 bit - null.
6 bit - data
```

| 03 00 | 00 00 | 05 00 | 06 00 |
|---|---|---|---|
| 00 00 | 08 09 | 00 0A | 0D 0E |
| 00 00 | 0F 10 | 00 00 | 00 00 |
| 05 06 | 0A 0B | 0D 0E | 0F 12 |
| 13 14 | 14 14 | 14 14 | 14 14 |
| 05 0E | C8 00 | 00 00 | 00 00 |
| 84 00 | 06 03 | 03 11 | C5 00 |
| 06 0B | 0B 0C | C4 00 | 00 00 |
| 0A 03 | 03 0A | C9 09 | 00 00 |
| CB 00 | 00 00 | 00 00 | 00 00 |
| 86 00 | 0D 04 | 04 11 | 11 07 |
| 07 0A | C7 00 | 0D 07 | 07 09 |
| 00 0D | C6 00 | 00 00 | 00 00 |
| 0E 10 | C2 00 | 00 00 | 00 00 |
| 0F 0C | 0C 08 | C3 00 | 00 00 |
| 12 0C | 0C 0A | C1 00 | 00 00 |
| 13 08 | 08 0C | 0C 0B | C0 00 |

The above is the micro code for the digit lexical tree. It allows branching, and it holds the word_id. It knows which lexical trees it contains and where they are housed. It also stores the possible end monophone list.

FIGS. 8A-8B show a further example of the Lexical Tree RAM, giving examples of different types of branching in the lexical tree, and how these are represented in the RAM.

FIG. 9 is a block diagram showing the data structure that is supported for the word link record, to enable word n-best decoding. The word engine maintains a record of the words that have been currently searched by the PINE array. It is used to determine the word history and allow trace back during or at the end of search. The word history is needed to determine the language model score and whether particular paths can be recombined or merged.

FIG. 10 shows a block diagram of the word engine. This is designed to allow fast access to the word history (thus allowing rapid phone creation at the phone level), and to allow reasonably fast trace back. The Word Engine is primarily a memory store that fills incrementally. The decoupling of the wordlat_node_id and the physical address will allow the possibility of being able to keep the WLRs for a given word in contiguous addresses, thus avoiding the need for the pointer field.

The language model interface is designed to allow the Phone Book to quickly obtain the appropriate LM factor for the phone model that it is currently constructing. Based on the phones in the wave front, all possible next LM factors can be determined. This will be done in software together with the language model factor engine. The ARM 9 will maintain its own record of the wavefront using the same next phone requests received by the wave front manager and its own copy of the lexical tree.

FIG. 11 shows the architecture of the LM interface. This allows the Phone book to quickly access the LM factor for the phone that is currently being generated. Prior to the phone generation phase LM_factors are computed for all possible phones that may be generated in the next frame.

The grammar engine is designed to give the Phone Book a quick response to requests for the next grammar node(s). In the case of a task grammar where the lexicon may be limited to a few words (e.g. yes, no), it may be desirable to use the same lexical tree. In this case it will be necessary for the grammar, to provide lexical tree pointers such that the phone generator can jump to the appropriate part of the lexical tree.

For a speech recognition system it is also necessary to specify the grammar. Again we will use HTK's Standard Lattice Format (SLF) to specify the grammar. In practice it will be convenient to use HTK's HParse format to specify the grammar using a high level grammar notation. This can then be converted into using the HParse tool. Consider having to specify a grammar for a digit recognition task. The HParse format for this is as follows:

$digit=one|two|three|four|five|six|seven|eight|nine|zero
$digit_sp=$digit sp
$noise=lipsmack|breath|sil
([sil]<$digit_sp|$noise>[sil])

where | denotes alternatives, < > denotes one or more repetitions, { } denotes zero or more repetitions, [ ] denotes that item is optional, and ( ) contains the grammar.

FIG. 12 shows the network that is defined by this grammar. The network starts and ends with a "sil" phone, representing silence. Between the start and end, a number of possible routes correspond to further silence, a breath, a lipsmack sound, or a detected word.

FIG. 13 shows the grammar engine architecture. When a next phone request arrives, the next grammar node(s) must be retrieved from memory. In the case of a task grammar, the phone book should be given the lexical tree memory addresses to allow the phone to be determined.

FIG. 14 shows a single frame of the Audio Codec (AC) link protocol used in some embodiments of the invention. The Advanced Audio CODEC Interface (AACI) is an ARM Primecell that provides an interface to off-chip AC97 audio codecs. AC97 is Intel's audio codec specification, initially created for the PC market. The AACI is an AMBA slave

IPR2023-00036

Apple EX1001 Page 40

23                                                    24

block that connects to the Advanced Peripheral bus (APB). The AACI connects to the off-chip codec using the AC-link protocol.

The AC-link protocol is a bi-directional, fixed clock rate, serial digital stream. AC-link handles multiple input and output PCM audio streams as well as register control accesses. It employs a time division multiplexed (TDM) scheme that divides each audio frame into 12 outgoing and 12 incoming data streams each with up to 20 bit sample resolution. The tag slots are used to indicate which of the subsequent slots contain valid data. Add and dat are the control register address and data slots for read and writes. The adc slots contain the outputs from the analog to digital converters. Assuming that the ADC sample rate is set to 16 kHz then the AC-link controller will receive 16 bits of data every third codec frame.

The AACI has 4 channels that can be operated simultaneously. They are accessed through DMA.

FIG. 15 shows the system timing. Each frame is divided into three sections:

Token update (MHD wash)

First pass—inter phone token passing

Second pass—garbage collection, max model pruning

The horizontal direction of the figure indicates elapsing time, and various subcircuits and processes are indicated along the vertical direction of the figure. The top part of the diagram shows frame count, and push to dictate button, and the lower part of the diagram shows various subcircuits and processes, within a single time frame, whilst the push to dictate button is engaged. These subcircuits and processes are language model interface, word engine, phone book, PINE array, MHD engine, mean & covar reg, and feature vector reg.

At the start of the time frame, the feature vector is generated, and the MHD values are calculated. The MHD values are then passed to the PINE array, which engages in beam pruning and token score updating. The phone book receives next phone requests and returns next phone responses. The word engine adds word link records, and the language model interface supplies language model factors.

In the second part of the frame, pruning thresholds are calculated for the PINE array, for the next frame, and the PINE array engages in token passing. The language model interface transfers language model factors for the next frame.

While the "push to dictate" button remains activated, the above process repeats in a sequence of frames.

The embodiments of the invention which are now described relate to a distance engine for calculation of Mahalanobis Distances.

FIG. 16 shows a block diagram of a speech recognition system according to an embodiment of the invention. The system includes a microphone 100, which outputs an audio signal to a combined AGC (automatic gain control) and ADC (analogue to digital converter) 101. In alternative embodiments, the AGC and ADC may be separate. In this embodiment, the incoming data comes from a microphone, and is then converted to digital format. However, it is also possible that the digital audio data may be received from a network, or may be read from storage means such as a memory, an optical disk, or a hard disk drive.

The digital audio data output from the ADC is input to an audio data buffer 102, and may be held here until required. The data is then output from the audio data buffer 102 to a front end circuit 103. The incoming audio data is divided into frames, as described above. In cases where the system is extremely busy, it is possible to drop some audio frames, to allow the system to catch up with any backlog.

In the audio front end circuit 103, the audio is split into spectral components to generate a feature vector, as described above. For example, the feature vector may have a number of frequency bands, and an energy band, plus their first and second derivatives. The feature vector is then output from the front end 103 to the distance calculation engine 104.

The distance calculation engine 104 converts feature vectors into Mahalanobis distances. The acoustic model may be chosen from a plurality of acoustic models, e.g. according to the language used, and may be stored in a storage means 105 such as a memory, a disk drive, etc. The distances calculated by the distance calculation engine are then transferred to the search stage 106 of the speech processing circuit, which uses models such as one or more word models and/or language models to generate and output recognised text. Such word and language models may be stored in a separate storage means 107.

In one embodiment, the distance calculation engine uses Mahalanobis Distance (MHD) calculations to determine distance values for output to the search stage 106. In further embodiments, different types of distance calculations may be used, e.g as described above.

In some embodiments of the invention, the distance calculation engine is designed as a speech accelerator, to operate as a loosely bound co-processor for a CPU running speech recognition software. This has the advantage of reducing computational load on the CPU, and reducing memory bandwidth load for the CPU.

In some embodiments, the accelerator interface is memory-mapped. Other types of interface are also possible to support different system configurations, for example removable accelerator cards with SDIO (secure digital input/output), CardBus, or USB interfaces.

The speech recognition apparatus may also operate with a CPU and DSP (digital signal processor), where the DSP implements the "front-end" signal processing to produce a feature vector, and the CPU implements the search stage, reading the distance results from the distance calculation engine.

The system may be implemented in any combination of hardware or software.

In some embodiments of the invention the search stage 106 provides the distance calculation engine 104 with an active state list 108 that indicates the subset of states for which the search stage requires distances to be calculated by the distance calculation engine 104. This is an optimization that may reduce computation time and/or power consumption.

In preferred embodiments of the invention, the front end 103, distance calculation engine 104 and the search stage 106 operate in a pipelined manner. When operating in a pipelined manner it is unlikely that the search stage 106 will be able to provide the active state list 108 early enough for the distance calculation engine 104 to implement the optimization of computing only the distances that will be required by the search stage 106. The distance calculation circuit 104 may calculate the MHD values for every state in the lexicon, per frame, whether it is subsequently required by the search stage or not. This allows the accelerator and software system to operate in a concurrent pipelined manner, which maximizes the system throughput.

The distance calculation engine 104 may have a plurality of memory areas for storing feature vectors, to allow a feature vector for one frame to be transferred to one memory

IPR2023-00036

Apple EX1001 Page 41

25

area in the distance calculation engine **104**, while another feature vector for another frame is being read from a second memory area, for calculation of a distance. The memory areas used for reading and writing may alternate with subsequent frames.

FIG. **17** shows a block diagram of a distance calculation accelerator **200**, used in an embodiment of the invention. A feature vector is received at input **212** of the accelerator **200**.

The feature vector is loaded into feature vector (FV) memory A **208** via a bus **211**. In reality, there may be more than a single bus, but for simplicity, only one bus **211** is shown in the figure.

The registers **203** are discussed further at the end of this description. The registers **203** may include, for example, an accelerator status register, for indicating whether the acoustic model data is correctly stored in memory, as described in more detail below.

The FV registers **209** hold the feature vector whose distances are currently bring computed by the distance calculation engine **204**. If the distance calculation engine **204** is implemented in software, the FV registers might be implemented as memory attached to the processor running the software. If the distance calculation engine **204** is implemented in hardware the FV registers might be implemented as logic or as a memory block. The FV registers **209** are loaded from the FV memory **208** when the Distance Calculation Engine **204** has completed distance calculations for the current feature vector and a subsequent feature vector is available in the FV memory **208**. In some embodiments there is an optional FIFO associated with FV registers **209** so that the FIFO is loaded from the FV memory **208** when there is a subsequent feature vector in the FV memory **208** and there is a space in the FIFO. In these embodiments the FV Registers **209** are loaded from the associated optional FIFO **209** when the Distance Calculation Engine **204** has completed calculations for the current feature vector and there is a subsequent feature vector in the associated optional FIFO **209**. The presence of the FIFO **209** provides for a looser coupling between the Front End **103** and the accelerator **200** which improves performance in some system configurations.

Each feature vector is transferred to a distance calculation engine circuit **204**, to obtain distances for each state of the acoustic model. The acoustic model is stored in an acoustic model memory **205**, which is connected to the bus **211**, for control of reading/writing to the memory. In some embodiments, this also allows acoustic models to be changed or updated via the bus. The acoustic model may be stored in compressed form in the acoustic model memory **205**. A decompressor **206** is provided on the data output of the acoustic model memory. The decompressor **206** can decompress the results as they are needed, and thus allows a much smaller size of acoustic memory to be used, than with uncompressed data. From the decompressor **206**, the decompressed acoustic model states are sent to the distance calculation engine **204**.

The distance calculation engine **204** converts feature vectors and acoustic model states to distances. The accelerator **200** includes two separate results memories for storing these calculated distances, labelled as "result memory A" **201** and "result memory B" **202**.

The control, sequencing, and address generation **210** is logic, state machines, and/or software programs that provide overall control of the other elements of the accelerator, taking inputs from the registers **203**, and all the other elements and interfaces to determine when to start and stop the Distance Calculation Engine **204**. The control **210** also

26

produces addresses and control signals to control the reading and writing of the memories **201**, **202**, **205** and **208**, to control the flow of data between the various elements of the accelerator **200**, the operation of the Decompressor **206**, CRC check **207** and Distance Calculation Engine **204**, and to control the setting or clearing or status bits in the Registers **203** and to control signalling to the front end **103** and search stage **106**. The control **210** is implemented using any of the widely known and used methods of controlling and sequencing in digital systems including logic gates, state machines, and embedded software systems. The control **210** might be a centralized control, or it might be distributed in some or all of the other elements of the accelerator **200**, or some combination of these.

Each time a feature vector is loaded into the accelerator, the accelerator computes the distances for all states for that feature vector, and stores the results alternately in the A or B Results Memory. The results are written to one of the two memories **201**, **202**, while the other memory is available for reading. Thus, while the distance calculation engine **204** is storing the distances calculated for one audio frame, the other result memory may make available the distances calculated for an earlier audio frame, to the search stage of the speech recognition system. For non-real time processing, "earlier" audio frame may refer to an audio frame that has been processed earlier, rather than being limited to an audio frame that corresponds to speech at an earlier time.

Thus, the search stage software reads results alternatively from the A or B result memory, while the accelerator writes results into the other result memory, allowing concurrent pipelined operation of the accelerator and the CPU [and the DSP if present].

In some implementations the A and B results memories may be exposed to the software interface as separate memories appearing at different locations in the CPU and/or DSP memory map. Another implementation is to map each memory alternatively to the same range of addresses in the CPU and/or DSP memory map, so that the software always accesses results at the same location, and the memory containing the set of results the software currently needs to access is the one mapped there.

The accelerator may autonomously load and decompress an acoustic model, which is stored in a compressed format in the acoustic model memory **205**. The Acoustic Model may be loaded into the Acoustic Model Memory by software running on the CPU prior to the first use of the Accelerator. The Acoustic Model Memory may be an on-chip memory, to maximize bandwidth and minimize power consumption of reading in the entire Acoustic Model every frame, which means 50 to 100 times per second, depending on the system design.

The Acoustic Model Memory may be a dedicated memory attached to, or incorporated within, the accelerator. Alternatively the Acoustic Model Memory may be a shared resource that is used by other system functions or applications when speech recognition is not running. To allow detection of situations where the acoustic model has been overwritten by another application, a pre-calculated CRC (cyclic redundancy check) signature may be stored with the acoustic model. Each time the acoustic model is read into the accelerator, a CRC may be computed and compared with the signature. If the comparison fails, an error bit is set in the accelerator status register.

Some embodiments of the invention relate to speech recognition systems comprising separate front end **103** and search stage **106** processors. These separate processors perform the front-end and search stages of the recognition

IPR2023-00036

Apple EX1001 Page 42

27                                                      28

process, with the accelerator **200** performing the distance calculations. Typically the front-end processing would be performed on a DSP and search stage would be performed on a CPU, although this description holds for any type of processors, even dedicated hardware implementations. As shown in FIG. **17**, the front end **103** supplies the distance accelerator with feature vectors, and the search stage **106** uses distances calculated by the accelerator.

The accelerator is designed to operate in a concurrent pipelined manner with the other processors, allowing a high level of parallelism in the system.

FIG. **18** shows how this pipelined operation works in an embodiment of the invention with ideal data flow, i.e. where each of the three recognition stages require exactly the same time to process each data frame, and the processors are never delayed, stalled, or diverted to other tasks.

The time axis is divided into equal "pipeline step times". If the step time is the same as a frame time then the system is processing audio in real time. If the step time is short than a frame time, the system is operating faster than real time, which may be valuable for batch processing of audio data, or catching up after some type of delay. If the step time is loner than a frame time, the system is operating slower than real time, which may be acceptable in some applications, for example where the person dictating pauses occasionally allowing the system to "catch up".

Once the pipeline has filled (which takes two step times), the DSP, the Accelerator, and the CPU are all operating in parallel. In this idealized example, the total time available for processing a frame is three step times—one step time in the DSP, one step time in the accelerator, and one step time in the search stage. There is a latency of three step times from the time the audio data enters the front end to the completion of the search stage for that frame, and the processing of one frame finishes each step time. If the system were not pipelined, then the processing of all stages for one frame would have to complete in one step time in order to achieve the same overall throughput of frames per second. Thus pipelining in this way can achieve three times the throughput with the same processing elements, compared to a non-pipelined system. A non-pipelined system would be one in which the processing of frame n+1 would not start until all stages of the processing of frame n was already complete.

If, for example, in a system running in real time with a frame time and step time of $\frac{1}{100}^{th}$ of a second, which is 10 ms, each of the three processing elements has the entire 10 ms available to complete the processing of one stage of the recognition task, giving 30 ms of processing time overall for each frame. If the system were not pipelined, real time operation would require that all three processing elements would be complete in 10 ms, allowing only 3.3 ms for each of the three processing elements.

At the end of each pipeline step time, the DSP provides a feature vector to the Accelerator, and the accelerator provides a set of distance results to the CPU. When the CPU is performing the search stage for frame n, the Accelerator is computing the distances for frame n+1, and the DSP is performing the front-end stage for frame n+2. During each pipeline step, the front end processing consumes one frame of digital audio data (although this is not indicated explicitly on the diagram).

Real world systems are more complex that the idealized system in many ways. The processing time for a frame is often highly variable and data dependent, especially in the search stage, and the processing time for each processing stage is likely to be quite different. The DSP and CPU are likely from time to time to be diverted to run other software tasks, either to service interrupts, or under control of an operating system scheduling regime. Communications between the processing elements may be stalled due to competing bus traffic, for example for DMA transfers.

Recognition software may implement "frame dropping" and other advanced techniques, and as a result not all frames are processed through all of the recognition stages.

Processing elements cannot respond instantly to the availability of data from the preceding processing stage, resulting in delays.

Finite buffer space for information storage between stages means that an earlier stage may be stalled waiting for a space to store its output data when following processing stages are "falling behind".

The accelerator has been carefully designed to mitigate these problems. FIG. **19** shows a pipelined system with real world complications added. The following text describes the interactions shown in the diagram. The time for the processing of various stages has been varied to show difference examples of buffering of data between stages and stalling of processing elements. The numbering corresponds to the numbered bubbles on the diagram. The text also makes reference to memories used to pass information into and out of the accelerator, which are shown in FIG. **17**.

The front end has computed the feature vector for the first frame, FV**1**. It is loaded into the accelerator, causing the accelerator to commence computation of the distances for the frame.

The feature vector for the second frame, FV**2**, is passed to the accelerator. The accelerator is still busy computing the distances for the first frame, so this feature vector is held in the accelerators FV memory.

The front end has computed the feature vector for the third frame, FV**3**, but it cannot be delivered to the accelerator as the FV memory is still full, holding FV**2**. The time period labelled "stall delivering FV**3**" is the period between FV**3** being computed and when it can first be delivered. Of course the DSP could be diverted to some other useful task, or it could buffer FV**3** in its own memory and commence computation of FV**4**.

The arrow labelled "FV**3** earliest" shows the earliest time that the feature vector FV**3** can be delivered to the accelerator, which is immediately after the accelerator loads FV**2** into its internal registers and frees the memory.

The arrow labelled "FV**3** latest" shows the latest time that the feature vector FV**3** can be delivered to the accelerator without causing the accelerator to stall for lack of a feature vector to work on. This example shows that there is a wide tolerance in the system to when FV**3** can be delivered without affecting system performance—an entire accelerator frame processing time. The accelerator provides an interrupt and a status bit that can be polled to indicate the state of the FV memory. Regardless of which control method the DSP uses, the system tolerates long latency without reducing performance.

The accelerator signals to the search stage that the distances for frame 1 are available in result memory A. The search stage commences processing for frame 1, reading distances from result memory A.

The search stage has finished its processing for frame 1 before the accelerator has completed computing the distances for frame 2, so the search stage stalls waiting for the accelerator. Of course the CPU could be diverted to other useful tasks, including any search stage tasks that can be completed before distances are available. Again, an interrupt

and status bits are provided by the accelerator to control this interaction between the accelerator and the CPU.

The accelerator completes the distance calculation for frame 2, and signals to the CPU that it can commence reading the distances from result memory B.

The accelerator has completed the computation of distances for frame 3 before the search stage has finished processing frame 2. As soon as the search stage signals to the accelerator that it has completed frame 2 by releasing memory B, the accelerator signals that the distances for frame 3 are available, allowing the search stage to immediately move on to processing stage 3.

The accelerator is stalled waiting for feature vector FV**4**, due to the long processing time in the front end. In real systems this may be caused by a number of factors, including the DSP being diverted to another task for a period of time, or simply due to the DSP performance being insufficient to keep up with the accelerator's throughput.

The accelerator restarts as soon as FV**4** is delivered by the front end.

The search stage is stalled waiting for distances for frame 4, a follow on consequence of the late delivery of FV**4** to the accelerator.

FV**5** is delivered to the accelerator while it is still computing the distances for the previous frame, allowing it to move onto processing frame 5 without stalling when it completes frame 4.

The accelerator signals that the distances for frame 4 are available and the search stage commences processing frame 4.

FV**6** is delivered to the accelerator while it is still computing the distances for frame 5.

The availability of distances for frame 5 is signalled by the accelerator to the CPU.

Even though the accelerator has already received FV**6**, it is stalled waiting for a free result memory it can write the distances into.

The search stage releases result memory B at the end of its processing of frame 4. This allows the accelerator to start computing distances for frame 6.

The accelerator completes computing distances for frame 6 and signals to the CPU that the results are ready.

Further embodiments of the invention relate to systems with a Front End and Search Stage on a single processor. This single processor performs the front-end and search stages of the recognition process, with the accelerator performing the distance calculations. This configuration is likely to be the most common configuration where the accelerator is added to an embedded system such as a PDA or mobile phone that has a high-performance embedded application processor (but no DSP) available to run speech recognition software.

In this configuration the accelerator still operates in a concurrent pipelined manner with the front-end and search stages; it is just that the front-end and search stages are running on a single processor.

CPUs in embedded systems are generally relatively simple compared to desktop PCs and servers. Embedded CPUs in mobile phones, PDAs, in-car navigation and telematics systems, and other consumer electronics devices are typically "simple uni-processors" by which we mean not multi-processors and not supporting hardware multi-threading support—i.e. they can only execute a single thread of instructions (although they can be diverted to a different thread under the control of interrupts, exceptions, or an operating system). For this discussion, except where explicitly stated otherwise, we are talking about embedded pro-

cessors that are "simple uni-processors". We are also using the term "CPU" and "processor" interchangeably.

FIG. **20** shows how the system can be pipelined with a single embedded processor working with the accelerator, in an idealized system. In this idealized system, the time taken for the processor to perform the front-end and search stage processing is identical to the time the accelerator takes to perform the distance calculations, and the processor is never delayed, stalled, or diverted to other tasks.

The time axis is divided into equal "pipeline step" times. If the step time is the same as a frame time then the system is processing audio in real time. If the step time is short than a frame time, the system is operating faster than real time, which may be valuable for batch processing of audio data, or catching up after some type of delay. If the step time is loner than a frame time, the system is operating slower than real time, which may be acceptable in some applications, for example where the person dictating pauses occasionally allowing the system to "catch up".

The first two pipeline step times are used to fill the pipeline. By the third pipeline step time, the pipeline is full, and all three stages of the recognition process are processed every pipeline step time, with each stage working on the processing of a different data frame.

During the first pipeline step time, the CPU completes the front-end processing for frame 1, and the feature vector passed to the accelerator so that distance calculations can start in the accelerator.

During the second pipeline step time, the front-end processing for frame 2 is completed by the CPU, in parallel with the accelerator computing the distances for frame 1.

During the third pipeline step time, the CPU runs the search stage for frame 1 reading distance results from the accelerator, and then runs the front-end processing for frame 3. The accelerator runs in parallel computing the distances for frame 2 using the feature vectors computed in the previous pipeline step.

Each subsequent pipeline step time is similar to the third pipeline step, with the frame numbers incremented. So for pipeline step n=4, 5, 6, etc. the CPU runs the search stage for frame n−2 and then runs the front-end for frame n. In parallel the accelerator computes the distances for frame n−1.

Note that with this situation the production of feature vectors and the consumptions of results run in lock step— one feature vector is produced every time the search stage consumes one frame of distance results. This considerably reduces the need for elastic buffering between the distance accelerator and the software system.

Again, real world systems are more complex than the idealized system in many ways. For example, the processing time for a frame is often highly variable and data dependent, especially in the search stage, and the processing time for each processing stage is likely to be quite different. The CPU is likely from time to time to be diverted to run other software tasks, either to service interrupts, or under control of an operating system scheduling regime. Communications between the CPU and accelerator may be stalled due to competing bus traffic, for example for DMA transfers.

Recognition software may implement "frame dropping" and other advanced techniques, and as a result not all frames are processed through all of the recognition stages.

Processing elements cannot respond instantly to the availability of data from the preceding processing stage, resulting in delays.

IPR2023-00036

Apple EX1001 Page 44

US 10,839,789 B2

31

Finite buffer space for information storage between stages means that an earlier stage may be stalled waiting for a space to store its output data when following processing stages are "falling behind".

The accelerator has been carefully designed to mitigate these problems. FIG. 21 shows a pipelined system with real world complications added. The following text describes the interactions shown in the diagram. The time for the processing of various stages has been varied to show difference examples of buffering of data between stages and stalling of processing elements. The numbering corresponds to the numbered bubbles on the diagram. The text also makes reference to memories used to pass information into and out of the accelerator, which are shown in FIG. 21.

At the end of front-end processing for frame 1, the CPU passes the feature vectors for frame 1 to the accelerator, allowing distance calculations to start.

To fill the pipeline, the CPU immediately performs the front-end processing for frame 2 and passes the feature vectors to the accelerator. They are stored in the accelerator so that the accelerator can load them into its internal engine for processing as soon as the distance calculations for frame 1 are complete.

The CPU is now ready to start the search stage for frame 1, however the distance computation in the accelerator has not completed. The box labeled "Prep search stage 1" indicates a period where the CPU could do any preparatory search stage processing that does not require distances. Alternatively the CPU could be diverted to another task, or it can stall waiting for the distance results.

The accelerator signals that the distance results for frame 1 are now available. The search stage can commence on the CPU, reading distance results from the accelerator's Result Memory A. The accelerator automatically starts processing the feature vector for frame 2 that was delivered earlier.

The accelerator signals to the CPU that it has completed the distance calculations for frame 2. The CPU is still busy running the search stage for frame 1, and has still to run the front end for frame 3, so the completion signal is ignored until the CPU has need of it, when it starts running the search stage for frame 2. As the accelerator has not received the feature vector for frame 3, it has no task it can perform and so it stalls.

The CPU delivers the feature vector for frame 3, restarting the accelerator, which writes results into Result Memory A. Note that Result Memory A was previously "released" at the end of the processing of search stage 1, informing the accelerator that it can overwrite the old results held in that memory with new results. The CPU then runs the search stage for frame 2, reading distance results from the accelerator's Result Memory B.

The accelerator signals to the CPU that the distance results for frame 3 are complete in Result Memory A. Again, the CPU ignores this signal until it is ready to commence the search stage for frame 3, and the accelerator stalls waiting for the next feature vector.

The CPU delivers the feature vector for frame 4, restarting the accelerator. It them starts search stage 3 reading distances from the accelerator's result memory A.

Search stage 3 and front end 5 were completed quickly, so that the feature vector for frame 5 is delivered to the accelerator while it is still running. The CPU performs all the preparatory work it can for the search stage, and then stalls waiting for distances to be available.

The accelerator signals that the distances for frame 4 are available. The CPU starts search stage 4, reading the distances from the accelerator's result memory B. The accel-

32

erator automatically starts computing distances for frame 5 using the feature vector delivered earlier.

Note that with the pipelining scheme just presented which alternates front-end and search stage processing, the accelerator can never stall waiting for a result memory to be released because the feature vector the accelerator needs as an input is not produced until after the memory has been cleared. The CPU task schedule could be described with the shorthand F1 F2 S1 F3 S2 F4 S3 F5 S4.

It can seen readily from FIG. 21 and the accompanying description above, that with this CPU task schedule, that the operation of the CPU and accelerator are tightly coupled and whenever the processing time for a pipeline step on the CPU is unequal to the processing time on the accelerator, then it quickly results in one of them stalling.

In a system where either the CPU or the accelerator is always (or at least in most instances) slower than the other in completing its processing task, stalling is inevitable and throughput may not be improved by adding additional buffering (e.g. additional result memories or FIFO depth on the feature vector interface). [Unless there are other difficulties to mitigate such as very low-bandwidth buses linking the CPU to the accelerator, or competing bus traffic such as DMA transfers that can significantly reduce performance.]

If the processing time for a pipeline step is highly variable on either the CPU or Accelerator, such that there are regular changes in which one of them takes the longer time, then significant enhancements in throughput may be obtained by adding additional buffering between them. This may have the disadvantage of adding additional latency through the system. This buffering may be implemented by adding additional depth to the Feature Vector FIFO, and/or adding additional Result Memories. Alternatively it may be by implementing elastic buffers in software.

If the accelerator has sufficient buffering on the feature vector interface, e.g. by including the optional FIFO shown in FIG. 21, then increasing the pipeline depth by computing extra front end frames up front will improve throughput at a cost of extra latency. This will result in a CPU task schedule of F1 F2 F3 S1 F4 S2 F5 S3 F6 S4 or F1 F2 F3 F4 S1 F5 S2 F6 S3 F7 S4, etc.

Of course it would also be possible to dynamically schedule whether the CPU should run the front-end or search stage code based on the availability, or not, of distance results and/or the space available to store more feature vectors and distance results. Given the fundamental relationship that one set of distance results is produced by the accelerator for every feature vector it consumes, and the restriction stated at the start of this section that we are discussing single-threaded CPUs, dynamic scheduling is likely to add little performance improvement while being complex to implement.

On a CPU supporting multi-threaded operation (which is a technique for improving performance in the presence of high memory system latency), or on a multi-processor, the highest system performance is likely to be achieved by running the front-end and search stages concurrently as separate threads, rather than alternating between the front-end and search stages. The system operation is then very similar to that described above, if each thread is thought of as a separate virtual processor. In some embodiments of the invention, elastic buffers may be used between stages, to accommodate varying time delays between the processing of frames at each stage. Elastic buffers in the interfaces between the three recognition stages may also significantly enhance performance of such a system.

IPR2023-00036
Apple EX1001 Page 45

Appx111

33

Operation of the accelerator and the software system is not constrained to a rigid repetitive frame time. Instead the timing of the system is controlled dynamically by the availability of feature vectors into the accelerator, and the consumption of results out of the accelerator.

This allows the recognition process to fall behind real-time operation and to "catch up" again. It also allows the system to be robust in complex systems where interrupts, DMA bus traffic, memory caches, operating system task switching, and competing real-time software tasks all make guaranteeing rigid timing constraints impractical.

Elastic buffers at the major data transfer points between processing elements maximize system performance by allowing one element to continue useful processing whenever it can, regardless of whether other processing elements have been stalled or diverted to other tasks. Elastic buffers are useful for the following applications:

(1) For buffering raw audio data arriving in real time from the microphone(s) The data would typically be moved into the buffer by a DMA and/or high priority interrupt driven software process to ensure that hard real time constraints are met.

(2) For buffering feature vectors output from the front end. This is especially true if the front-end is implemented on a DSP or other processing element independent of the search stage.

(3) For buffering distance results from the accelerator. Again this is especially true if the front-end and search stages are implemented on independent processing elements. This buffering is also especially valuable if the interface between the search stage processor and the accelerator is very slow, has high latency, or is subject to competing bus traffic.

The Feature Vector and Results interfaces on the accelerator already provide a level of elasticity that should be sufficient in systems where the Front End and Search stages are running on the same CPU, and the accelerator has a high-bandwidth interface to the CPU with low level of competition from other bus traffic such as DMA.

Other embodiments may have deeper FIFOs. In one embodiment, the two result memories are an implementation of a FIFO where the implementation is exposed across the interface. It would be possible to have additional memories and use them in a round-robin fashion, or to use another implementation of a FIFO that hides the FIFO depth by only exposing one result memory at a time to the interface. An example of this would be to map each memory in turn to a memory range that is always used to read results, so that at any one time the "current" result memory is mapped to that location. This would hide the FIFO depth behind the interface so that the pipeline depth can be changed without changing the software (or hardware) that accesses the interface.

Slow or Conflicted Bus Interfaces may occur. In the system configurations described above, the search stage reads distances directly from the Accelerator's Result Memories. The result memories allow the search stage to randomly access the distance results, as they are needed. This will only give a high performance system if the interface or bus between the CPU and Accelerator provides the CPU with low latency, high bandwidth access to the Accelerator Result Memories.

In some systems it is not practical to provide such a low latency, high bandwidth interface between the CPU and the Accelerator. This may be for many reasons, including:

The interface is a bus shared with other devices and/or processors that generate bus traffic that keeps the bus

34

busy such that the CPU access to the accelerator is delayed waiting for the bus to be free. DMA transfers are one example of conflicting bus traffic.

The interface is implemented as a serial bus, or narrow parallel bus, for cost or compatibility reasons, yielding low bandwidth and high latency

The interface crosses an industry standard interface such as PCI, USB, SDIO, Cardbus, Firewire, PCIExpress etc. that introduces protocol overheads and/or latency as would be the case where the accelerator is in a plug-in peripheral to a system containing a CPU (or CPU and DSP).

In these situations it is possible to add another pipeline stage during which the result data is copied from the Accelerator into another memory (which we will call a "buffer memory") to which the CPU does have high bandwidth, low latency access. This copying can be performed by a DMA controller, or by software running as an interrupt handler, or a separate software thread on the CPU, or a software thread on another processor, or by other commonly known means. The device controlling the transfer may be on the CPU side of the interface or on the accelerator side of the interface, depending on the capabilities of the interface. This extra pipeline stage then allows an entire pipeline step time to copy the data from the accelerator to the other memory. The data copy can optionally be performed as a sequential burst, or a number of sequential bursts, to optimize transfers across the interface between the Accelerator and the buffer memory. The search stage, running on the CPU, can then randomly access the results in the buffer memory with low latency.

Similarly an extra pipeline stage can be added for transferring the Feature Vectors to the Accelerator, although given that the feature vectors are a much smaller object than the distance results, and that they are not accessed randomly across the interface but delivered once to the Accelerator for each frame, there are fewer situations where the performance benefit from this extra pipeline stage is as significant.

FIGS. 22 and 23 show idealized systems with the two extra pipeline stages for transfers added. The first shows a system with a CPU, DSP, and Accelerator with the two extra pipeline stages. The second shows a system with a CPU and DSP with the two pipeline stages added.

Other embodiments may add additional pipeline stages so that the distance computations are performed over two or more pipeline stages rather than being restricted to a single pipeline stage. This allows more time for the computation of the distance results for each frame, while maintaining the same throughput of distance results. This is similar in concept to the well-known pipelining techniques used to implement RISC microprocessors.

The Acoustic Models may occupy many megabytes of storage space. In embedded systems they will typically held in a non-volatile memory such as FLASH memory, or other types of non-volatile memory as is the appropriate currently economic technology. The Accelerator may read the acoustic model directly from the non-volatile memory, or more likely the acoustic model will be copied from the non-volatile memory into a higher bandwidth RAM memory of some type (e.g. SRAM or DRAM, SDRAM, etc.). The RAM memory may be part of the same integrated circuit as the Accelerator (i.e. "on chip"), or attached to the integrated circuit containing the Accelerator. ("off chip"). The having the RAM memory on-chip is particularly advantageous, as this configuration would give the lowest power consumption and highest bandwidth. An alternative solution would be for the acoustic model to be stored on a disk drive, or an another

US 10,839,789 B2

35
36

device accessible via a wired or wireless bus or network, and for the acoustic model to be loaded into the RAM memory from the disk drive, or over the wired or wireless bus or network.

On-chip RAM memory is however likely to come at a cost-premium to off-chip commodity memory devices. Many embedded systems face extreme cost pressures in the market place, especially high volume devices supplied by many manufacturers such as mobile phones. For a speech recognizer to be incorporated into such systems, the overall recognizer solution much be delivered at very low cost. There is therefore a significant economic benefit from reducing the cost of the RAM memory and the non-volatile memory. One way to reduce the cost of these memories is to compress the acoustic models and store the compressed model in the memory.

The Accelerator computes all of the distances associated with each Feature Vector that is delivered to it by the front end. This means that the accelerator must use the data from the entire Acoustic Model each time a new Feature Vector is presented to the Accelerator (with the exception of some specific optimizations that may determine that some data values need not be used in the distance computations). It is therefore possible to arrange for the accelerator to read through the acoustic data sequentially once for each Feature Vector, using each data value as it read from the Acoustic Model.

Reading through the entire Acoustic Model sequentially is ideally suited to placing a decompressor between the distance calculation engine and the RAM memory, because many compression schemes depend on the decompressor reading sequentially through the compressed data, and do not readily support random access into the compressed data.

Thus this configuration allows storing compressed data in the RAM memory (and the non-volatile memory), which can therefore be smaller and lower cost. There is no requirement for a memory that is large enough to hold the entire decompressed acoustic model, as the decompressed data is consumed as it is decompressed.

The decompression scheme could be any combination of:
sign or zero extension or otherwise conversion of narrow or variable width data to a wider data format.
sign or zero extension or otherwise conversion of narrow or variable width data to IEEE standard single or double precision floating point format
codebook decompression of a binary bitstream, where the codebook is stored as part of the acoustic model data
decompression of a Huffman or Lempel-Ziv compressed stream
decompression of run length encoded data
decompression of difference encoded data
any well known compression scheme.

Additionally the model size can be reduced by using subspace distribution clustering and the decompressor and distance calculation engine designed to operate with such models.

The following description provides further information on the visible registers in some embodiments of the invention.

The register bank is designed to allow simple connection with an 8-bit data bus. Accesses to the register bank should be made with byte-read and byte-write accesses. To facilitate this, only the least significant 8 bits of the data bus are used.

The address decoder should respond to byte accesses to byte 0 or byte 3 within the designated word. This way the same code can be used on an ARM processor regardless of whether the processor is configured for little endian or big endian operation.

REGBASE=Base address of register bank
Register 0 Product Version
8-bit Product Version ID
This register value is changed when the functionality of the hardware charges in a way that changes the hardware/software interface.
Address=REGBASE (and REGBASE+3 for big endian)
Read only. Reads with value 0x01
Writes ignored
Register 1 Implementation Version
8-bit Implementation Version ID
This register value is changed for each implementation to facilitate bug tracking and version control.
Address=REGBASE+4 (and REGBASE+4+3 for big endian)
Read only. Reads with value 0x01
Writes ignored
Register 2 Interrupt Enable
8-Bit Interrupt Enable register
Address=REGBASE+4*2 (and REGBASE+4*2+3 for big endian)
Readable and writeable.
Value following reset is 0 for bits 0, 1, 2, 3
Bit 0 I 1=Enable FV memory empty interrupt on Int0 output.
Bit 1 J 1=Enable Results complete interrupt on Int0 output.
Bit 2 K 1=Enable FV memory empty interrupt on Intl output.
Bit 3 L 1=Enable Results complete interrupt on Intl output.
Bit 4 Future use. Read value is not defined. Writes ignored.
Bit 5 Future use. Read value is not defined. Writes ignored.
Bit 6 Future use. Read value is not defined. Writes ignored.
Bit 7 Future use. Read value is not defined. Writes ignored.
Software should use a read-modify-write code sequence when setting this register so that future use bits are written with the value read from them.
Register 3 Status
Address=REGBASE+4*3 (and REGBASE+4*3+3 for big endian)
Read-only register. Writes are ignored.
Value following reset is 0 for bits 0, 1, 2, 3
Bit 0 FVMB Feature Vector Memory is Busy
0=OK to write new value to FV memory (FV memory is empty)
1=Don't write new value to FV memory (FV memory is busy)
Bit 1 CRM Current Result Memory
0=Result memory A
1=Result memory B
This bit toggles every time the Release Result Memory (RRM) command is issued to the accelerator (register 3). It indicates which memory software should read results from, and which result memory the RRM command should release next time it is issued. Note: Software should also check that results are available in the indicated result memory by checking the value of the MA and MB bits.
Bit 2 MA 1=Results are Available is Result Memory A
The MA bit is set to 1 when the compute engine completes writing all of the distances for a frame into result memory A. This value is set to zero when the Release Result Memory command is issued and CRM-0.

IPR2023-00036
Apple EX1001 Page 47

Bit **3** MB 1=Results are available is result memory B

The MB bit is set to 1 when the compute engine completes writing all of the distances for a frame into result memory B. This value is set to zero when the Release Result Memory command is issued and CRM==1.

Bit **4** Dfault 1=Accoustic data CRC fault. Indicates that the CRC value at the end of the acoustic data did not match the CRC value computed while the acoustic data was read in.

Bit **5** Future use. Value undefined.

Bit **6** Future use. Value undefined.

Bit **7** Future use. Value undefined.

Register 4 COMMAND

Address=REGBASE+4*4 (and REGBASE+4*4+3 for big endian)

Write-only register.

Software should perform byte writes to this register with a single bit set to 1 and all other bits set to zero to issue a command to the accelerator.

Behaviour is not defined if more than one command is issued within a single write (i.e. if more than 1 bit is a 1).

Value on read is not defined.

Bit **0** LFV Load Feature Vector from the FV memory.

Tells the accelerator that a new feature vector has been placed into FV memory ready for use by the accelerator. The FV will be loaded into the compute engine when the compute engine completes its current task (or immediately if the compute engine is idle). Computation of distances for this FV will commence when the FV is loaded AND there is a released result memory. (At reset, both result memories are released). The results for the first, third, fifth etc. feature vectors loaded are written to Result Memory A. The results for the second, fourth, sixth etc. feature vectors loaded are written to Result Memory B.

Bit **1** RRM Release Result memory. Indicates that the results in the current result memory can now be overwritten with new results. The current result memory is indicated by the CRM bit in the status register.

Bit **2** CFVI Clear the FV memory empty interrupt

Bit **3** CRI Clear the Results Complete interrupt

Bit **4** Future use—write 0

Bit **5** Future use—write 0

Bit **6** Future use—write 0

Bit **7** Future use—write 0

The present invention may be included in a mobile phone, or in another consumer electronics device, a PC, Laptop or tablet PC, in-car electronics system, or plug-in card for an electronic device.

The methods and apparatus according to the invention are not limited to embedded mobile systems, but may be used with any type of computing device, including PCs, workstations, laptop computers, notebook computers, handheld computing devices, dictation machines, PDAs (personal digital assistants), personal organisers, mobile phones, games consoles, video players, etc. Embedded computers according to the present invention may be embedded in a wide range of apparatus and machinery, such as electronic entertainment products, domestic appliances, factory machinery, vehicles, etc.

Embodiments of the present invention may be implemented as an IP core in a System on Chip (SOC) or a discrete device. Multiple chips or bare die may be connected to provide a larger vocabulary system.

Although the apparatus may include all or some of an input for accepting audio input, a circuit for digitising the audio input, a circuit for dividing the audio input into a plurality of time-frames, and a circuit for analysing the spectral components of each time frame to characterise the audio in that frame, this is not essential. The apparatus may also include a circuit for calculating a score indicating the probability or likelihood that each audio frame corresponds to each of a plurality of different possible states, but again, this is not essential. Instead, the apparatus may include an input for receiving the pre-calculated scores.

In the described embodiments, n-gram language models are used. For example, the Bigram language model is based on outputting the probability that a given second word directly follows a given first word. However, it is possible to use alternative language models instead. It is possible to use a mixture of different models. For example, it is possible to run a word-dependent n-best decode applying a bigram language model, and the resulting word link record or word graph could then be rescored using a trigram language model.

The Viterbi beam search algorithm may be used in embodiments of the invention, to perform the search. A word level search may be performed. Dummy states may be used for the start and end of an utterance

The grammar level model may be used to add distance elements into the likelihood calculation. This is not essential, but tends to give much better results.

The HMM models described in the embodiments comprise self connections to each states and single connections to a neighbouring state. However, the present invention is not limited to such HMM models, and for example, HMM models with additional connections between states may also be used. Alternatively, embodiments of the invention may use alternative types of acoustic models, rather than HMM models.

The system may comprise a plurality of language models (e.g. English, French), A model of words may comprise actual words, phrases, silence, lipsmack sounds, and/or other sounds for recognition by the apparatus.

As previously discussed, the phone level has been found to be the best level for lexical tree searching, rather than the state level or the word level. However, this invention is not limited solely to phone level searching.

Pipelining may comprises processing data in different parts of a circuit at the same time, i.e. parallel processing.

In the following claims, the calculation means may comprise the distance calculation engine described above.

Further embodiments of the invention include the methods carried out in the accelerator, and the methods carried out in the speech recognition circuit.

While the invention has been described in terms of what are at present its preferred embodiments, it will be apparent to those skilled in the art that various changes can be made to the preferred embodiments without departing from the scope of the invention, which is defined by the claims.

What is claimed is:

1. An acoustic coprocessor for processing data associated with an audio signal, comprising:

a first interface for receiving at least one feature vector, wherein the feature vector is determined from the audio signal;

an acoustic model memory for storing an acoustic model defining a plurality of acoustic states;

a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and respective acoustic states of the acoustic model read from the acoustic model memory; and

a second interface for sending at least one distance calculated by the calculating apparatus;

IPR2023-00036

Apple EX1001 Page 48

**39**

wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit.

**2**. The acoustic coprocessor of claim **1**, wherein the acoustic model contains Gaussian parameters and the distances are probabilities.

**3**. The acoustic coprocessor of claim **2**, wherein the acoustic model memory is a FLASH memory.

**4**. The acoustic coprocessor of claim **2**, wherein the second interface for sending distances is a serial bus.

**5**. The acoustic coprocessor of claim **4**, wherein at least one of the distances sent over the serial bus is a Mahalanobis Distance.

**6**. The acoustic coprocessor of claim **4**, wherein the acoustic coprocessor, in response to receiving a feature vector, autonomously calculates the distance for an associated acoustic state of the acoustic model.

**7**. The acoustic coprocessor of claim **6**, further comprising a result memory, wherein the distance for an associated acoustic state of the acoustic model is stored in the result memory.

**8**. The acoustic coprocessor of claim **7**, wherein the result memory is configured so that distances calculated from a first feature vector are sent over the second interface for sending while at least one distance calculated from a second feature vector is being stored in the one or more result memories.

**9**. A speech recognition system comprising the acoustic coprocessor of claim **7**, the speech recognition system further comprising at least one CPU, wherein:

the CPU executes software to perform or initiate a speech recognition word search using the distances calculated by the acoustic coprocessor in response to receiving the first feature vector, and

a time period for the speech recognition word search overlaps a time period for the acoustic coprocessor to calculate the distance in response to receiving the second feature vector.

**10**. An acoustic coprocessor, comprising:

a first interface for receiving at least one feature vector;

a calculating apparatus for calculating distances indicating a similarity between the at least one feature vector and at least one acoustic state of an acoustic model read from an acoustic model memory; and

a second interface for sending at least one distance calculated by the calculating apparatus.

**11**. The acoustic coprocessor of claim **10**, wherein the calculating apparatus and the acoustic model memory are fabricated on a single integrated circuit.

**12**. The acoustic coprocessor of claim **10**, wherein the acoustic model contains Gaussian parameters and the distances are probabilities.

**13**. The acoustic coprocessor of claim **10**, wherein the acoustic model memory is a FLASH memory.

**14**. The acoustic coprocessor of claim **10**, wherein the second interface for sending distances is a serial bus.

**15**. The acoustic coprocessor of claim **10**, wherein the distances are Mahalanobis Distances.

**16**. A speech recognition system comprising the acoustic coprocessor of claim **10**, the speech recognition system further comprising at least one CPU, wherein:

the CPU executes software to perform or initiate a speech recognition word search using one or more distances calculated by the acoustic coprocessor in response to receiving a first feature vector, and

a time period for the speech recognition word search overlaps with a time period for the acoustic coprocessor

**40**

to calculate one or more distances in response to receiving a second feature vector.

**17**. The acoustic coprocessor of claim **10**, wherein the acoustic coprocessor is capable of, in response to receiving a feature vector, autonomously calculating the distances for each acoustic state of the acoustic model.

**18**. The acoustic coprocessor of claim **17**, further comprising one or more result memories configured to store the distances for each acoustic state of the acoustic model.

**19**. The acoustic coprocessor of claim **18**, wherein the one or more result memories are configured so that a distance calculated from a first feature vector are sent over the first interface while a distance calculated from a second feature vector is being stored in the one or more result memories.

**20**. The acoustic coprocessor of claim **18**, wherein the calculating apparatus is capable of computing distances using acoustic models representing Gaussian probability distributions.

**21**. The acoustic coprocessor of claim **20**, wherein the acoustic model uses a neural network to calculate at least one of the distances.

**22**. The acoustic coprocessor of claim **21**, wherein the acoustic coprocessor is capable of generating an interrupt in response to a completion of calculation of a set of distances.

**23**. The acoustic coprocessor of claim **22**, wherein the acoustic model memory includes a plurality of storage locations within a static random access memory (SRAM).

**24**. The acoustic coprocessor of claim **23**, wherein the SRAM and the calculating apparatus are fabricated on a single integrated circuit.

**25**. The acoustic coprocessor of claim **22**, further comprising a status register, wherein the acoustic coprocessor is capable of setting one or more bits in the status register to values that indicate the completion of calculation of the set of distances.

**26**. The acoustic coprocessor of claim **25**, wherein the acoustic coprocessor further comprises a direct memory access (DMA) controller capable of copying distances from the one or more result memories to a buffer memory.

**27**. The acoustic coprocessor of claim **26**, wherein the DMA controller is capable of copying distances in a plurality of sequential bursts.

**28**. A speech recognition system comprising the acoustic coprocessor of claim **26**, wherein:

the speech recognition system further comprises at least one processor configured to execute software to perform or initiate a speech recognition word search using one or more distances calculated by the acoustic coprocessor in response to receiving a first feature vector, and

a time period for the speech recognition word search overlaps with a time period for the acoustic coprocessor to calculate one or more distances in response to receiving a second feature vector.

**29**. The speech recognition system of claim **28**, wherein the acoustic coprocessor and the at least one processor are fabricated on a single integrated circuit.

**30**. The acoustic coprocessor of claim **26**, wherein the acoustic coprocessor further comprises a decompressor configured to decompress the acoustic model and send the decompressed acoustic model to the calculating apparatus.

**31**. The acoustic coprocessor of claim **26**, wherein the acoustic coprocessor is capable of setting one or more bits in the status register to values that represent an error condition when a check code stored with the acoustic model fails to match a check code computed from data read from the acoustic model memory.

IPR2023-00036
Apple EX1001 Page 49

**41**

**32**. The acoustic coprocessor of claim **26**, wherein the second interface an industry standard interface.

**33**. The acoustic coprocessor of claim **26**, wherein the acoustic model includes parameters represented with fixed point data.

**34**. The acoustic coprocessor of claim **26**, wherein the acoustic model includes parameters represented with floating-point data.

**35**. The acoustic coprocessor of claim **26**, wherein the acoustic model includes parameters represented with integer data.

**36**. The acoustic coprocessor of claim **33** wherein data read from the acoustic model memory is decompressed by sign or zero extension or other conversion of data of narrow or variable width to a wider data format.

**37**. A speech recognition system comprising the acoustic coprocessor of claim **27**, the speech recognition system further comprising at least one microphone.

**42**

**38**. A speech recognition system comprising the acoustic coprocessor of claim **27**, the speech recognition system further comprising a plurality of microphones.

**39**. The speech recognition system of claim **38**, further comprising the buffer memory.

**40**. The speech recognition system of claim **39**, further comprising a push-to-dictate button.

**41**. A vehicle comprising the speech recognition system of claim **39**.

**42**. A laptop or tablet personal computer comprising the speech recognition system of claim **39**.

**43**. A mobile phone comprising the speech recognition system of claim **39**.

**44**. An electronic entertainment product comprising the speech recognition system of claim **39**.

**45**. An appliance comprising the speech recognition system of claim **39**.

\* \* \* \* \*

IPR2023-00036
Apple EX1001 Page 50

# CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 9,529 words, excluding the parts of the filing exempted by the Rules.

Dated: January 23, 2025

/s/ Brian R. Matsui
Brian R. Matsui

ny-2830324